ORIGINAL
FILED

08 SEP -9 PM 3:43

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   Jonathan K. Levine (State Bar No. 220289)
      jkl@girardgibbs.com
2   Aaron M. Sheanin (State Bar No. 214472)
      ams@girardgibbs.com
3   **GIRARD GIBBS LLP**
    601 California Street, 14th Floor
4   San Francisco, California  94108
    Telephone:  (415) 981-4800
5   Facsimile:  (415) 981-4846

6
    Ralph M. Stone
7     rstone@lawssb.com
    Thomas G. Ciarlone, Jr.
8     tciarlone@lawssb.com
9   **SHALOV STONE BONNER & ROCCO LLP**
    485 Seventh Avenue, Suite 1000
10  New York, New York 10018
    Telephone: (212) 239-4340
11  Facsimile: (212) 239-4310

12  Counsel for Individual and Representative Plaintiff Lisa Miller

13

14

15                  **UNITED STATES DISTRICT COURT**

16                 **NORTHERN DISTRICT OF CALIFORNIA**

17  LISA MILLER, on behalf of herself and all )   Civil Action No._____ 1280
18  others similarly situated,                 )
                                               )
19                  Plaintiffs,                )   **CLASS ACTION COMPLAINT FOR**
                                               )   **VIOLATIONS OF THE FEDERAL SECURITIES**
20           v.                                )   **LAWS**
                                               )
21  NVIDIA CORP.; JEN-HSUN HUNAG; and )
    MARVIN BURKETT                             )   **JURY TRIAL DEMANDED**
22                                             )
                    Defendants.                )
23                                             )
                                               )
24  _____ )

25

26

27

28

_____
                      CLASS ACTION COMPLAINT

1.    Plaintiff, Lisa Miller ("Plaintiff"), alleges the following as her Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased or otherwise acquired the common stock of NVIDIA Corp. ("NVIDIA" or the "Company"), between November 8, 2007, and July 2, 2008, inclusive (the "Class Period").

2.    The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and her counsel, which are made upon personal knowledge. Plaintiff's information and belief are based, among other things, on investigations made by and through her attorneys. Such investigations have included, but have not been limited to, the review and analysis of: (a) filings made by NVIDIA with the United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to NVIDIA and the allegations contained herein; and (d) other matters of public record.

## I.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

4.    This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.    In furtherance of and in connection with the acts alleged herein, Defendants (as defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of the NASDAQ, a national securities exchange.

## II.

## PARTIES

### *The Plaintiff*

7.    Plaintiff purchased the Company's common stock during the Class Period, as set forth in her attached Certification, and was damaged thereby.

*The Defendants*

8.      Defendant NVIDIA is a corporation organized under the laws of Delaware.  NVIDIA maintains its principal place of business in this District, at 2701 San Tomas Expressway, in Santa Clara, California.  Its common stock trades on the NASDAQ, a national securities exchange, under the ticker symbol "NVDA."

9.      At all relevant times, Jen-Hsun Huang ("Huang") was NVIDIA's President and Chief Executive Officer.

10.     At all relevant times, Marvin Burkett ("Burkett") was NVIDIA's Chief Financial Officer.

11.     The Company, Huang, and Burkett are collectively referred to herein as "Defendants."

## III.

## SUBSTANTIVE ALLEGATIONS

12.     This is a class action on behalf of all purchasers of NVIDIA common stock between November 8, 2007, and July 2, 2008, inclusive, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

13.     The Company's current CEO, Jen-Hsun Huang, co-founded NVIDIA in 1993 with venture capital firm Sequoia Capital.  According to the investor relations section of the Company's website, NVIDIA is "the world leader in visual computing technologies and the inventor of the GPU,[1] a high-performance processor which generates breathtaking, interactive graphics on workstations, personal computers, game consoles, and mobile devices."  The Company's product portfolio includes graphics processors, wireless communications processors, and PC motherboard chipsets.  Among consumers, NVIDIA is probably best known for its "GeForce" line of graphics processors.

14.     According to a recent survey from a prominent market research firm, NVIDIA captured 31.8% of all graphics chip sales in the final quarter of 2007.  But NVIDIA's dominant market position hinges almost exclusively on the Company's continued success in designing and manufacturing state-of-the-art GPUs and media and communications processors ("MCPs").  If any of these core technologies exhibit signs of defect or failure, it would have dire consequences for NVIDIA's financial condition and results and its future business prospects.

---

[1]      "GPU" stands for "Graphics Processing Unit."

CLASS ACTION COMPLAINT

1      15.   History provides vivid examples of this risk in the semiconductor industry.  In 1994, for

2  instance, a defect in a mass-produced Intel microprocessor demonstrated the financial shockwaves that

3  can be generated by chip flaws.  While the defect became manifest only when consumers attempted rare

4  mathematical calculations, Intel was flooded with an avalanche of complaints and forced to take a $475

5  million write down to compensate for repairs and returns.

6      16.   This kind of disaster scenario materialized for NVIDIA earlier this year.  On July 2,

7  2008, the Company announced that flawed processes and materials used in manufacturing GPUs and

8  MCPs was apparently causing these mobile video adapters to fail at unusually high rates.  While

9  NVIDIA claims that it has "not been able to determine a root cause for these failures," the Company

10  admits that "testing suggests a weak material set of die/package combination, system thermal

11  management designs, and customer use patterns are contributing factors."  Prior to the total failure of the

12  graphics cards, affected computers often suffer from a variety of symptoms, including black screens,

13  duplicate images, wireless networking complications, and the random appearance of lines, characters,

   and other on-screen interference.

14      17.   On the same day as these revelations, NVIDIA unexpectedly slashed its second-quarter

15  revenue and margin forecasts after the close of regular trading.  In substantial part, the Company

16  attributed the drastically revised projections to the fallout from its defective graphics cards:

17          NVIDIA plans to take a one-time charge from $150 million to $200 million

18          against cost of revenue for the second quarter to cover anticipated warranty,

19          repair, return, replacement and other costs and expenses, arising from a weak

20          die/packaging material set in certain versions of its previous generation GPU and

21          MCP products used in notebook systems.  Certain notebook configurations with

22          GPUs and MCPs manufactured with a certain die/packaging material set are

23          failing in the field at higher than normal rates.

24      18.   Sophisticated market participants have openly questioned the adequacy of this reserve.

25  For example, according to an article from the August 19, 2008, edition of the *Wall Street Journal*, titled

26  "Chip Problems Haunt NVIDIA," JoAnne Feeney, an equity analyst at FTN Midwest Securities,

   expressed concerns over whether the $196 million reserve is sufficient.

27      19.   Reacting to this news, NVIDIA stock opened at $12.98 on July 3, 2008, down almost six

28

CLASS ACTION COMPLAINT

1  dollars per share from its intraday high of $18.78 from the day before.  This 31% decline cut NVIDIA's

2  market capitalization by over $3 billion virtually overnight.  In the ensuing weeks, shares in the

3  Company would trade for as little as $10.55, down $25.71 (or 71%) from NVIDIA's Class Period high

4  of $36.26.

5       20.     The truth is that, at least as early as November 2007, NVIDIA and the other Defendants

6  have known about these unprecedented failure rates, as well as their "root causes."  Indeed, Michael

7  Hara, the Company's Vice President for Investor Relations and Communications, conceded during a

8  September 4, 2008, "Citigroup Technology Conference" that NVIDIA began troubleshooting these

   problems with major computer manufacturers beginning in August of 2007.  "We've ... been working on

9  this problem with the customers for well over a year," Hara admitted, "going all the way back to August

10 of last year."

11      21.     The problem stems from what has been termed "heat cycling" by industry professionals.

12 When computers equipped with NVIDIA's graphics cards are switched on, the cards quickly reach high

13 temperatures.  As the cards cool down, however, the rapid change in temperature subjects them to

14 extreme physical stress.  As a result, solder joints weaken and ultimately crack, causing the video

15 adapters to malfunction or stop working altogether.

16      22.     In response to these defects, Dell and Hewlett-Packard, among other computer

17 manufacturers, have released hardware BIOS updates that activate the system cooling fan sooner and for

18 a longer period of time, with the aim of keeping the adapter from growing too hot.  This is only a

19 temporary solution, however, and it comes with a host of negative side effects.  It dramatically reduces

20 battery life, for example, while simultaneously increasing the level of noise produced by the fan.

21 Recently, the Company's investment relations officer specifically acknowledged that the defects, even if

22 corrected, "cause a degradation in battery life," but suggested that (even if never disclosed to consumers

23 or investors) this was an appropriate solution: "[T]here will always be a trade off, but the trade off of not

24 having your notebook fail is probably the best one to make."  Additionally, technology commentators

25 have suggested that this quick fix may lead to the premature failure of the cooling fan.  It has also been

26 predicted that these BIOS updates will merely postpone failure of NVIDIA video cards until after their

27 warranties expire.  As reported on July 29, 2008, by one of the Internet's leading technology portals,

28 ZDNet, *a BIOS update is little more than a band-aid and isn't going to fix the underlying problem."*

4

1  (Emphasis added.)

2      23.     According to multiple public sources, the earliest of the BIOS updates was issued by

3  Hewlett-Packard no later than November 2007.  Although NVIDIA and the other Defendants were

4  almost certainly aware of the underlying problem earlier than this, the fact that they had knowledge of

5  the flaws by November 2007 is beyond serious debate.  Nevertheless, for at least eight months,

6  Defendants concealed from NVIDIA investors these defects and their obvious impact on the Company's

7  financial condition and future business prospects.

8      24.     More recently, in August 2008, industry watchdogs revealed that the flaws in NVIDIA's

9  video adapters may affect an even broader range of the Company's product line.  Reacting to this

10  possibility, some notebook manufacturers have reportedly turned to NVIDIA rival ATI to provide

11  graphics options on their new portable systems.

12      25.     Consumer response to the defective NVIDIA video cards has been swift and severe.

13  These are some examples gathered from public message boards by technology reporter Adrian

14  Kingsley-Hughes:

15          [H]aving the BIOS activate the fans sooner to compensate for a defective chipset

16          is a band-aid solution.

17                  *   *   *

18          [S]ince this BIOS update won't mysteriously change the die packaging material,

19          the only real thing you can do is to extend warranty or premium support to the

20          amount of years you wan[t to] use the computer, and still then live with the fact

21          that your computer could die on you any time.

22                  *   *   *

23          So rather than replacing the faulty parts you are going to just turn up the fans, at

24          the expense of battery life and noise.  I would rather just leave the BIOS as it is

25          and get a proper fix if the problem occurs.  Even if the problem occurs out of

26          warranty I think there is a strong case for ... fixing it for free since there is an

27          admitted manufacturing defect.

28                  *   *   *

    With this solution, you try to push the issue outside the customers' warranty-time

... but what[] [about] after that time?  Will you repair the notebooks for free?

        * * *

Nice to see that a hardware issue is fixed by software update.  How is a physical defect suppose[d] to be fixed by software?  Time to step up to the plate ... and start offering a replacement device.

        * * *

I tend to agree with some of the other comments.  A BIOS update to turn on cooling fans is not the appropriate response when I have spent approx[imately] $2000 on a[] [laptop computer] that I now fear will have a shortened life span.

26.     Defendants have known about these problems since November 2007, at the latest. Despite this, for eight months or more NVIDIA and the other Defendants concealed the defects and their ramifications for the Company's financial health and future in a series of false and misleading statements made to the investing public.

27.     For example, on November 8, 2007, the first day of the Class Period, Defendants issued a press release titled "NVIDIA Reports Record Results for Third Quarter of Fiscal 2008."  In the release, Defendants touted the fact that the Company had supposedly set a "new quarterly revenue record, surpassing $1 billion."  Defendants also emphasized that "net income and gross margin [likewise] reach[ed] record highs."  More specifically, the press release provided in pertinent part as follows:

For the third quarter of fiscal 2008, revenue increased to a record $1.12 billion compared to $820.6 million for the third quarter of fiscal 2007, an increase of 36 percent.  Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the third quarter of fiscal 2008 was a record $235.7 million, or $0.38 per diluted share, an increase of 121 percent compared to the third quarter of fiscal 2007.  GAAP gross margin improved by 550 basis points from a year ago to a record 46.2 percent.

Non-GAAP net income for the third quarter of fiscal 2008, which excludes stock-based compensation charges and the associated tax impact, was $264.2 million, or $0.44 per diluted share, an increase of 77 percent compared to the third quarter of

fiscal 2007. Non-GAAP gross margin improved to a record 46.4 percent, an increase of 350 basis points from a year ago.

For the nine months ended October 28, 2007, revenue increased to a record $2.90 billion compared to $2.19 billion for the nine months ended October 29, 2006, an increase of 32 percent. GAAP net income for the nine months ended October 28, 2007 was $540.7 million, or $0.89 per diluted share, compared to $285.3 million, or $0.50 per diluted share, for the nine months ended October 29, 2006.

Non-GAAP net income for the nine months ended October 28, 2007, which excludes stock-based compensation charges and the associated tax impact was $626.7 million, or $1.06 per diluted share, compared to $372.3 million, or $0.66 per diluted share, for the nine months ended October 29, 2006.

28. NVIDIA's President and CEO, Defendant Jen-Hsun Huang, was quoted in the November 8th press release:

"We are very proud to have achieved our first billion dollar quarter. And, while it is a wonderful milestone to reach, we believe this is just the beginning," said Jen-Hsun Huang, president and CEO of NVIDIA. "Our core businesses are continuing to grow as the GPU becomes increasingly central to today's computing experience in both the consumer and professional market segments."

Mr. Huang added: "This is the era of visual computing and NVIDIA is at the forefront. People want a delightful, compelling experience when they interact with their computing devices, whether it's on a phone, notebook, game console, or workstation. NVIDIA is leading the way in making this experience more intuitive and rewarding through our relentless pace of innovation and focus on execution."

CLASS ACTION COMPLAINT

29.     On November 8, 2007, NVIDIA filed with the SEC, on Form 8-K, a current report that included the November 8th press release as an exhibit.  The Company's CFO, Defendant Marvin Burkett, signed the 8-K.

30.     Shortly thereafter, on November 21, 2007, NVIDIA filed with the SEC, on Form 10-Q, its quarterly report for the period ended September 30, 2007.  The 10-Q repeated the financial results announced in the November 8th press release.  Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Huang and Burkett both attested that the 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading ...."  They further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] ...."

31.     The November 8th press release, the November 8th 8-K, and the November 21st 10-Q were false and misleading because, among other things, they failed to disclose the defects in NVIDIA's graphics cards and their impact on the Company's financial condition and results and future business prospects.  Additionally, by failing to adjust the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses arising from the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations and overstated the Company's revenue, income, and margin.

32.     On February 13, 2008, Defendants issued a press release titled "NVIDIA Reports Record Results for Fourth Quarter and Fiscal Year 2008."  In the release, Defendants highlighted the fact that the Company had ostensibly "achieve[d] record quarterly revenue and record annual revenue."  More specifically, after announcing that NVIDIA's "annual net income [had] increase[d] 78 percent year-over-year," the press release provided in pertinent part as follows:

> For the fourth quarter of fiscal 2008, revenue increased to a record $1.20 billion, compared to $878.9 million for the fourth quarter of fiscal 2007, an increase of 37 percent.  Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the fourth quarter of fiscal 2008 was $257.0 million, or $0.42 per diluted share, compared to net income of $163.5 million, or

$0.27 per diluted share, for the fourth quarter of fiscal 2007, a net income increase of 57 percent.

Non-GAAP net income for the fourth quarter of fiscal 2008, which excludes stock-based compensation charges, a charge for in-process research and development related to an acquisition closed during the quarter, and the associated tax impact, was $292.6 million, or $0.49 per diluted share.

Annual revenue for the fiscal year ended January 27, 2008 was a record $4.10 billion, compared to revenue of $3.07 billion for the fiscal year ended January 28, 2007, an increase of 34 percent. GAAP net income for the fiscal year ended January 27, 2008 was $797.6 million, or $1.31 per diluted share, compared to GAAP net income of $448.8 million, or $0.76 per diluted share, for the fiscal year ended January 28, 2007, a net income increase of 78 percent.

Non-GAAP net income for the fiscal year ended January 27, 2008, which excludes stock-based compensation charges, a charge for in-process research and development related to an acquisition closed during the year, and the associated tax impact, was $919.3 million, or $1.56 per diluted share.

33.   Huang was quoted in the February 13th press release:

"Fiscal 2008 was another outstanding and record year for us. Strong demand for GPUs in all market segments drove our growth. Relative to Q4 one year ago, our discrete GPU business grew 80%. Our growth reflects the ever-increasing use of rich graphics in applications from Google Earth to Apple iTunes to online virtual worlds," said Jen-Hsun Huang, president and CEO of NVIDIA.

Mr. Huang continued: "This is the era of visual computing. The richness of the graphics is increasingly central to our computing experience. And at the core of that experience is the GPU, the processor that defines the modern PC."

CLASS ACTION COMPLAINT

34.     On February 13, 2008, NVIDIA filed with the SEC, on Form 8-K, a current report that included the February 13th press release as an exhibit.  Burkett signed the 8-K.

35.     The next month, on March 21, 2008, NVIDIA filed with the SEC, on Form 10-K, its annual report for the period ended December 31, 2007.  The 10-K repeated the financial results announced in the February 13th press release.  Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Huang and Burkett both attested that the 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading ...."  They further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] ...."

36.     The February 13th press release, the February 13th 8-K, and the March 21st 10-K were false and misleading because, among other things, they failed to disclose the defects in NVIDIA's graphics cards and their impact on the Company's financial condition and results and future business prospects.  Additionally, by failing to adjust the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses arising from the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations and overstated the Company's revenue, income, and margin.

37.     On May 8, 2008, Defendants issued a press release titled "NVIDIA Reports Results for First Quarter Fiscal 2009."  In the release, Defendants announced that the Company had purportedly "achieve[d] 37 percent revenue growth and 34 percent net income growth year-over-year."  More specifically, the press release provided in pertinent part as follows:

> For the first quarter of fiscal 2009, revenue was $1.15 billion, compared to $844.3 million for the first quarter of fiscal 2008, an increase of 37 percent.  Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the first quarter of fiscal 2009 increased by 34 percent year-over-year to $176.8 million, or $0.30 per diluted share.
>
> Non-GAAP net income for the first quarter of fiscal 2009, which excludes stock-

10

CLASS ACTION COMPLAINT

based compensation charges and the associated tax impact, was $211.8 million, or $0.36 per diluted share.

38.     Again, Huang was quoted in the press release:

"The growth of GPUs continues to outpace the PC market. We shipped 42 percent more GPUs this quarter compared to the same period a year ago, resulting in our best first quarter ever," said Jen-Hsun Huang, president and CEO of NVIDIA. "This is the era of visual computing. With a few hundred million GeForce GPUs in the market, developers can now confidently create applications with dazzling graphics. Amazing applications with beautiful graphics are showing up on the Web constantly, driving even faster adoption of GPUs. We expect this positive feedback loop to continue to drive our growth."

39.     On May 8, 2008, NVIDIA filed with the SEC, on Form 8-K, a current report that included the May 8th press release as an exhibit. Burkett signed the 8-K.

40.     Later the same month, on May 22, 2008, NVIDIA filed with the SEC, on Form 10-Q, its quarterly report for the period ended March 31, 2008. The 10-Q repeated the financial results announced in the May 8th press release. Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Huang and Burkett both attested that the 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading ...." They further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] ...."

41.     The May 8th press release, the May 8th 8-K, and the May 22nd 10-Q were false and misleading because, among other things, they failed to disclose the defects in NVIDIA's graphics cards and their impact on the Company's financial condition and results and future business prospects. Additionally, by failing to adjust the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses arising from the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations and overstated the Company's revenue, income, and margin.

11

42.    As set forth in detail above, the truth about the foregoing matters was not revealed until after the market closed on July 2, 2008.  When NVIDIA stock resumed trading the next day, the Company's market capitalization promptly dwindled by over $3 billion, and Plaintiff and other NVIDIA investors collectively lost hundreds of millions of dollars due to Defendants' misconduct.

## IV.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:

### FRAUD-ON-THE-MARKET DOCTRINE

43.    At all relevant times, the market for NVIDIA common stock was an efficient market for the following reasons, among others:

    a.    NVIDIA common stock was listed and actively traded on the NASDAQ, a highly efficient market;

    b.    As a regulated issuer, the Company filed periodic public reports with the SEC;

    c.    NVIDIA stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

    d.    NVIDIA regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

44.    As a result, the market for NVIDIA securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of NVIDIA common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## V.

### NO SAFE HARBOR

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  The specific statements pleaded herein were not identified as "forward-looking statements" when made.  Nor

was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## VI.

## SCIENTER ALLEGATIONS

46. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and its business practices, their control over and/or receipt of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NVIDIA were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances, and operations. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants.

47. Among other reasons, Defendants engaged in such a scheme to inflate the price of NVIDIA securities in order to: (a) protect and enhance their executive positions and the substantial

1    compensation and prestige they obtained thereby; and (b) enhance the value of their personal holdings of

2    NVIDIA securities.

3                                                    **VII.**

4                                          **LOSS CAUSATION**

5           48.     NVIDIA common stock promptly declined in value in response to corrective disclosures

6    made by Defendants during the Class Period and to the materialization of risks that had been concealed

7    by Defendants.

8           49.     For example, on July 3, 2008 (the first day of trading following a disclosure of the

9    relevant truth), NVIDIA stock opened at $12.98, down almost six dollars per share from its intraday

10   high of $18.78 from the day before.  This steep 31% decline reduced NVIDIA's market capitalization by

11   over $3 billion in less than one day.

12          50.     In the weeks that followed this corrective disclosure, shares in the Company would sell

13   for as little as $10.55, down $25.71 (or 71%) from NVIDIA's Class Period high of $36.26.

14                                                   **VIII.**

15                                   **CLASS ACTION ALLEGATIONS**

16          51.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the

17   Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons who purchased or

18   otherwise acquired NVIDIA common stock between November 8, 2007, and July 2, 2008, inclusive, and

19   who were damaged thereby.  Excluded from the Class are Defendants, members of the immediate family

20   of each of the Defendants, any subsidiary or affiliate of NVIDIA and the directors, officers, and

21   employees of NVIDIA or its subsidiaries or affiliates, or any entity in which any excluded person has a

22   controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

23          52.     The members of the Class are so numerous that joinder of all members is impracticable.

24   While the exact number of Class members is unknown to Plaintiff at this time and can only be

25   ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the

26   Class located throughout the United States.  Throughout the Class Period, NVIDIA common stock was

27   listed and actively traded, on the NASDAQ, an open and efficient market.  Record owners and other

28   members of the Class may be identified from records maintained by the Company and/or its transfer

     agents and may be notified of the pendency of this action by mail, using a form of notice similar to that

1  customarily used in securities class actions.

2      53.    Plaintiff's claims are typical of the claims of the other members of the Class as all

3  members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal

4  law that is complained of herein.

5      54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and

6  has retained counsel competent and experienced in class and securities litigation.

7      55.    Common questions of law and fact exist as to all members of the Class and predominate

8  over any questions solely affecting individual members of the Class.  Among the questions of law and

fact common to the Class are:

9

10      a.    whether the federal securities laws were violated by Defendants' acts and
omissions as alleged herein;

11

12      b.    whether Defendants participated in and pursued the common course of conduct
complained of herein;

13

14      c.    whether documents, press releases, and other statements disseminated to the

15  investing public and the Company's shareholders during the Class Period

16  misrepresented material facts about the business, finances, financial condition,
and prospects of NVIDIA;

17      d.    whether statements made by Defendants to the investing public during the Class

18  Period misrepresented and/or omitted to disclose material facts about the

19  business, finances, value, performance, and prospects of the Company;

20      e.    whether the market price of NVIDIA common stock during the Class Period was

21  artificially inflated due to the material misrepresentations and failures to correct

22  the material misrepresentations complained of herein; and

23      f.    the extent to which the members of the Class have sustained damages and the

24  proper measure of damages.

25      56.    A class action is superior to all other available methods for the fair and efficient

26  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of

27

28  individual litigation make it impossible for members of the Class to individually redress the wrongs

1    done to them.  There will be no difficulty in the management of this suit as a class action.

2                                                IX.

3                                            COUNTS

4                                         FIRST CLAIM

5              (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5

6                   Promulgated Thereunder Against All Defendants)

7        57.     Plaintiff repeats and realleges each and every allegation contained above.

8        58.     Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public

information about the Company's financial results and then existing business conditions, which was not

9    disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements,

10   releases, reports, and other public representations of and about NVIDIA.

11       59.     During the Class Period, Defendants, with knowledge of or reckless disregard for the

12   truth, disseminated or approved the false statements specified above, which were misleading in that they

13   contained misrepresentations and failed to disclose material facts necessary in order to make the

14   statements made, in light of the circumstances under which they were made, not misleading.

15       60.     Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated

16   thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue

17   statements of material facts or omitted to state material facts necessary in order to make statements

18   made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

19   practices and a course of business that operated as a fraud or deceit upon the purchasers of NVIDIA

20   stock during the Class Period.

21       61.     Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the

22   market, they paid artificially inflated prices for NVIDIA stock, which subsequently declined in value as

23   a result of the revelation of the misrepresentations and omissions alleged herein.  Plaintiff and the Class

24   would not have purchased NVIDIA stock at the prices they paid, or at all, if they had been aware that the

25   market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

26   ///

27   ///

28   ///

                                                16

1

## SECOND CLAIM

2

### (Violation Of Section 20(a) Of The Exchange Act

3

### Against Defendants Huang and Burkett)

4

62.        Plaintiff repeats and realleges each and every allegation contained above.

5

63.        The individual Defendants (Huang and Burkett) acted as controlling persons of

6

the Company within the meaning of § 20(a) of the Exchange Act.  By reason of their senior executive

7

and/or Board positions they had the power and authority to cause the Company to engage in the

wrongful conduct complained of herein.

8

64.        By reason of such wrongful conduct, Defendants Huang and Burkett are liable

9

pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants'

10

wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with

11

their purchases of NVIDIA stock during the Class Period.

12

### X.

13

### PRAYER FOR RELIEF

14

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

15

65.        Determining that this action is a proper class action and certifying Plaintiff as a class

16

representative under Rule 23 of the Federal Rules of Civil Procedure;

17

66.        Awarding compensatory damages in favor of Plaintiff and the other Class members

18

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

19

wrongdoing, in an amount to be proven at trial, including interest thereon;

20

67.        Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

21

action, including counsel fees and expert fees; and

22

68.        Such other and further relief as the Court may deem just and proper.

23

///

24

///

25

///

///

26

///

27

///

///

28

CLASS ACTION COMPLAINT

## XI.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: September 9, 2008

Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____
        Jonathan K. Levine

Aaron M. Sheanin
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:     (415) 981-4800
Facsimile:     (415) 981-4846


**SHALOV STONE BONNER & ROCCO LLP**

Ralph M. Stone
rstone@lawssb.com
Thomas G. Ciarlone, Jr.
tciarlone@lawssb.com
485 Seventh Avenue, Suite 1000
New York, NY 10018
Telephone:     (212) 239-4340
Facsimile:     (212) 239-4310

*Counsel for Individual and Represntative Plaintiff Lisa Miller*

CLASS ACTION COMPLAINT