KIM MILLER (178380)
MELISSA RYAN CLARK (*Pro Hac Vice*)
MICHAEL A. MCGUANE
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: 212-696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

BARRY A. WEPRIN (*Pro Hac Vice*)
LEIGH SMITH (*Pro Hac Vice*)
JEAN LEE (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com
Email: lsmith@milberg.com
Email: jlee@milberg.com

LEWIS KAHN (*Pro Hac Vice*)
PAUL S. BALANON (*Pro Hac Vice*)
**KAHN SWICK & FOTI, LLC**
650 Poydras Street, Ste. 2150
New Orleans, LA 70130601
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

MICHYO MICHELLE FURUKAWA (SBN 234121)
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs*
*New Jersey Carpenters Pension and*
*Annuity Funds and Roberto Cohen*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE NVIDIA CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To: All Actions | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 08-cv-4260-JW

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

Lead Plaintiffs Roberto Cohen and the New Jersey Carpenters Pension Fund and New Jersey Carpenters Annuity Fund (the "Funds") (collectively, "Plaintiffs"), on behalf of themselves and the Class they seek to represent, make the allegations contained in this Complaint upon information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based on personal knowledge) against Defendants NVIDIA Corporation ("NVIDIA" or the "Company"), Jen-Hsun Huang ("Huang"), and Marvin Burkett ("Burkett"). Plaintiffs base their information and belief on the thorough investigation conducted by and under the supervision of Lead Counsel, which included, among other things: (1) reviewing and analyzing: (i) publicly available information concerning NVIDIA and the industries and markets in which NVIDIA operates, (ii) filings with the U.S. Securities and Exchange Commission ("SEC"), (iii) annual reports, (iv) press releases, (v) published interviews and conference calls (vi) news articles and other media reports (whether disseminated in print or by electronic media), and (vii) reports of securities analysts and investor advisory services; and (2) interviewing or consulting with numerous individuals, including, but not limited to, former NVIDIA employees who worked at the Company before and during the Class Period and who are knowledgeable about NVIDIA's business and operations and/or about the industries and markets in which NVIDIA operates, as well as former and current employees of customers of NVIDIA.

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this securities fraud action on behalf of themselves and all persons who purchased or otherwise acquired the common stock of NVIDIA between November 8, 2007 and July 2, 2008, inclusive (the "Class Period"), against NVIDIA and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      NVIDIA is an international company headquartered in Santa Clara, California that provides "visual computing technologies." The Company is the inventor of the graphic processing unit ("GPU"), which generates interactive graphics on workstations, personal computers, game consoles, and mobile devices. NVIDIA serves the entertainment and consumer market, the professional design and visualization market, and the high-performance computing

market. In light of its continued success in designing and marketing state-of-the-art products, NVIDIA dominated the market for GPUs and media and communications processors ("MCPs"), commonly known as integrated graphics or motherboard GPUs, throughout the Class Period.

3.     Beginning at least as early as August 2007, NVIDIA knew that its graphics chipsets[1] were defective and caused notebook computers to overheat. Prior to the start of the Class Period, NVIDIA was in active discussions with its main customers, Hewlett-Packard ("HP") and Dell Incorporated ("Dell"), about how to cure problems with its chips on both a short and long term basis. Nevertheless, NVIDIA failed to disclose to its shareholders and the public that its products were defective.

4.     Instead, Defendants knowingly or with deliberate recklessness engaged in the alleged fraud that concealed defects in the Company's primary products throughout the Class Period to avoid disclosure of these product failures, which would adversely affect NVIDIA's financial condition and business prospects. This fraud enabled Defendants to continue to report strong results during the three fiscal quarters prior to the end of the Class Period and artificially inflated the price of NVIDIA stock.

5.     By the close of the quarter ended October 28, 2007, NVIDIA's knowledge of the problems associated with its malfunctioning graphics chipsets required that a reserve be established for a loss contingency under Generally Accepted Accounting Principles ("GAAP").[2] However, Defendants refused to establish this reserve. As a result, Defendants artificially inflated NVIDIA's net income by 83 percent in the quarter ended October 28, 2007; 24.6 percent for the fiscal year ended January 27, 2008; and 111 percent for the quarter ended April 27, 2008.

6.     On July 2, 2008, the Company disclosed that flawed GPU and MCP manufacturing processes and materials caused notebook computers containing these products to fail at unusually high rates. Defendants further disclosed the belated establishment of a $196 million dollar reserve for a loss contingency related to defects in the Company's GPU and MCP

---

[1] A chipset is a group of microchips designed to perform one or more related functions as a unit. Encarta World English Dictionary (2009).

[2] NVIDIA operates on a fifty-two (52) or fifty-three (53) week fiscal year that ends on the last Sunday before January 31.

1  products during the quarter ended on October 28, 2007. At that time, Defendant Huang stated

2  "[t]his has been a challenging experience for us. However, the lessons we've learned will help us

3  build far more robust products in the future, and become a more valuable system design partner

4  to our customers."

5       7.     As a result of the Company's July 2, 2008 announcement, investors learned

6  Defendants' prior Class Period statements regarding NVIDIA's financial condition, results,

7  products, and business prospects were materially false and misleading when made because

8  Defendants failed to timely disclose the defects in the Company's GPUs and MCP products and

9  their impact on the Company. On this revelation, NVIDIA's stock plummeted by 31% (thirty-

10 one percent) from an intraday high of $18.78 per share on July 2, 2008 to an opening of $12.98

11 per share on July 3, 2008 – a decline that cut NVIDIA's market capitalization by over $3 billion

12 overnight, thereby damaging Plaintiffs and the Class. In the ninety days following this belated

13 revelation, NVIDIA's share price continued to decline without recovering, averaging $11.82 per

14 share.

15                     **<u>JURISDICTION AND VENUE</u>**

16      8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

17 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the

18 SEC, 17 C.F.R. § 240.10b-5.

19      9.     This Court has jurisdiction over the subject matter of this action pursuant to 28

20 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21      10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

22 U.S.C. § 78aa.

23      11.     In furtherance of and in connection with the acts alleged herein, Defendants

24 directly or indirectly used the means and instrumentalities of interstate commerce, including, but

25 not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of

26 the NASDAQ (National Association of Securities Dealers Automated Quotations), a national

27 securities exchange.

28

**THE PARTIES**

**Lead Plaintiffs**

12.     Mr. Cohen purchased the Company's common stock during the Class Period, as set forth in his previously filed Certification, at inflated prices and has been damaged by the disclosure of the true facts about NVIDIA, its financial results, and its business practices.

13.     The Funds purchased the Company's common stock during the Class Period, as set forth in their previously filed Certifications, at inflated prices and have been damaged by the disclosure of the true facts about NVIDIA, its financial results, and its business practices.

14.     By Order of the Court dated December 23, 2008, Mr. Cohen and the Funds were appointed Lead Plaintiffs.

**Defendants**

*NVIDIA Corporation*

15.     Defendant NVIDIA is a corporation originally organized under the laws of the State of California in 1993 and subsequently reorganized under the laws of the State of Delaware in 1998. NVIDIA maintains its principal place of business in this District at 2701 San Tomas Expressway, in Santa Clara, California. Its common stock trades on NASDAQ under the ticker symbol "NVDA."

16.     The Company's operations are classified into four operating segments: (i) the GPU business; (ii) the professional solutions business ("PSB"); (iii) the MCP business; and (iv) the consumer products business ("CPB"). The GPU business segment is primarily composed of the Company's "GeForce" products that support desktop and notebook personal computers, plus memory products. The GPU business is the most profitable segment of NVIDIA and without its success in capturing market share, NVIDIA would not be able to generate sufficient revenue to survive in the competitive semiconductor[3] industry. The MCP business segment comprises NVIDIA nForce core logic and motherboard GPU products, which include the Company's

---

[3]   Semiconductors are found in electronic technology including computers. Commercial semiconductors are made of silicon. Semiconductor manufacturers include NVIDIA, Taiwan Semiconductor Manufacturing Co., Intel, and AMD, to name a few.

graphics chips.

*The Individual Defendants*

17.     Defendant Jen-Hsun Huang co-founded NVIDIA in April 1993 and has served as its President and Chief Executive Officer ("CEO"), and as a member of the board of directors, since NVIDIA's inception. As NVIDIA's CEO, Defendant Huang is also NVIDIA's chief operating decision maker, or CODM, who reviews financial information on an operating segment basis for purposes of making operating decisions and assessing financial performance.

18.     Defendant Marvin Burkett has been NVIDIA's Chief Financial Officer ("CFO") since September 2002. On March 21, 2008, Defendant Burkett announced his resignation but stated he would remain with the Company until a replacement had been found. Defendant Burkett remained as CFO through the end of the Class Period.

19.     Defendants Huang and Burkett are collectively referred to herein as the "Individual Defendants."

## **OVERVIEW**

20.     According to the Company's Form 10-K for the fiscal year ended January 27, 2008, NVIDIA "is the worldwide leader in visual computing technologies and the inventor of the graphic processing unit, or the GPU." The Company's product portfolio includes graphics processors, wireless communications processors, and PC motherboard chipsets. Among consumers, NVIDIA is probably best known for its "GeForce" line of graphics processors.

21.     Although NVIDIA has four business segments, prior to and throughout the Class Period, the Company's GPU business and MCP business, composed of NVIDIA nForce core logic and motherboard GPU products, were NVIDIA's main revenue generators. Both Defendant Huang and leading industry analysts stressed the importance of NVIDIA's GPUs to NVIDIA's financial health during the relevant period.

22.     For example, during the Company's fourth fiscal quarter 2007 Earnings Conference Call on February 13, 2007, Defendant Huang stated: "Today we are pleased to report record revenue of $878.9 million for the fourth quarter. This is our fourth consecutive record quarter. . . [and] fourth quarter revenue grew 39%. For the year, we delivered record revenue of

1   $3.07 billion, an increase of 29% over the previous year." On the same call, Defendant Huang

2   informed investors that the "nForce MCP product line achieved record revenue for its tenth

3   consecutive quarter."

4       23.   On July 9, 2007, Bear Stearns Analysts Gurinder Kalra and Dinesh Moorjani

5   raised NVIDIA's second quarter revenue estimate from $857 million to $865 million and non-

6   GAAP EPS (earnings per share) from $0.43 to $0.44. In addition, Bear Stearns raised its October

7   and January quarter estimates "*due primarily to higher MCP and GPU revenues*." (Emphasis

8   added.) Bear Stearns Analysts raised NVIDIA's full fiscal year ("FY") 2008 EPS target from

9   $1.90 billion to $1.95 billion, and Kalra and Moorjani raised FY09 EPS from $2.17 to $2.30

10  billion. Kalra and Moorjani stated, "[t]hough [NVIDIA's] shares have appreciated significantly

11  recently, we do not view the stock as being fully valued at these levels. . . ." Furthermore, Kalra

12  and Moorjani did "not see a pause in NVIDIA's story and expect[ed] momentum in the

13  company's fundamentals to continue in upcoming quarters – in addition to an unchallenged GPU

14  leadership position, [Kalra and Moorjani] expect[ed] a strong Fall [2007] for MCPs . . . and

15  continued margin expansion."

16      24.   As a result of the importance of NVIDIA's GPUs and MCPs to the Company's

17  financial condition, results, and business prospects, Defendants failed to disclose serious

18  problems with these core products. Indeed, Defendants knew, at least as early as August 2007,

19  that design problems caused NVIDIA GPUs to overheat and fail. This overheating led to

20  excessive use of the cooling fan, which in turn caused the battery of the notebook computer to be

21  depleted at an unacceptable rate, affecting, at a minimum, GPUs of two of the world's largest

22  notebook computer manufacturers, HP and Dell. In addition, as explained by Confidential

23  Witness Number 1 ("CW #1"), who worked as an NVIDIA Software Engineer from 2000 to

24  2008, the problem with NVIDIA's GPU chips "was a heating/cooling problem; a hysteresis

25  problem. If you heated up the thing *too much* and cooled it down, and then heated it up, it would

26  crack." (Emphasis added.) As further confirmed by Confidential Witness Number 2 ("CW #2"),

27  a Senior New Product Introduction Planner ("NPI Planner") who worked at NVIDIA from 2005

28  to 2008, the problem was that NVIDIA's final GPU specification was much hotter than what the

Company had promised to its original equipment manufacturers ("OEMs") customers. CW #2 recalled, "We always had a weird feeling that we are testing something this hot. We didn't care too much. We built units and we shipped them."

25.    In fact, Michael Hara, Vice President of Investor Relations and Communications for NVIDIA ("VP of IR and Communications" or "VP Hara"), admitted during a Citigroup Technology Conference on September 4, 2008 that NVIDIA had been working with its OEMs customers to resolve the overheating issues since as early as August 2007. During the same conference, VP Hara acknowledged that NVIDIA knew that its GPU chip failures were widespread and impacted an array of computer models built by a variety of OEMs. VP Hara's statement is further confirmed by Confidential Witness Number 3 ("CW #3"), an NVIDIA Quality Engineer from 2004 until 2008, who verified that "before they went public [with their BIOS releases in November 2007], we [NVIDIA] were already talking with Dell and HP."

26.    In or around August 2007, HP, the world's largest computer manufacturer, approached NVIDIA to inform the Company that its GPUs were to blame for thermal-stress failures on at least a dozen different HP notebook lines. According to Confidential Witness Number 4 ("CW #4"), a reporter covering NVIDIA's chip defects who travelled to Taiwan to interview a former senior HP employee, by mid-2007, the problems with NVIDIA's chips were so serious that they collectively caused a significant change in the average defect rate for all HP laptops.

27.    At a minimum, NVIDIA's defective GPUs were responsible for thermal-stress failures in the following HP hardware products: a) HP Pavilion notebook PC series (i) dv20xx, (ii) dv21xx, (iii) dv22xx, (iv) dv23xx, (v) dv24xx, (vi) dv60xx, (vii) dv61xx, (viii) dv62xx, (ix) dv63xx, (x) dv64xx, (xi) dv90xx, (xii) dv92xx, (xiii) dv93xx, and (xiv) dv94xx; and b) Compaq Presario notebook PC series (i) v30xx, (ii) v31xx, (iii) v32xx, (iv) v33xx, (v) v34xx, (vi) v60xx, (vii) v61xx, (viii) v62xx, (ix) v63xx, and (x) v64xx.

28.    In response, HP attempted to address the overheating problems by issuing an update to the code embedded in the notebook computers (referred to as Basic Input/Output

Consol. Amended Class Action Compl. For Violation of Federal Securities Laws
No. 08-cv-4260 JW

8

System or BIOS)[4] no later than November 2007.

29.    At the time HP issued its BIOS updates, Defendants had sufficient knowledge regarding the nature and scope of the problems affecting the Company's GPU chips to create a contingent-loss reserve relating to the matter. Nevertheless, Defendants concealed from NVIDIA investors these defects and their impact on the Company's financial condition and future business prospects for at least the following eight months.

30.    Consistent with VP Hara's belated revelations, by the late summer of 2007, around the same time HP was approaching NVIDIA about the GPU problems, e-mails were circulating internally at Dell, Inc., the world's second largest computer manufacturer, and between Dell and NVIDIA that discussed and emphasized the gravity of the defects in NVIDIA's GPU chips. These e-mails put NVIDIA on written notice that the defects in its GPUs were negatively affecting a wide range of Dell's notebook computer offerings.

31.    At a minimum, NVIDIA's defective GPUs were responsible for thermal-stress failures in the following Dell hardware products: a) Inspiron 1420; b) Latitude D630; c) Latitude D630c; d) Dell Precision M2300; e) Vostro Notebook 1310; f) Vostro Notebook 1400; g) Vostro Notebook 1510; h) Vostro Notebook 1710; i) XPS M1330; and j) XPS M1530.

32.    In response, Dell also began issuing BIOS updates in an attempt to alleviate the overheating resulting from the defective GPUs in November 2007. However, Defendants were already aware of the underlying problem before November 2007, by virtue of having addressed the very same problem with HP.

33.    By November 2007, HP and Dell confronted NVIDIA with data and other information showing that dozens of computer model lines from several manufacturers were all suffering from the same problem: heat-related video failures of NVIDIA's graphics processors. The only explanation for these thermal-stress failures was a systemic defect in NVIDIA's GPUs.

34.    As a result of receiving these reports in the period ending between August and

---

[4] BIOS assures that "all the other chips, hard drives, ports and central processing unit ['CPU'] function together." *See* How BIOS Works at http://computer.howstuffworks.com/bios.htm/printable; *see also* BIOS at http://en.wikipedia.org/wiki/BIOS.

September, 2007, Defendants knew or were deliberately reckless in not knowing that a systemic defect in the Company's GPUs caused thermal-stress failures in customers' notebook computers.

35.     Although all the major semiconductor manufacturers, including NVIDIA, obtain the materials for their chips from the same small group of die and packaging suppliers, only notebook computers equipped with NVIDIA's chips exhibited similar thermal-stress failures across full product spectrums during the relevant time period. Thus, these product failures resulted from defects in NVIDIA's GPU chips and not the materials NVIDIA obtained from its suppliers.

36.     For the reasons set forth above (¶¶ 24-35), among others, Defendants understood, prior to the start of the Class Period, that the thermal-stress failures of the Company's GPUs could not be attributed to either: (i) overall notebook system design flaws owing to the OEMs; or (ii) defective die or packaging materials originating with the Company's supplier base.

37.     Accordingly, by the inception of the Class Period, upon learning of the nature and scope of the defects in the Company's GPUs, NVIDIA sought to redesign an entire generation of graphics processors without disclosing these significant product defects to the market and NVIDIA investors.

38.     During the same time period that NVIDIA was experiencing systemic product failure backlash, NVIDIA's competitors were putting increasing pressure on the Company in the form of rival products. In particular, in January 2008 Advanced Micro Devices Inc. ("AMD") announced that its new Radeon HD 3879 X2 card was outperforming NVIDIA's GeForce 880 Ultra; AMD was also offering the Radeon card for significantly less than NVIDIA's products. As the competitive pressure on NVIDIA increased, the defect in its core products became an even more significant liability.

39.     In addition to competitive pressures, NVIDIA was throughout the Class Period engaging in significant business transactions which would have brought its financial condition under scrutiny and required strong credit ratings. For instance, in late February 2008 NVIDIA acquired 25 acres of real estate in Santa Clara, California at a cost of $149.5 million. NVIDIA also apparently had several significant corporate acquisitions during the Class Period, including

the acquisitions of: Mental Images, Inc. for a total consideration of approximately $88.3 million; AGEIA Technologies, Inc. for a total consideration of approximately $29.7 million; and RayScale.

40.   In the midst of this, NVIDIA was faced with the decision to undertake a complete chip redesign to cope with the overheating problems it was seeing in its GPUs.

41.   As explained in greater detail below (*see infra* ¶¶ 45-46), the redesigning, remanufacturing, and quality testing of a graphics chip is a complex, expensive, and time-intensive exercise. Assuming that every stage in the process is both expedited and successful (on the first attempt), under ideal circumstances it would have taken NVIDIA a minimum of six months to produce commercially available replacements for the defective GPUs. However, because circumstances are rarely ideal, as confirmed by CW #2, who worked as an NVIDIA Senior New Product Introduction Planner from 2005 to 2008, on average each new product usually takes approximately one year to roll out. Therefore, initial product planning meetings normally begin one year prior to the product's release.

42.   Appreciating that it would take the better part of a year, or more, before the Company could release corrected versions of the defective graphics chips, NVIDIA quietly – and without any meaningful public disclosure – worked with various OEMs to release "flash updates" to the BIOS of the affected notebook computers. Flash updates are software patches generally regarded as temporary solutions, which are adopted until the problem's root cause can be fully and properly addressed.

43.   However, NVIDIA knew that BIOS updates would not resolve its chips' defects. As aptly reported on July 29, 2008 by ZDNet, one of the Internet's leading technology portals, "*If there's a problem with the [NVIDIA] GPUs in a range of Dell notebooks then a BIOS update is little more than a band-aid and isn't going to fix the underlying problem*." (Emphasis added.)

44.   Nevertheless, NVIDIA's OEMs issued BIOS updates throughout late 2007 and beyond, on the advice, and with the cooperation, of Defendants. While the Company never disclosed as much to its investors, the BIOS updates were intended as only a temporary, stop-gap

measure while NVIDIA worked behind the scenes to design, manufacture, and test a new breed of replacement chips.

45.     As noted above, producing a semiconductor such as a video chip takes at least six months under ideal conditions. From start to finish the process involves, among other things: (a) one month or more at the design house, where engineers devise the schematics for the reworked chip; (b) taping out the schematics to one or more manufacturing facilities, where it takes at least two months (and usually three or more) to produce a prototype; (c) two to three months of thermal testing of the prototype and, assuming the first prototype is a success; (d) an additional month or more to manufacture and ship the first commercially available units. For the process to take only six months, the process would have to encounter no delays and meet with success at every step, which is highly unusual in the industry. Accordingly, this process generally takes closer to one full year to complete.

46.     Aside from assuming that a new chip optimally progresses through each of the preceding steps, the prospective six-month turnaround further assumes that the chip maker is able to "hot job" the process, which involves paying a substantial premium to a silicon manufacturing house to place the chip maker's new product at the head of the production line. Hot jobbing is not always an option, however, and, even when it is, the price is invariably steep and results in significant additional charges, costs, and expenses.

47.     In March 2008, in the midst of the Class Period and during the chip failure crisis, the Company announced that its CFO, Defendant Burkett, intended to retire. While he was expected to remain in his position as CFO in the interim, the Company was then actively seeking a replacement so that he could step down. In June 2008, International Rectifier ("IR") announced that NVIDIA's former head internal auditor, Alex Garcia, had joined IR as Vice President, Compliance. Garcia went directly from NVIDIA to IR in the midst of a product crisis that would have significant financial implications for the Company and its investors.

48.     In May of 2008, unbeknownst to investors, the Company made an initial batch of redesigned GPU chips available to OEMs that addressed the prior defects in NVIDIA's GPUs. The Company's Product Change Notifications ("PCNs"), which NVIDIA privately disseminated

to OEMs beginning in the spring of 2008, confirm the full nature and scope of the Company's redesign. These PCNs were designated by NVIDIA as "Type 1," a rating classification indicating a major overhaul of an existing chipset, and included a "ship date" of May 22, 2008.

49.     Given the lengthy process of product development outlined above (¶¶ 45-46), Defendants began the redesign and manufacturing process at least six months prior to the May 2008 release date, or no later than November 2007. Defendants' redesign efforts had actually commenced well before November 2007, however. As confirmed by CW #3, an NVIDIA Quality Engineer from 2004 until 2008, "before they went public, we [NVIDIA] were already talking with Dell and HP."

50.     Thus, by November 2007 at the latest, NVIDIA understood that it needed to redesign and remanufacture an entire generation of its GPU chips. As Defendants knew or recklessly disregarded at the time, the estimated costs for the project exceeded $10 million in design and prototype testing alone. NVIDIA was aware of the extent of the costs at the onset of the redesign and manufacturing process but failed to disclose these material developments to the investment community until more than half a year later.

51.     The costs to the Company did not end there. Because the useful shelf life, or time before a product becomes obsolete by virtue of new generation products, of a typical GPU chip is approximately one year, NVIDIA knew at the onset of the redesign and manufacturing process that the six months or more it would take to develop replacement graphics processors would undercut at least half of the merchantable life span of a generation of its core silicon products. In other words, the chipset failure required an early redesign which rendered existing products obsolete sooner than they otherwise would have been, thereby costing the Company even more. On September 4, 2008, during the Citigroup Technology Conference, VP Hara confirmed that a GPU chip's shelf life is no more than a year by stating that "[t]wo of the three parts that are failing the most . . . have been end of lifed" since March 2008.

52.     In addition to the huge expense tied directly to redesigning the defective graphics chips, NVIDIA's engineering staff – which otherwise would have focused its efforts on developing the next generation of NVIDIA GPU chips – was instead forced to search for a

solution to the thermal-stress failures plaguing the Company's existing line of graphics processors. As a result, redesigning the defective GPU chips placed NVIDIA at a competitive disadvantage, imperiling its ability to introduce new and innovative products and to maintain a lead market share in a highly competitive industry and adversely impacting its foreseeable future growth and profitability.

53.     Despite the emergence of these factors in or around November 2007 – the multimillion-dollar expense associated with the silicon redesign and manufacture process; the degradation of at least half the merchantable shelf life of a generation of video chips; and the resultant impact on the Company's ability to compete for future market share – NVIDIA kept its investors in the dark until July 2008.

54.     According to CW #3 who worked as a Quality Engineer from 2004 until 2008, and whose primary responsibility was to determine the root causes of customer failures and to improve product, NVIDIA had also spent months prior to November 2007 working with HP and Dell to resolve the overheating issues. NVIDIA had purchased hundreds of notebook computers and spent months determining the root causes of the problem.

55.     Confidential Witness Number 5 ("CW #5") worked as an Environmental Compliance Engineer Board Operations from August 2007 through the end of the Class Period. CW #5 is familiar with numerous instances in which NVIDIA failed to take responsibility for Company problems. On more than one occasion, when CW #5 suggested notifying customers of product defects, CW #5 was told that that was not CW #5's responsibility, and no one addressed the problem. CW #5 stated that the Company policy was to let customers discover the problems on their own rather than to call the problems to the customers' attention. CW #5 is confident NVIDIA was aware of the scope of the problems with the defective chips long before the July 2, 2008 announcement.

56.     CW #5's statements are further corroborated by Confidential Witness Number 6 ("CW #6") and Confidential Witness Number 7 ("CW #7"). CW #6 worked as a Software and Hardware Test Engineer at NVIDIA from February 2006 through July 2006 and confirmed NVIDIA's failure to notify customers of known product defects. Accordingly to CW #6, similar

problems arose at the Company with respect to NVIDIA's 6X and 7X groups of chips during his/her employment. Rather than notifying the customers of the problem, CW #6 stated that NVIDIA not only shipped the problematic chips to customers knowing that they were defective, but the Company then waited until receiving numerous customer complaints before taking remedial action.

57.    Similarly, CW #7, a Senior Engineering Manager who worked at NVIDIA from 2002 until March 2006, verified that NVIDIA "will not admit that there is going to be a problem." Far from an isolated occurrence, CW #7 indicated that this was NVIDIA's policy "all the time, on every product."

58.    Confidential Witness Number 8 ("CW #8") was the Administrator for a technology website specializing in hardware graphics and software news and reviews from 2004 through June 2008. CW #8 worked as a technical support employee for Dell from 2000-2004 and stated that NVIDIA had a history of problems with overheating causing the chip failures but had always been reluctant to acknowledge problems.

59.    During the Citigroup Technology Conference on September 4, 2008, VP Hara confirmed many of the statements made by the confidential sources, as alleged above, by admitting that NVIDIA had been seeking to correct the overheating problems with its customers since August 2007. According to VP Hara, the problems with notebook computers equipped with NVIDIA's chips stemmed from what industry professionals have termed "heat cycling." When computers equipped with NVIDIA's graphics cards are switched on, the cards quickly reach high temperatures. As the cards cool down, however, the rapid change in temperature subjects them to extreme physical stress. As a result, solder joints weaken and ultimately crack, causing the video adapters to malfunction or stop working altogether.

60.    Unable to conceal the true condition of the Company's core products any longer, NVIDIA announced on July 2, 2008, in a report on Form 8-K, that it would take a $150 million to $200 million charge against the cost of revenue to cover anticipated customer warranty, repair, return, replacement, and other consequential costs and expenses arising from defects in its graphics chips in certain versions of its previous generation MCP and GPU products used in

notebook systems. NVIDIA further reported that all newly manufactured products and all products currently shipping in volume had been substantially changed.

61.     As a result of the July 2, 2008 announcement, investors learned that Defendants' prior Class Period statements regarding NVIDIA's financial condition, results, and business prospects were materially false and misleading when made because Defendants failed to timely disclose or had deliberately disregarded the defects in the Company's GPUs and MCPs and their impact on the Company. As a result of these revelations, NVIDIA's stock price plummeted.

## NVIDIA'S MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

62.     The Class Period commences on November 8, 2007. On that date, Defendants issued a press release touting the Company's first billion dollar quarter, which according to Defendant Huang, NVIDIA's President and CEO, "was just the beginning." Defendant Huang further stated that NVIDIA's core businesses were continuing to grow "as the GPU becomes increasingly central to today's computing experience." In particular, the NVIDIA's GeForce® desktop and notebook GPU product lines each achieved record revenue, and the Company's notebook GPU product line grew 120 percent year-over-year.

63.     Defendant Huang further emphasized that "net income and gross margin [likewise] reach[ed] record highs." More specifically, the November 8, 2007 press release provided:

> ***For the third quarter of fiscal 2008, revenue increased to a record $1.12 billion compared to $820.6 million for the third quarter of fiscal 2007, an increase of 36 percent.*** Net income computed in accordance with U.S. Generally Accepted Accounting Principles (GAAP) for the third quarter of fiscal 2008 was a record $235.7 million, or $0.38 per diluted share, an increase of 121 percent compared to the third quarter of fiscal 2007. GAAP gross margin improved by 550 basis points from a year ago to a record 46.2 percent.
>
> Non-GAAP net income for the third quarter of fiscal 2008, which excludes stock-based compensation charges and the associated tax impact, was $264.2 million, or $0.44 per diluted share, an increase of 77 percent compared to the third quarter of fiscal 2007. Non-GAAP gross margin improved to a record 46.4 percent, an increase of 350 basis points from a year ago.

Consol. Amended Class Action Compl. For Violation of Federal Securities Laws
No. 08-cv-4260 JW

16

For the nine months ended October 28, 2007, revenue increased to a record $2.90 billion compared to $2.19 billion for the nine months ended October 28, 2007 was $540.7 million, or $0.89 per diluted share, compared to $285.3 million, or $0.50 per diluted share, for the nine months ended October 29, 2006.

Non-GAAP net income for the nine months ended October 28, 2007, which excludes stock-based compensation charges and the associated tax impact was $626.7 million, or $1.06 per diluted share, compared to $372.3 million, or $0.66 per diluted share, for the nine months ended October 29, 2006.

(Emphasis added.)

64.     Also, in the November 8, 2007 press release, Defendant Huang commented:

We are very proud to have achieved our first billion dollar quarter. And, while it is a wonderful milestone to reach, ***we believe this is just the beginning….Our core businesses are continuing to grow as the GPU becomes increasingly central to today's computing experience in both the consumer and professional market segments***.

(Emphasis added.)

65.     On November 8, 2007, NVIDIA also filed with the SEC a current report on Form 8-K, signed by Defendant Burkett, that included the November 8th press release as an exhibit.

66.     Shortly thereafter, on November 21, 2007, NVIDIA filed with the SEC, on Form 10-Q, its quarterly report for the period ended September 30, 2007. The 10-Q repeated the financial results announced in the November 8th press release. Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Defendants Huang and Burkett both attested that the 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…" Defendant Burkett further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]…"

67.     The November 8th press release, the November 8th 8-K, and the November 21st 10-Q were materially false and misleading because, among other things, they failed to disclose the defects in NVIDIA's GPUs and MCPs and their impact on the Company's financial condition and results, as well as on future business prospects. Additionally, by failing to adjust

the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses arising from the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations and overstated the Company's revenue, income, and margin by at least $196 million. Had NVIDIA timely recorded the $196 million charge during the quarter ended October 28, 2007 as required by GAAP, the Company's stated gross profit would have been reduced by 38%.

68.   On February 13, 2008, Defendants issued a press release titled "NVIDIA Reports Record Results for Fourth Quarter and Fiscal Year 2008." In the release, Defendants highlighted the fact that the Company had ostensibly "achieve[d] record quarterly revenue and record annual revenue." More specifically, after announcing that NVIDIA's "annual net income [had] increase[d] 78 percent year-over-year," the press release provided in pertinent part:

> ***For the fourth quarter of fiscal year 2008, revenue increased to a record $1.20 billion, compared to $878.9 million for the fourth quarter of fiscal 2007, an increase of 37 percent***. Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the fourth quarter of fiscal 2008 was $257.0 million, or $0.42 per diluted share, compared to net income of $163.5 million, or $0.27 per diluted share, for the fourth quarter of fiscal 2007, a net income increase of 57 percent.
>
> Non-GAAP net income for the fourth quarter of fiscal 2008, which excludes stock-based compensation charges, a charge for in-process research and development related to an acquisition closed during the quarter, and the associated tax impact, was $292.6 million, or $0.49 per diluted share.
>
> ***Annual revenue for the fiscal year ended January 27, 2008 was a record $4.10 billion***, compared to revenue of $3.07 billion for the fiscal year ended January 28, 2007, an increase of 34 percent. GAAP net income for the fiscal year ended January 27, 2008 was $797.6 million, or $1.31 per diluted share, compared to GAAP net income of $448.8 million, or $0.76 per diluted share, for the fiscal year ended January 28, 2007, a net income increase of 78 percent.
>
> Non-GAAP net income for the fiscal year ended January 27, 2008, which excludes stock-based compensation charges, a charge for in-process research and development related to an acquisition closed during the year, and the associated tax impact, was $919.3 million, or $1.56 per diluted share.

Consol. Amended Class Action Compl. For Violation of Federal Securities Laws
No. 08-cv-4260 JW

18

(Emphasis added.)

69.     Defendant Huang was quoted in the February 13th press release:

> *Fiscal 2008 was another outstanding and record year for us. Strong demand for GPUs in all market segments drove our growth. Relative to Q4 one year ago, our discrete GPU business grew 80%. Our growth reflects the ever-increasing use of rich graphics in applications from Google Earth to Apple iTunes to online virtual worlds.*

> * * *

> This is the era of visual computing. The richness of the graphics is increasingly central to our computing experience. And at the core of that experience is the GPU, the processor that defines the modern PC.

(Emphasis added.)

70.     On February 13, 2008, NVIDIA filed with the SEC a current report on Form 8-K, signed by Defendant Burkett, that included the February 13th press release as an exhibit.

71.     The next month, on March 21, 2008, NVIDIA filed with the SEC, on Form 10-K, its annual report for the period ended January 27, 2008. The 10-K repeated the financial results announced in the February 13th press release. Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Defendants Huang and Burkett both attested that the 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…" Defendant Burkett further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]…"

72.     The February 13th press release, the February 13th 8-K, and the March 21st 10-K were materially false and materially misleading because, among other things, they failed to disclose the defects in NVIDIA's MCPs and GPUs and their impact on the Company's financial condition and results and future business prospects. Additionally, by failing to adjust the Company's projections and reported financial results for the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations

and overstated the Company's revenue, income, and margin. For example, had NVIDIA timely recorded the $196 million charge during the quarter ended October 28, 2007 as required, the Company's actual gross profit would have been 10.5% lower than the $1,869,280 figure stated in the March 21st 10-K.

73.     On May 8, 2008, Defendants issued a press release titled "NVIDIA Reports Results for First Quarter Fiscal 2009." In the release, Defendants announced that the Company had purportedly "achieve[d] 37 percent revenue growth and 34 percent net income growth year-over-year." More specifically, the press release provided:

> **For the first quarter of fiscal 2009, revenue was $1.15 billion, compared to $844.3 million for the first quarter of fiscal 2008, an increase of 37 percent.** Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the first quarter of fiscal 2009 increased by 34 percent year-over-year to $176.8 million, or $0.30 per diluted share.
>
> Non-GAAP net income for the first quarter of fiscal 2009, which excludes stock-based compensation charges and the associated tax impact, was $211.8 million, or $0.36 per diluted share.

(Emphasis added.)

74.     Again, Defendant Huang was quoted in the press release stating:

> **The growth of GPUs continues to outpace the PC market. We shipped 42 percent more GPUs this quarter compared to the same period a year ago, resulting in our best first quarter ever.** This is the era of visual computing. With a few hundred million GeForce GPUs in the market, developers can now confidently create applications with dazzling graphics. Amazing applications with beautiful graphics are showing up on the Web constantly, driving even faster adoption of GPUs. **We expect this positive feedback loop to continue to drive our growth**.

(Emphasis added.)

75.     On May 8, 2008, NVIDIA filed with the SEC a current report on Form 8-K, signed by Defendant Burkett, that included the May 8th press release as an exhibit.

76.     Later that month, on May 22, 2008, NVIDIA filed with the SEC, on Form 10-Q, its quarterly report for the quarter ended April 27, 2008. The Form 10-Q repeated the financial results announced in the May 8th press release. The Form 10-Q also included a section titled

"Product Defect Contingencies" which stated:

> During the first quarter fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products. This product was included in a significant number of the customer's notebook products that have been sold to end users, and has also been shipped to other of our customers in significant quantities. We are evaluating the potential scope of this situation, including the nature and cause of the alleged defect and the merits of the customer's claim, and to what extent the alleged defect might occur with other of our products. We are currently unable to estimate the amount of costs that may be incurred by us beyond the normal product warranty accrual that we have taken related to this claim and the alleged defect and, therefore, we have not recorded any additional related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

Pursuant to the certification requirements of the Sarbanes–Oxley Act ("SOX"), Defendants Huang and Burkett both attested that the 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…" Defendant Burkett further certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]…"

77.     The May 8th press release, the May 8th Form 8-K, and the above-quoted statements in NVIDIA's 10-Q were false and misleading because, among other things, they failed to disclose the defects in NVIDIA's graphics cards and their impact on the Company's financial condition and results and future business prospects. Additionally, by failing to adjust the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses arising from the defects, the preceding statements were false and misleading because they understated NVIDIA's expenses and other obligations and overstated the Company's revenue, income, and margin. For instance, the Company's stated gross profit would have decreased by 38% had NVIDIA timely recorded the $196 million charge during the quarter ended October 28, 2007 as required by GAAP.

78.     Further, the May 22nd Form 10-Q was materially false and misleading when made because, although Defendants disclosed the MCP material set problems, they failed to make any disclosure about the more serious problem with the GPU chips, of which they had been aware since before October 28, 2007.

79.     The truth about the foregoing matters was not revealed until after the market closed on July 2, 2008. When NVIDIA stock resumed trading the next day, the Company's market capitalization promptly dwindled by over $3 billion, and Plaintiffs and other NVIDIA investors were severely damaged as a result of Defendants' misconduct.

## NVIDIA'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

80.     As set forth above, at all times during the Class Period, Defendants represented that NVIDIA's consolidated financial statements were prepared in accordance with GAAP. GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time. Throughout the Class Period, Defendants manipulated NVIDIA's financial statements by not accruing and disclosing loss contingencies associated with its MCP and GPU units in violation of GAAP and SEC reporting requirements. This manipulation artificially understated cost of revenue and overstated gross profit and net income by $196 million throughout the Class Period.

81.     As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1 ("CON1"), Objectives of Financial Reporting by Business Enterprises (November 1978), one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. CON1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

82.     SEC Regulation S-X requires that publicly traded companies present their annual financial statements in accordance with GAAP. *See* 17 C.F.R. § 210.4-01(a)(1). In addition, Regulation S-X requires that interim financial statements comply with GAAP. Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, and management is responsible for preparing financial statements that conform to GAAP. As noted by the American Institute of Certified Public Accountants ("AICPA") professional standards:

> Financial statements are management's responsibility… [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions…are within the direct knowledge and control of management….Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

83.     Defendants' representations concerning cost of revenue, gross profit, and net income were materially false and misleading when made because Defendants knowingly or with deliberate recklessness failed to timely accrue and disclose loss contingencies relating to issues with NVIDIA's MCP and GPU units.

84.     Specifically, Defendants caused the Company to violate GAAP and SEC requirements in the following key respects. First, Defendants caused NVIDIA not to accrue loss contingencies associated with abnormal failure rates of its MCP and GPU units used in notebook systems as soon as Defendants knew these costs were likely to occur. These contingencies should have been recorded during the quarter ended October 27, 2008 and would have resulted in a higher cost of revenue, and a lower gross profit and net income, of $196 million. This adjustment would have also impacted NVIDIA's results going forward and resulted in cost of revenue being understated and gross profit and net income being overstated for the year ended January 27, 2008 and the quarter ended April 27, 2008

85.     Second, as discussed in greater detail below (¶¶ 95-103), Defendants caused

NVIDIA not to disclose certain information relating to the abnormal failure rates of NVIDIA's MCP and GPU units. This undisclosed adverse information concealed by Defendants during the Class Period is the very type of information required to be disclosed by GAAP as Defendants knew that it related to events that already occurred and were likely to result in loss contingencies. This omission resulted in material misstatements of NVIDIA's financial statements, for the quarter ended October 28, 2007, the year ended January 27, 2008 and the quarter ended April 27, 2008. Defendant Burkett was directly responsible for preparation of NVIDIA's financial statements and Individual Defendants Huang and Burkett certified their accuracy under the Sarbanes-Oxley Act of 2002 ("SOX").

**A.     Defendants Violated GAAP and SEC Reporting Requirements by Knowingly Failing to Timely Recognize a $196 Million Loss Contingency**

86.     GAAP generally provides that financial statements should accrue for loss contingencies if information prior to the issuance of the financial statements indicates that a liability has been incurred. Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies (March 1975) ¶ 8. SFAS 5 defines a loss contingency as an "existing condition, situation or set of circumstances involving uncertainty as to possible loss to an enterprise that will ultimately be resolved if one or more future events occur or fail to occur." SFAS 5 ¶ 1. Specifically, SFAS 5 ¶ 8 states that an estimated loss contingency should be accrued by a charge to income "[i]f information available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated." SFAS 5 ¶ 4 includes "obligations related to product warranties and product defects" as an example of a loss contingency.

87.     When a loss contingency exists, SFAS 5 ¶ 3 explains that the likelihood that the future event or events will confirm the loss can range from "probable" to "remote." As defined by SFAS 5 ¶ 3, "probable" means future events that are likely to occur; "reasonably possible" means the chance that a future event or events will occur is more than remote but less than likely to occur; and "remote" means the chance that a future event or events will occur is slight.

88.     NVIDIA's 2008 Form 10-K filed with the SEC on March 21, 2008, included the following disclosure with respect to the Company's policy of accounting for product warranty costs: "We generally offer limited warranty to end users that ranges from one to three years for products in order to repair & replace products for any manufacturing defects or hardware component failures. Cost of revenue included the estimated cost of product warranties that are calculated at the point of revenue recognition." This disclosure was materially false and misleading because it failed to disclose and/or account for the problem with the Company's defective chips, which at that time represented a probable liability.

89.     On May 22, 2008, NVIDIA filed a Form 10-Q with the SEC and included the following disclosure regarding product defect contingencies:

> During the first quarter fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products. This product was included in a significant number of the customer's notebook products that have been sold to end users, and has also been shipped to other of our customers in significant quantities. We are evaluating the potential scope of this situation, including the nature and cause of the alleged defect and the merits of the customer's claim, and to what extent the alleged defect might occur with other of our products. We are currently unable to estimate the amount of costs that may be incurred by us beyond the normal product warranty accrual that we have taken related to this claim and the alleged defect and, therefore, we have not recorded any additional related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

(Emphasis added.) This disclosure was materially false and misleading because of the failure to disclose and/or create a reserve for the much larger problem with the GPUs, and because NVIDIA failed to reserve for a probable loss relating to the MCPs.

90.     In the weeks leading up to July, 2008, NVIDIA stock showed strong performance. Its stock received buy ratings and analysts foresaw positive trends and strong market positions in its near-term business. For instance, on June 5, 2008 Goldman Sachs Analyst James Schneider increased his NVIDIA rating to buy from neutral, saying "trends in its near-term business are likely to be better than we had expected." In the months leading up to the end of the Class

Period, several analysts considered NVIDIA likely to continue to outperform its competitors and face down any threat from new market entrants such as Intel.

91.   On July 2, 2008, NVIDIA finally acknowledged the scope of its problem to the market by announcing the following in a press release:

> ***NVIDIA Corporation stated that it would take a $150 million to $200 million charge against cost of revenue to cover anticipated customer warranty, repair, return, replacement and other consequential costs and expenses arising from a weak die/packaging material set in certain versions of our previous generation MCP and GPU products used in notebook systems.***

> ***The previous generation MCP and GPU products that are impacted were included in a number of notebooks that were shipped and sold in significant quantities. Certain notebook configurations of these MCP and GPU products are failing in the field at higher than normal rates.*** While we have not been able to determine a root cause for these failures, testing suggests a weak material set of die/packaging combinations, system thermal management designs, and customer use patterns are contributing factors.

(Emphasis added.) This disclosure reveals the materially false and misleading statements made in NVIDIA's prior disclosure on May 22, 2008. Specifically, the May 22, 2008 disclosure was materially false and misleading because of the failure to disclose and/or account for the much larger problem with the GPUs.

92.   In addition, NVIDIA made a similar disclosure in its Form 10-Q for the quarter ended July 27, 2008 filed with the SEC on August 21, 2008:

> ***During our fiscal quarter ended July 27, 2008, we recorded a $196 million charge against cost of revenue to cover anticipated customer warranty, repair, return, replacement and other associated costs arising from a weak die/packaging material set in certain versions of our previous generations MCP and GPU products used in notebook systems.***

(Emphasis added.)

93.   Although these announcements were made by NVIDIA in July 2008, NVIDIA had been aware of the abnormal failure rates of its MCPs and GPUs and had been working on the issue for over a year. As Michael Hara, NVIDIA's Vice President of Investor Relations

Consol. Amended Class Action Compl. For Violation of Federal Securities Laws
No. 08-cv-4260 JW

26

announced on September 4, 2008, "We've been working on this problem with the customers for well over a year, going all the way back to August of last year….We've been hearing about this and working on [the problem] for over a year…."

94.     VP Hara's comments are an admission that the problems with the MCP and GPU units had been known to NVIDIA's executives, including the Individual Defendants, prior to the start of the Class Period. When NVIDIA filed its October 28, 2007 Form 10-Q, Defendants were aware that a loss contingency was required for the chip problems because they were NOT "reasonably possible" or "remote" but, in fact, "probable" as defined by GAAP. SFAS 5 ¶ 3. As a result, Defendants were required to disclose and establish a reserve for these problems but failed to do so. Rather, Defendants knowingly concealed the issues relating to NVIDIA's MCPs and GPUs and their associated loss contingencies in direct contravention of GAAP, SEC requirements and NVIDIA's own accounting policies. Consequently, NVIDIA's cost of revenue was materially understated by $196 million and gross profit and net income materially overstated by $196 million for the quarter ended October 28, 2007, the year ended January 27, 2008 and the quarter ended April 27, 2008.

### B.     Defendants Omitted to Disclose Material Information Concerning MCP and GPU Abnormal Failure Rates

95.     In addition to failing to accrue probable costs associated with the MCP and GPU unit failures, Defendants violated GAAP and SEC reporting requirements by failing to disclose any qualitative information concerning the product failures in NVIDIA's financial statements during the Class Period, in conformity with SFAS No. 5, thereby misleading investors.

96.     SFAS No. 5 ¶ 10 requires that financial statements disclose contingencies when it is at least "reasonably possible" (i.e., a greater than slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.

97.     Additionally FASB Interpretation ("FIN") No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees if Indebtedness of Others (November 2002), requires that guarantors disclose certain information regarding product

warranties, including:

> (a) The guarantor's accounting policy and methodology used in determining its liability for product warranties.
> (b) A tabular reconciliation of the changes in the aggregate product warranty liability for the reporting period. That reconciliation should present in the beginning balance of the aggregate reductions in that liability for payments made (in cash or in kind) under the warranty, the aggregate changes in the liability for accruals related to product warranties issued during the reporting period, the aggregate changes in the liability for accruals related to preexisting warranties (including adjustments related to changes in estimates), and the ending balance of the aggregate product warranty liability.

98.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X, 17 C.F.R. § 210.10-01, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

99.     In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business. AICPA Statement of Position No. 94-6 <u>Disclosure of Certain Significant Risks and Uncertainties</u> (December 1994).

100.     Thus, Defendants had an affirmative duty to disclose the product quality issues associated with its MCP and GPU products in its interim financial statements in accordance with GAAP even if the financial impact had not been readily quantifiable, which it was (¶¶ 86-94). As indicated by APB Opinion No. 28, ¶ 22, <u>Interim Financial Reporting</u> (December 1973), "Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports."

101.     Item 7 of Form 10-K and Item 2 of Form 10-Q, Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K, 17.C.F.R. § 229.303. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to "[d]escribe any

known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations."

102.    In addition, the SEC, in its May 1989 Interpretive Release No. 34-26831, indicated that registrants should employ a two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K: "A disclosure duty exists where a trend, demand, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations."

103.    In violation of the foregoing GAAP and SEC Regulations, NVIDIA's financial statements for the Class Period failed to disclose material information regarding the abnormal failure rates and product issues with its MCP and GPU units of which it had been aware for over a year.

### C.    NVIDIA's GAAP & SEC Violations Were Material

104.    The foregoing statements and omissions in violation of GAAP and SEC Regulations were unquestionably material. For example, if NVIDIA had recorded the $196 million charge during the quarter ended October 28, 2007, as required by GAAP, NVIDIA's gross profit would have been 38% lower and its net income would have been reduced by a staggering 83%. Additionally, the Company's net income of $176,805,000 reported for the quarter ended April 27, 2008 would have become a loss of $19,195,000. The table below summarizes the effects of not timely recording the accrual for the MCP and GPU loss contingencies in the quarter ended October 28, 2007 on gross profit and net income for subsequent reporting periods during the Class Period:

|  | Quarter Ended October 28, 2007 | Year Ended January 27, 2008 | Quarter Ended April 27, 2008 |
|---|---|---|---|
| Gross Profit ("GP") | $515,553,000 | $1,869,280,000 | $514,843,000 |
| GP after $196m contingency | $319,553,000 | $1,673,280,000 | $318,843,000 |
| % reduction in GP | 38% | 10.5% | 38% |
| Net Income ("NI") | $235,661,000 | $797,645,000 | $176,805,000 |

| NI after $196m contingency | $39,661,000 | $601,645,000 | $(19,195,000) |
| % reduction in NI | 83% | 24.6% | 111% |

105.    FASB Concepts Statement No. 2, <u>Qualitative Characteristics of Accounting Information</u> ¶ 132 (May 1980), indicates that materiality determinations are based on whether "it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

106.    Staff Accounting Bulletin No. 99, <u>Materiality</u>, (August 1999) emphasizes the need to assess and take into account the qualitative aspects of materiality, including, but not limited to:

- Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

- Whether the misstatement masks a change in earnings or other trends;

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- Whether the misstatement changes a loss into income or vice versa;

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

- Whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

107.    Based on the foregoing, Defendants knowing or deliberately reckless misstatments of cost of revenue, gross profit, and net income, rendered NVIDIA's Class Period financial statements false and misleading to a material degree at the time they were issued.

### D.    *Additional GAAP Violations*

108.    In addition to the foregoing accounting improprieties, NVIDIA presented its financial statements during the Class Period in a manner that also violated, at a minimum, the following additional GAAP provisions:

Consol. Amended Class Action Compl. For Violation of Federal Securities Laws
No. 08-cv-4260 JW

30

A.      The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions (CON1 ¶ 34);

B.      The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON1 ¶ 40);

C.      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON1 ¶ 50);

D.      The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (CON1 ¶ 42);

E.      The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON2 ¶¶ 58-59);

F.      The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON2 ¶ 79); and

G.      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON2 ¶¶ 95, 97).

**LOSS CAUSATION**

109.    On July 2, 2008, NVIDIA announced, in a report on Form 8-K filed with the SEC, that:

> ***[I]t would take a $150 million to $200 million charge against cost of revenue*** to cover anticipated customer warranty, repair, return, replacement and other consequential costs and expenses arising from a weak die/packaging material set in certain versions of our previous generation MCP and GPU products used in notebook systems.
>
> ***The previous generation MCP and GPU products that are impacted were included in a number of notebooks that were shipped and sold in significant quantities.*** Certain notebook configurations of these MCP and GPU products are failing in the field at higher than normal rates. While we have not been able to determine a root cause for these failures, testing suggests a weak material set of die/packaging combinations, system thermal management designs, and customer use patterns are contributing factors.

(Emphasis added.) NVIDIA did not hold a conference call to discuss the failures of the GPUs and MCPs in conjunction with its July 2, 2008 press release.

110.    At this time, investors learned that Defendants' prior Class Period statements regarding NVIDIA's financial condition, results, and business prospects were materially false and misleading when made because Defendants improperly failed to disclose or deliberately disregarded the defects in the Company's GPUs and MCPs and their impact on the Company. More specifically, the Company's July 2, 2008 press release indicated that Defendants' Class Period statements materially understated NVIDIA's expenses and other obligations and overstated revenue, income, and margin due to Defendants' failure to adjust the Company's projections and reported financial results for customer warranty, repair, return, replacement, and other consequential costs and expenses stemming from the Company's previously concealed GPU and MCP defects.

111.    On this news, NVIDIA's stock plummeted by as much as 31% percent from an intraday high of $18.78 per share to opening at $12.98 per share on July 3, 2008. This decline cut NVIDIA's market capitalization by over $3 billion. In the ninety days following the July 2, 2008

announcement, NVIDIA's stock price averaged $11.82 per share.

112.   In addition, several analysts cut their ratings on NVIDIA stock while others revised their earnings projections and stock price targets. Recognizing the immediate effect of Defendants' belated revelation of the Company's business prospects, Suji De Silva, an analyst for Kaufman Bros. Equity Research, downgraded NVIDIA from a buy to hold stating that GPU and MCP notebook issues "will dampen notebook GPU/chipset shipments in the heavily back-end loaded July quarter."

113.   Similarly, Shawn Webster, an analyst with JPMorgan, also downgraded NVIDIA from Overweight to Neutral stating that the "$150-$200 million charge for flaws in shipped products [is] . . . *overwhelming evidence of broken execution*." (Emphasis added). Webster rejected NVIDIA's excuses that a weaker global end market had contributed to NVIDIA's weak results. According to Webster, the personal computer global end market was stable and *NVIDIA's weak results were NVIDIA-specific as a result of the chip failures that resulted in the $150-$200 million charge*.

114.   The injury to the Class members was directly and proximately caused by the fraud alleged herein. When NVIDIA disclosed that it was taking a $196 million charge for an undisclosed contingency that had existed for at least three quarters, revealing that Defendants' prior Class Period statements regarding the Company's financial condition, results, and business prospects were materially false and misleading when made, the market price of NVIDIA common stock fell 31% the following day on heavy volume.

### ADDITIONAL ALLEGATIONS SUPPORTING
### THE INDIVIDUAL DEFENDANTS' SCIENTER

115.   Among other reasons, Defendants engaged in the alleged fraud to inflate the price of NVIDIA securities in order to: (a) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and (b) enhance the value of their personal holdings of NVIDIA securities. To this end, the Individual Defendants' scienter is further evidenced by their compensation arrangements, including stock option and incentive payment programs, which furnished a direct and personal financial motive to make the

misrepresentations and omissions alleged.

116.   The Company's 2007 proxy statement, filed with the SEC on May 9, 2007, demonstrates that the Individual Defendants had compelling personal financial motives to artificially inflate the income of NVIDIA (and thus the price of the public traded stock) during the Class Period.

117.   The proxy statement states that NVIDIA believed equity-based compensation is critical to its overall pay program for executives.

118.   As reported in the Company's 2008 proxy statement, filed with the SEC on May 15, 2008, the Individual Defendants reaped substantial benefits from stock option and other incentive plans during the Class Period, when they concealed and misrepresented: (i) the scope and gravity of the defects in NVIDIA's video chips; and, thus, (ii) the true state of NVIDIA's operations and its financial condition and results.

119.   Among other things, the proxy statement disclosed that Defendant Huang's base salary was "increased from $500,000 in fiscal 2007 to $600,000 in fiscal 2008." Defendant Burkett's base salary was $425,000 for both fiscal years 2007 and 2008. In addition to their base salaries, Individual Defendants Huang and Burkett received compensation of $1,250,000 and $425,000 respectively, if they achieved their individual targets.

120.   Because of NVIDIA's inflated financial results, "each executive officer received 200 percent of his or her corporate performance payout, which is the maximum amount payable for the corporate performance target under our variable compensation plan." The Individual Defendants also received payouts ranging from 90 percent to 120 percent of their individual performance based variable compensation. "Mr. Burkett received 100 percent of his target individual performance based variable compensation for fiscal 2008 and Mr. Huang received 120 percent of his individual performance based variable compensation for the fiscal year." Had the Individual Defendants timely disclosed the problems with Company's GPUs, their compensation for fiscal 2008 would have been substantially lower.

121.   Furthermore, Defendants and other high-level Company employees at NVIDIA profited handsomely as Company stock continued to perform well throughout the Class Period.

1    Brooke Seawell, a director in the audit committee, netted $2 million in December 2007 alone

2    when he exercised options to buy 60,000 shares of the Company's stock at $1.36 each and then

3    promptly sold them at prices ranging from $35 to $35.14. Directors received stock options

4    instead of cash for their service. And directors who sat on its audit committee were given an

5    extra helping to compensate for the extra time demands.

6        122.    Under a 10b5-1 trading plan adopted prior to the beginning of the Class Period

7    but subsequently amended, Defendant CFO Huang exercised options for and sold shares of

8    common stock. Under the original plan, Huang's last 10b5-1 trade would have occurred in

9    December 2007. Under the amended plan, Huang was able to purchase and sell 186,000 shares in

10   May 2008, netting $3 million. Huang also made significant trades in March, April, and June of

11   2008.

12       123.    Furthermore, during the Class Period, the Individual Defendants, as senior

13   executive officers and/or directors of NVIDIA, were privy to confidential and proprietary

14   information concerning NVIDIA, its operations, finances, financial condition, and present and

15   future business prospects. As a result of their positions with NVIDIA, the Individual Defendants

16   had access to materially adverse non-public information about the Company's business, finances,

17   products, markets, and present and future business prospects *via* access to internal corporate

18   documents, conversations and connections with other corporate officers and employees,

19   attendance at management and board of directors meetings and committees, and *via* reports and

20   other information provided to them in connection therewith. Because of their possession of this

21   information, the Individual Defendants knew of or were deliberately reckless in disregarding the

22   adverse facts specified herein that were not disclosed to, and were being concealed from, the

23   investing public during the Class Period.

24       124.    The Individual Defendants are liable as direct participants in the wrongs

25   complained of herein. In addition, the Individual Defendants, by reason of their status as senior

26   executive officers and/or directors were "controlling persons" within the meaning of Section 20

27   of the Exchange Act and had the power and influence to cause the Company to engage in the

28   unlawful conduct complained of herein. Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of NVIDIA's business.

125.    In addition, as a result of their positions with the Company, the Individual Defendants controlled and/or possessed the authority to control the contents of NVIDIA's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged by Plaintiffs to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

126.    As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Securities Act of 1933 and traded on the NASDAQ, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding NVIDIA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, and earnings, as well as present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of NVIDIA's common stock would reflect truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

127.    The Individual Defendants are liable as active participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of NVIDIA common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (a) deceived the investing public regarding NVIDIA's business, operations, and management and the intrinsic value of NVIDIA common stock, and (b) caused Plaintiffs and members of the Class to purchase NVIDIA common stock at artificially inflated prices. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's core business, finances, and operations. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a

substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants.

128.    Given the magnitude of the defects in NVIDIA's video chips – which adversely affected millions of units from the world's largest computer manufacturers – and the substantial expense associated with redesigning a full generation of graphics processors thereby halving the saleable life of the Company's core product offerings, NVIDIA and the Individual Defendants knew, or were deliberately reckless in not knowing, that the defects identified herein: (i) were highly material to NVIDIA's financial results and operations; and, therefore (ii) required meaningful public disclosure and appropriate accounting adjustments to reserve against the rising tide of warranty repair and replacement costs.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE MARKET DOCTRINE

129.    At all relevant times, the market for NVIDIA's securities was an efficient market for the following reasons, among others:

- NVIDIA's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, the Company filed periodic public reports with the SEC;

- NVIDIA was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

- NVIDIA regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

130.    As a result, the market for NVIDIA securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of NVIDIA common stock during the Class Period suffered similar injury through their purchase of stock at

artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

131.    The federal statutory safe harbor for certain forward-looking statements does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent that Plaintiffs plead any purportedly forward-looking statements as actionable, those statements lacked meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any purportedly forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NVIDIA who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## CLASS ACTION ALLEGATIONS

132.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired NVIDIA common stock between November 8, 2007 and July 2, 2008, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, and assigns and any entity in which Defendants have or had a controlling interest.

133.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, more than 554,733,685 shares of common stock

were outstanding and actively traded in an efficient market on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NVIDIA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

134.   Plaintiffs' claims are typical of those of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law.

135.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. The Court has appointed Lead Counsel who are competent and experienced in class and securities litigation.

136.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements and/or omissions made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business operations, and financial statements or condition of NVIDIA; (c) whether Defendants knew or were deliberately reckless in disregarding that their statements and omissions were materially false and misleading; (d) whether the price of NVIDIA common stock was artificially inflated; and (e) the extent to which members of the Class have sustained damages as a result of the conduct alleged and the proper measure of damages.

137.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress their wrongs on an individual basis. There will be no difficulty in the management of this action as a class action.

**COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND**

## RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

138.    Lead Plaintiffs repeat and re-allege each and every allegation referenced above as if fully set forth herein.

139.    During the Class Period, Defendants, with actual knowledge or deliberate recklessness, disseminated or approved the materially false and misleading statements specified above, which failed to disclose material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

140.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of NVIDIA's securities; and (c) cause Lead Plaintiffs and other Class members to purchase NVIDIA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

141.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the alleged statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NVIDIA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

142.    NVIDIA and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of NVIDIA as specified herein.

143.    Each Individual Defendants' primary and control person liability arises from the following facts: (a) each Individual Defendant was a high-level executive and/or director at NVIDIA during the Class Period; (b) by virtue of their responsibilities and activities as an NVIDIA senior officer and/or director, each Individual Defendant was privy to and participated

in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; and (c) each Individual Defendant was aware of the Company's dissemination of information to the investing public, information that each Individual Defendant knew, or was deliberately recklessness in disregarding, was materially false and misleading.

144.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate recklessness for the truth in that they failed to ascertain and to disclose such facts, even though available to them. Defendants made these material misrepresentations and/or omissions for the purpose and effect of concealing NVIDIA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, to the extent that the Defendants did not have actual knowledge of the representations alleged, each was deliberately reckless in purposely refraining from taking steps necessary to discover whether those statements were false or misleading.

145.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NVIDIA's securities was artificially inflated during the Class Period. In ignorance of this fact, and relying directly or indirectly on Defendants' false and misleading statements or upon the integrity of the market in which the securities trade, and/or upon the absence of material adverse information known to or disregarded with deliberate recklessness by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired NVIDIA securities during the Class Period at artificially high prices and were damaged thereby.

146.     At the time of Defendants' alleged misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true undisclosed financial condition and business prospects of NVIDIA, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NVIDIA securities, or, if they had acquired such securities during the Class Period, would not have done so at the artificially

1    inflated prices paid.

2          147.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

3    Exchange Act, and Rule 10b-5 promulgated thereunder.

4                      **COUNT II: VIOLATIONS OF SECTION 20(a)**
5              **OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS**

6          148.    Plaintiffs repeat and re-allege each and every allegation contained above as if

7    fully set forth herein.

8          149.    The Individual Defendants acted as controlling persons of NVIDIA within the

9    meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, ownership

10   and contractual rights, participation in and awareness of the Company's operations, and intimate

11   knowledge of the Company's Class Period disclosures, the Individual Defendants had the power

12   to influence and control and did influence and control, directly or indirectly, the decision-making

13   of the Company, including the content and dissemination of the various statements which Lead

14   Plaintiffs contend are false and misleading.

15         150.    In particular, each Individual Defendant had direct and supervisory involvement

16   in the day-to-day operations of the Company and, therefore, is presumed to have had the power

17   to control or influence the particular transactions giving rise to the securities violations as alleged

18   herein, and exercised the same.

19         151.    The Individual Defendants were provided with or had unlimited access to copies

20   of the Company's reports, press releases, public filings, and other statements alleged by Lead

21   Plaintiffs to be materially false and/or misleading prior to and/or shortly after their issuance and

22   had the ability to prevent the issuance of the statements or cause the statements to be corrected.

23         152.    NVIDIA and the Individual Defendants each violated Section 10(b) and Rule

24   10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as

25   controlling persons of NVIDIA, each Individual Defendants is liable pursuant to Section 20(a) of

26   the Exchange Act.

27         153.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs

28   and the other members of the Class suffered damages in connection with their respective

1   purchases and sales of the Company's common stock during the Class Period.

2   ### PRAYER FOR RELIEF

3   154.    WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

4   A.      Determining that this action is a proper class action, certifying Lead Plaintiffs as

5   class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs'

6   Counsel as Class Counsel;

7   B.      Awarding compensatory damages in favor of Plaintiffs and other Class members

8   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

9   wrongdoing, in an amount to be proven at trial, including interest thereon;

10  C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

11  this action, including counsel fees and expert fees; and

12  D.      Such other and further relief as the Court may deem just and proper.

13  ### JURY TRIAL DEMANDED

14  155.    Plaintiffs hereby demand a trial by jury.

15

16  Dated: January 22, 2010                    _____/s/ Kim E. Miller_____
        Kim E. Miller (178380)

17      Melissa Ryan Clark (*Pro Hac Vice*)
        Michael A. McGuane

18      **KAHN SWICK & FOTI, LLC**
        500 Fifth Avenue, Ste. 1810

19      New York, NY 10110
        Telephone: 212-696-3730

20      Facsimile: (504) 455-1498
        Email: kim.miller@ksfcounsel.com

21      Email: melissa.clark@ksfcounsel.com

22      Email: michael.mcguane@ksfcounsel.com

23      Lewis S. Kahn (*Pro Hac Vice*)
        Paul S. Balanon (*Pro Hac Vice*)

24      **KAHN SWICK & FOTI, LLC**
        650 Poydras Street, Ste. 2150

25      New Orleans, LA 70130
        Telephone: (504) 455-1400

26      Facsimile: (504) 455-1498
        Email: lewis.kahn@ksfcounsel.com

27      Enail: paul.balanon@ksfcounsel.com

28

Barry A. Weprin (*Pro Hac Vice*)
Leigh Smith (*Pro Hac Vice*)
Jean Lee (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com
Email: lsmith@milberg.com
Email: jlee@milberg.com

**Michyo Michelle Furukawa**
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs New Jersey Carpenters Pension and Annuity Funds and Roberto Cohen*

Jonathan K. Levine (220289)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: jkl@girardgibbs.com

*Liaison Counsel for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2        I hereby certify that this Consolidated Amended Class Action Complaint was filed

3   through the ECF system and will be sent electronically to the registered participants as identified

4   on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-

5   registered participants on January 22, 2010.

6                                                        _____/s/ Kim E. Miller_____

7                                                              Kim E. Miller

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28