1   MICHAEL D. TORPEY (SBN 79424)
    *Email:  mtorpey@orrick.com*
2   JAMES N. KRAMER (SBN 154709)
    *Email:  jkramer@orrick.com*
3   JUSTIN  M. LICHTERMAN (SBN 225734)
    *Email:  jlichterman@orrick.com*
4   CHRISTIN J. HILL (SBN 247522)
    *Email:  chill@orrick.com*
5   COLEEN P. SCHOCH (SBN 262444)
    *Email:  cschoch@orrick.com*
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
7   405 Howard Street
    San Francisco, CA  94105-2669
8   Telephone:     (415) 773-5700
    Facsimile:     (415) 773-5759
9
    Attorneys for Defendants
10  NVIDIA CORPORATION, JEN-HSUN HUANG
    and MARVIN BURKETT
11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                          SAN JOSE DIVISION

15

16  In re NVIDIA CORPORATION              Case No.  08-cv-04260-JW
    SECURITIES LITIGATION,
17                                        CLASS ACTION

18  This Document Relates To:             **NOTICE OF MOTION AND MOTION
    ALL ACTIONS.                          TO DISMISS CONSOLIDATED
19                                        AMENDED CLASS ACTION
                                          COMPLAINT FOR VIOLATIONS OF
20                                        FEDERAL SECURITIES LAWS;
                                          MEMORANDUM OF POINTS AND
21                                        AUTHORITIES IN SUPPORT**

22                                        Date:         June 14, 2010
                                          Time:         9:00 a.m.
23                                        Judge:        Honorable James Ware
                                          Courtroom:    8, 4th Floor
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................... vii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ...................................................................................... 3

    A.     NVIDIA Develops And Supplies Components To Computer
        Manufacturers ................................................................................................... 3

    B.     |NVIDIA's Chips Are Complex Products With Attendant Risk of
        Problems ........................................................................................................... 4

    C.     The Chip Problems and NVIDIA's Response ................................................... 4

    D.     NVIDIA's May 22, 2008 Disclosure ............................................................... 5

    E.     NVIDIA's July 2, 2008 Press Release .............................................................. 6

    F.     Plaintiffs' CAC ................................................................................................. 7

III.   THE HEIGHTENED PLEADING STANDARDS APPLICABLE TO
     PLAINTIFFS' CLAIM ............................................................................................... 7

IV.    PLAINTIFFS FAIL TO PLEAD WITH PARTICULARITY FACTS
     THAT ESTABLISH DEFENDANTS MADE FALSE OR MISLEADING
     STATEMENTS ........................................................................................................... 8

    A.     The CAC Offers No Particularized Facts Establishing That the
        Timing of NVIDIA's Accounting Charge Was Incorrect Under ...................... 9

        1.     Plaintiffs Rely on Generic Opinions and Baseless
            "Information and Belief" to Suggest That a Loss Was
            "Probable" by November 8, 2007 ........................................................ 10

        2.     Plaintiffs Offer No Facts Establishing That Any Loss Was
            "Reasonably Estimable" by November 8, 2007 ................................... 12

        3.     NVIDIA's "Clean" Audit Opinions Corroborate That its
            Accounting was Correct ...................................................................... 13

    B.     Plaintiffs Offer No Particularized Facts to Support Their Disclosure
        Claim ............................................................................................................... 13

        1.     The CAC Fails to Plead Particularized Facts Establishing
            That the May 22, 2008 Disclosure Was False When Made .................... 14

        2.     The CAC Fails to Plead Particularized Facts Showing That
            NVIDIA's Disclosures Violated GAAP or SEC Reporting
            Requirements ..................................................................................... 14

        3.     Plaintiffs' BIOS Allegations Contradict Their Theory, and
            Corroborate The Timing of NVIDIA's Disclosure ............................... 15

**TABLE OF CONTENTS**
(continued)

Page

4.   Plaintiffs Mischaracterize Mr. Hara's Statements, Which Do Not Establish Falsity ............................................................................... 15

V.   PLAINTIFFS' CONFIDENTIAL WITNESSES ARE UNRELIABLE, LACK PERSONAL KNOWLEDGE OF NVIDIA'S ACCOUNTING, AND HAVE NO CONNECTION TO EITHER INDIVIDUAL DEFENDANT ................................................................................................... 16

VI.   PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE THAT EACH DEFENDANT ACTED WITH SCIENTER ..................... 19

A.   The Defendants' Stock Trading Patterns Negate Any Inference of Scienter, Let Alone a Cogent One ................................................... 20

1.   NVIDIA Lacked Motive To Inflate its Stock Price While Engaged in a Billion Dollar Stock Repurchase Program ....................... 20

2.   Plaintiffs Do Not, and Cannot, Allege Unusual or Suspicious Trading By Either Individual Defendant .............................. 21

B.   Plaintiffs' Generic Allegations of the Individual Defendants' Motive Do Not Create Any Inference of Scienter, Let Alone a Cogent One ................................................................................. 22

C.   Allegations of Employee Resignations Do Not Create An Inference of Scienter ............................................................................. 23

D.   The CW Statements Do Not Create Any Inference of Scienter .......................... 23

E.   Plaintiffs' Theory That NVIDIA Concealed Problems With Its Product to Protect Its Competitive Position is Implausible and Not Compelling ................................................................................. 23

VII.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ................................................... 24

VIII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF SECTION 20(A) ....................................................................................... 25

IX.   THE COURT SHOULD DENY LEAVE TO AMEND ................................................. 25

X.   CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................... 9

*Ashcroft v. Iqbal*,
   -- U.S. --, 129 S. Ct. 1937 (2009) .................................................................. 8, 11

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 8, 24

*Brodsky v. Yahoo!, Inc.*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................................................. 18

*Coble v. Broadvision Inc.*,
   2002 WL 31093589 (N.D. Cal. Sept. 11, 2002) ................................................. 17

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................... 24

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .............................................................................. 21

*Eminence Capital LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ........................................................................... 25

*Gompper v. VISX*,
   298 F.3d 893 (9th Cir. 2002) ............................................................................... 8

*Grassi v. Info. Resources, Inc.*,
   63 F.3d 596 (7th Cir. 1995) ............................................................................... 12

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ............................................................................. 16

*In re Acceptance Ins. Cos. Sec. Litig.*,
   423 F.3d 899 (8th Cir. 2005) ............................................................................. 10

*In re Apple Computer Inc., Sec. Litig.*
   243 F. Supp. 2d 1012 (N.D. 2002) .................................................................... 19

*In re Autodesk, Inc. Sec. Litig.*,
   132 F. Supp. 2d 833 (N.D. Cal. 2000) ............................................................ 7, 8

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*In re Boeing Sec. Litig.*,

4

40 F. Supp. 2d 1160 (W.D. Wash. 1998) ........................................................................ 13

*In re Cirrus Logic Sec. Litig.*,

5

946 F. Supp. 1446 (N.D. Cal. 1996) ............................................................................. 13

6

*In re Countrywide Fin. Corp. Deriv. Litig.*,

7

554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................................... 9

8

*In re Dot Hill Sys. Corp. Sec. Litig.*,

594 F. Supp. 2d 1150 (S.D. Cal. 2008) ......................................................................... 16

9

*In re GlenFed Sec. Litig.*,

10

42 F.3d 1541 (9th Cir. 1994) .................................................................................... 7, 12

11

*In re Harmonic,*

12

2002 WL 31974384 (N.D. Cal. 2002) ............................................................................ 19

13

*In re K-tel Int'l, Inc. Sec. Litig.*,

300 F.3d 881 (8th Cir. 2002) ............................................................................. 9, 10, 13

14

*In re Metawave Commc'n Corp. Sec. Litig.*,

15

298 F. Supp. 2d 1056 (W.D. Wash. 2003) ..................................................................... 17

16

*In re Midway Games, Inc. Sec. Litig.*,

17

332 F. Supp. 2d 1152 (N.D. Ill. 2004) .......................................................................... 12

18

*In re Netflix, Inc. Sec. Litig.*,

2005 WL 1562858 (N.D. Cal. June 28, 2005) ................................................................ 22

19

*In re Network Assoc., Inc. II Sec. Litig.*,

20

2003 WL 24051280 (N.D. Cal. Mar. 25, 2003) .............................................................. 17

21

*In re Northpoint Commc'n Group, Inc. Sec. Litig.*,

22

184 F. Supp. 2d 991 (N.D. Cal. 2001) ........................................................................... 19

23

*In re Read-Rite Corp.*,

2004 WL 2125883 (N.D. Cal. 2004) ............................................................................. 10

24

*In re Rigel Pharm., Inc. Sec. Litig.*,

25

2009 WL 5125344 (N.D. Cal. Dec. 21, 2009) ................................................................ 25

26

*In re Silicon Graphics Inc. Sec. Litig.*,

27

970 F. Supp. 746 (N.D. Cal. 1997) ................................................................................. 3

28

MOTION TO DISMISS CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT - CASE NO. 08-CV-4260-JW

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ................................................................. passim

*In re Silicon Storage Tech., Inc.*,
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ............................................. 13, 17

*In re Syncor Int'l Corp. Sec. Litig.*,
    239 F. App'x 318 (9th Cir. 2007) ........................................................... 22

*In re Tibco Software, Inc.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006)............................................. 20

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ................................................... 18

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................... 9

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................. 16

*Leadsinger, Inc. v. BMG Music Publ'g*,
    512 F.3d 522 (9th Cir. 2008) ................................................................. 25

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) ............................................... 13

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) ................................................................. 3

*Mathews v. Centex Telemgm't, Inc.*,
    1994 WL 269734 (N.D. Cal. June 8, 1994) .............................................. 20

*McCasland v. FormFactor, Inc.*,
    2008 WL 2951275 (N.D. Cal. July 25, 2008) ............................................ 19, 22

*McNamara v. Pre-Paid Legal Services*,
    189 F. App'x 702 (10th Cir. 2006) ......................................................... 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................... 8, 13, 25

*Nursing Home Pension Fund v. Oracle Corp.*
    380 F.3d 1226 (9th Cir. 2004) ............................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Osher v. JNI Corp.*,
   308 F. Supp. 2d 1168 (S.D. Cal. 2004), *aff'd in part, vacated in part on other
   grounds*, 183 F. App'x. 604 (9th Cir. 2006).......................................................... 17

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) ........................................................................ 14

*Panther Partners, Inc. v. Ikanos Commc'n Inc.*,
   347 F. App'x 617 (2d Cir. 2009) ....................................................................... 10

*Panther Partners, Inc. v. Ikanos Commc'n Inc.*,
   538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008), *aff'd in part, vacated in part on
   other grounds*, 347 F. App'x 617 (2d Cir. 2009) ...................................2, 12, 13, 14

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ......................................................................... 8, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................... 8, 19

*The NVIDIA GPU Litig.*,
   2009 WL 4020104  (N.D. Cal. Nov. 19, 2009) ...................................................... 4

*Thornton v. Micrografx, Inc.*,
   878 F. Supp. 931 (N.D. Tex. 1995) ................................................................... 24

*Zaluski v. United Am. Healthcare Corp.*,
   527 F.3d 564 (6th Cir. 2008)............................................................................ 14

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)..................................................................... passim

**STATUTES**

15 U.S.C.
   § 78u-4(b)(1)(B) ............................................................................................. 8

   § 78u-4(b)(1) .................................................................................................. 8

**RULES**

Federal Rule of Civil Procedure 9(b)..................................................................... 7

1

## NOTICE OF MOTION AND MOTION

2    TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3            PLEASE TAKE NOTICE that, on June 14, 2010 at 9:00 a.m. or as soon thereafter as the

4    matter may be heard, in the courtroom of the Honorable James Ware of the above-entitled Court,

5    located at 280 South 1st Street, San Jose, California, Defendants NVIDIA Corporation, Jen-Hsun

6    Huang, and Marvin Burkett (Messrs. Huang and Burkett are referred to collectively as the

7    "Individual Defendants") shall and hereby do move the Court for an order dismissing without

8    leave to amend Plaintiffs' Consolidated Amended Class Action Complaint for Violations of

9    Federal Securities Laws ("CAC").

10           This motion is brought pursuant to the Private Securities Litigation Reform Act of 1995

11   ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds

12   that the CAC fails to plead fraud with particularity and to state a claim upon which relief may be

13   granted. This Motion is based on this Notice of Motion and Motion, the following Memorandum

14   of Points and Authorities, and the Request for Judicial Notice ("RJN") filed herewith, all files and

15   records in this action, oral argument, and such additional matters as may be judicially noticed by

16   the Court or may come before the Court prior to or at the hearing on this matter.

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION**

3      Plaintiffs' CAC embodies precisely the sort of "fraud-by-hindsight" pleading that
4 Congress aimed to eradicate through the exacting, heightened pleading requirements of the Private
5 Securities Litigation Reform Act ("PSLRA").  On July 2, 2008, NVIDIA announced that it was
6 taking an accounting charge to cover anticipated customer warranty, repair, replacement and other
7 consequential costs arising from a problem with some of its graphics chip products.[1]  Plaintiffs do
8 not take issue with the fact or substance of this charge.  Rather, they quibble with the timing and
9 assert that NVIDIA should have taken the charge three quarters earlier.  But, as explained in detail
10 below, Plaintiffs' hindsight pleading fails as matter of law to sufficiently allege virtually every
11 element of a securities fraud claim, including falsity, scienter, and loss causation.

12      Right from the get-go, the CAC fails to show that any statement by NVIDIA was false
13 when made.  According to Plaintiffs, Financial Accounting Standards Board Statement No. 5
14 ("FAS 5") required NVIDIA to record an accounting charge on November 8, 2007, when the
15 Company announced its third quarter results.  Because NVIDIA did not record the charge at that
16 time, Plaintiffs assert that its financial results for the intervening periods were fraudulently
17 overstated.  CAC ¶4.  But Plaintiffs fail to plead particularized facts showing that NVIDIA knew by
18 November 2007 that a loss was both "probable" and "reasonably estimable," as required by FAS 5.
19 The CAC offers none of the "great detail" required by the PSLRA to show that NVIDIA knew by
20 that date that (1) notebook computers containing its chips were failing at "abnormally high rates,"
21 (2) NVIDIA was financially responsible for those failures, and (3) how to quantify the financial
22 impact of the problem.  Those omissions doom the CAC in its entirety.

23      Graphics chips are complex, "state-of-the-art" products that experience normal failures in
24 the ordinary course for a host of reasons.  NVIDIA expects those problems, expressly warns
25 investors about that risk, and takes a financial reserve against the cost of revenue for anticipated
26 problems each quarter.  Recognizing as much, Plaintiffs disavow claims based on a materialization

27

28

---

[1] As explained in detail below and in Section VII, in that same press release NVIDIA also announced that it would
miss its revenue goal and lowered its guidance.  The CAC does not assert claims based on that announcement.

1   of that risk, conceding that "[t]his case does not involve allegations of false forward-looking

2   statements or projections[.]"  CAC ¶127.  Instead, the CAC is premised on vague statements that

3   NVIDIA had "discussions" or received "reports" of "problems" with chips in late 2007.  However,

4   the CAC fails to tie those vagaries to the FAS 5 standard.  As one court points out:

> It is no secret that chips are subject to some percentage of failure
> (and here there is no pleading as to what a "normal" defect rate is),
> so the allegation that "there were defects" is meaningless without
> more.  **Certainly the failure to disclose that there was a defect
> does not amount to a basis for liability under the securities laws**
> . . . The Plaintiff must tell the Court what was going on when—and
> how much the defect experienced actually differed from the norm.[2]

9        Plaintiffs offer no facts showing NVIDIA's contemporaneous understanding of the nature,

10  root cause, or scope of the chip problem, all of which are required to show that a loss was

11  "probable" in November 2007 (when Plaintiffs say NVIDIA should have taken the charge).  Nor

12  does the CAC allege particularized facts showing NVIDIA's awareness of its financial

13  responsibility for or ability to quantify the problem before July 2, 2008 (when NVIDIA took the

14  charge).  That NVIDIA received unqualified audit opinions for fiscal years 2008 and 2009 is the

15  final nail in the falsity coffin, particularly since Plaintiffs allege that NVIDIA took the charge in the

16  wrong fiscal year.

17       Similarly, Plaintiffs' theory that NVIDIA's May 22 disclosure was false because it

18  "disclosed the MCP material set problems" but failed to disclose "the more serious problem with

19  the GPU chips" is equally flawed.  CAC ¶78.  The disclosure itself makes clear that it came in

20  response to one customer's specific "claim for incremental repair and replacement costs" associated

21  with an MCP problem during the quarter.  Plaintiffs offer no facts showing that NVIDIA received

22  any claim prior to this time for GPU products.

23       Short on facts, Plaintiffs rely heavily on the supposed musings of confidential witnesses

24  ("CWs").  But these CWs either never worked at NVIDIA, left long before the relevant period, or

25  had no involvement in NVIDIA's accounting, finance, or analysis of the chip problem.  Moreover,

26  none of them was privy to discussions with Defendants about any alleged false statement.

27

28  ---

[2] *Panther Partners, Inc. v. Ikanos Commc'n Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) (emphasis added), *aff'd in part, vacated in part on other grounds*, 347 F. App'x 617 (2d Cir. 2009).

1    The CAC also fails to allege with particularity that Defendants acted with the requisite

2  intent to deceive.  To the contrary, Defendants' stock trading during the class period <u>negates</u> any

3  inference of scienter, let alone a cogent one.  One of the Individual Defendants, NVIDIA's CEO,

4  sold a mere 2% of his shares pursuant to a Rule 10b5-1 trading plan, and was actually a net acquirer

5  of NVIDIA stock during the class period.  The other individual defendant, NVIDIA's CFO, sold no

6  stock at all.  Perhaps most damning, NVIDIA itself repurchased over 6 million shares during the

7  class period.  Plaintiffs cannot overcome these judicially noticeable facts, now or ever.

8    Furthermore, Plaintiffs' theory that NVIDIA concealed the chip problem to protect its

9  competitive market position is nonsensical.  NVIDIA's market position depends on its customers,

10  not investors.  NVIDIA could not possibly hide problems from customers simply by failing to take

11  an accounting charge sooner.  If its chips were failing, its customers would be the first to know it.

12    Finally, the CAC fails to allege loss causation.  Plaintiffs make no effort to show that

13  NVIDIA's stock price drop is attributable to the announced chip problems, rather than its

14  simultaneous announcement <u>in the same press release</u> that its second quarter financial results would

15  be below expectations and that it was lowering its going-forward financial guidance.

16    For each of these independent reasons, the CAC should be dismissed.

17  **II.**  **FACTUAL BACKGROUND**

18    By way of background, NVIDIA summarizes the relevant facts.[3]

19  **A.**    **NVIDIA Develops And Supplies Components To Computer Manufacturers**

20    NVIDIA is a Silicon Valley-based semiconductor company that designs graphics chips,

21  including media communications processor chipsets ("MCPs") and graphics processing units

22  ("GPUs").[4]  CAC ¶¶2-3, 15-16.  These chips are sold to Original Equipment Manufacturers

23  ("OEMs"), such as Dell and Hewlett-Packard ("HP"), who include them, along with many other

---

[3] The facts are gleaned from the CAC and judicially noticeable materials.  Where a document is incorporated by reference into a complaint, "[t]he court may treat such a document as 'part of the complaint'" and  documents referred to in the plaintiff's complaint and central to the claims are considered part of the pleadings, so the court "may assume that [their] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted); *In re Silicon Graphics Inc. Sec. Litig.*, 970 F. Supp. 746, 758 (N.D. Cal. 1997) (Securities and Exchange Commission filings that form basis for securities fraud claims are incorporated by reference into complaint).  *See also* NVIDIA Defendants' Request for Judicial Notice in Support of Motion to Dismiss Consolidated Amended Complaint, filed contemporaneously with this motion.
[4] NVIDIA's GPUs and MCPs are referred to collectively herein as "chips."

1   components, in computers that are sold to consumers.  CAC ¶¶2-3, 24; RJN Ex. 2 at RJN-48

2   (describing NVIDIA's need  to "hav[e] our existing and future products chosen for hardware

3   components or subassemblies designed by OEMs[.]")  NVIDIA sells billions of dollars worth of

4   chips each year for use in both notebook and desktop computers.  *See* RJN Ex. 2 at RJN-78.

5          NVIDIA is a fabless semiconductor company, meaning it does not directly manufacture its

6   chips.  Rather, it relies on independent contractors to manufacture, assemble, test and package its

7   products.  CAC ¶35; RJN Ex. 2 at RJN-38, 43, 44.

8          **B.      NVIDIA's Chips Are Complex Products With Attendant Risk of Problems**

9          As Plaintiffs acknowledge, NVIDIA's chips are complex, "state-of-the-art" products.

10  CAC ¶¶2, 41.  The chips are silicon-based microprocessor components that are embedded inside a

11  computer that is designed and built by OEMs.  The chips at issue here interact with the computer's

12  central processing unit and other internal components to generate interactive graphics on

13  workstations and personal computers.  CAC ¶¶2-3, 25; RJN Ex. 2 at RJN-31-35.[5]

14         As with most "state-of-the-art" products, some number of NVIDIA chips can and do fail

15  after they are sold to OEMs and incorporated into computers that are sold through to end-user

16  consumers.  In recognition of that fact, NVIDIA each quarter records a reduction to revenue in the

17  amount of the estimated cost of product warranties and estimated product returns, based on

18  historical return rates.  CAC ¶88; RJN Ex. 2 at RJN-49, 73-74, 103;  *see also* RJN Ex. 3 at RJN-

19  167-68, Ex. 7 at RJN-244-45, Ex. 10 at RJN-305, Ex. 11 at RJN-314-15.

20         **C.      The Chip Problems and NVIDIA's Response**

21         According to the CAC, between August and September 2007, NVIDIA began "receiving

22  reports" that certain notebook computers manufactured by certain OEMs were failing in the field at

23  higher than normal rates.  CAC ¶¶6, 34.  Although NVIDIA sold its chips to numerous OEMs for

24  use in both notebook and desktop computers, only certain configurations of notebook computers

25  sold by certain OEMs were failing at higher than normal rates at that time.  CAC ¶91 ("Certain

26  notebook configurations … are failing in the field at higher than normal rates.").  While neither the

27

28  ───────────────
    [5] *See also In re NVIDIA GPU Litig.*, 2009 WL 4020104 at *1 (N.D. Cal. Nov. 19, 2009) (Ware, J.) (citing allegations
    made by Milberg LLP, the same firm that drafted the CAC).

1   OEMs nor NVIDIA understood the root cause or scope of the notebook failures, by November

2   2007 some OEMs suggested that failures may have involved heat-related video failures of

3   NVIDIA's chips.  CAC ¶33.  NVIDIA, however, did not know whether the problem was caused by

4   its chips, rather than a compatibility issue or some other error.

5        Together with its OEMs, NVIDIA therefore began testing to try to ascertain the cause of

6   the problem.  CAC ¶91 (referring to testing).  As part of that process, they learned that computer

7   system thermal management designs contributed to notebook failures.  *Id.*  Specifically,

8   idiosyncratic thermal management design differences between notebook and desktop computers

9   and between different configurations of notebooks explained why failures occurred only in certain

10  notebook configurations.  CAC ¶24 (describing thermal cycling effect on chip), ¶33 (attributing

11  failures to thermal stress); ¶91 (system thermal management designs contributing factor in

12  notebook failures).  The OEMs -- not NVIDIA -- therefore issued BIOS updates[6] in November

13  2007 to improve their notebook's thermal management system.  CAC ¶¶28, 29, 32, 42-44.

14       **D.   NVIDIA's May 22, 2008 Disclosure**

15       In the first quarter of NVIDIA's 2009 fiscal year, one of its OEM customers tendered a

16  claim for incremental costs arising from the notebook failures.  NVIDIA promptly disclosed the

17  claim in its first quarter Form 10-Q, and warned investors that it might result in the Company

18  incurring costs beyond its normal product warranty accrual.[7]  Specifically, on May 22, 2008,

19  NVIDIA announced in a section of its Form 10-Q titled "Product Defect Contingencies" that:

20              During the first quarter of fiscal year 2009, one of our customers
              asserted claims for incremental repair and replacement costs related to
21             an alleged die/packaging material set defect in one of our notebook
              MCP products.  This product was included in a significant number of
22             customer's notebook products that have been sold to end users, and
              has also been shipped to other of our customers in significant
23             quantities.  We are evaluating the potential scope of this situation,
              including the nature and cause of the alleged defect and the merits of
24             the customer's claim, and to what extent the alleged defect might
              occur with other products.  We are currently unable to estimate the
25             amount of costs that may be incurred by us beyond the normal product
              warranty accrual that we have taken related to this claim and the
26             alleged defect and, therefore, we have not recorded any additional

27  ────────────────

28  [6] BIOS is special software that interacts with various components of a computer.  CAC ¶28, n.4 (citing websites).
    [7] NVIDIA's fiscal year ends on the last Sunday in January.  CAC ¶5, n.2

related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

CAC ¶76; RJN Ex. 3 at RJN-174.

NVIDIA's stock price barely moved in response to the disclosure.  On May 22, 2008, it closed at $23.65 per share.  It opened the next day four cents lower, at $23.61 per share, before closing at $23.11 per share, pennies below where it was trading before the announcement.  The next business day, NVIDIA's stock was trading above $24.  RJN Ex. 26 at RJN-463.

### E.       **NVIDIA's July 2, 2008 Press Release**

In the months following the May 22 disclosure, NVIDIA continued to work with its OEM customers to understand the nature, cause and scope of the problem.  By July 2008, NVIDIA determined that the notebook failures were associated with a weak die/packaging material set in certain versions of its previous generation MCP and GPU products.  By then, NVIDIA had sufficient data to estimate the scope of costs it might incur in connection with the notebook failures.

Accordingly, on July 2, 2008, NVIDIA issued a press release announcing that it was taking "a $150 million to $200 million charge against cost of revenue to cover anticipated customer warranty, repair, return, replacement and other consequential costs and expenses arising from a weak die/packaging material set in certain versions of its previous generation MCP and GPU products used in notebook computers."  CAC ¶91; RJN Ex. 5 at RJN-234.  NVIDIA explained that:

> The previous generation MCP and GPU products that are impacted were included in a number of notebook products that were shipped and sold in significant quantities.  Certain notebook configurations of these MCP and GPU products are failing in the field at higher than normal rates.  ***While we have not been able to determine a root cause for these failures***, testing suggests a weak material set of die/package combination, system thermal management designs, and customer use patterns are contributing factors.
>
> . . . .
>
> ***We continue to not see any abnormal failure rates in any systems using NVIDIA products other than certain notebook configurations.***[8]

*Id.* (emphases added).

---

[8] The announcement made clear that NVIDIA still did not know the root cause of the problems, but that testing suggested that the failures were due to a combination of factors, principally: (1) a particular material set combination in the chips; (2) the thermal designs of certain notebook computers; and (3) patterns of customer use.  CAC ¶91

1   In the same press release, NVIDIA also announced that it expected second quarter revenue

2   and gross margins to be lower than previously projected. RJN Ex. 6 at RJN-237. The Company

3   explained that it was revising guidance in response to end-market weakness around the world, the

4   delayed ramp of a next generation of MCP, and price adjustments to certain GPU products in

5   response to competitive pressures. *Id.* The next day, NVIDIA's stock price declined from a July 2

6   close of $18.03 per share to a July 3 close of $12.49 per share. RJN Ex. 26.

7   **F.  Plaintiffs' CAC**

8   Following the July 2, 2008 announcement, several class action lawsuits were filed in this

9   court. The Court appointed lead Plaintiffs on December 8, 2009. They filed the CAC on January

10   22, 2010, asserting violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

11   and Rule 10b-5 thereunder on behalf of purchasers of NVIDIA stock between November 8, 2007

12   and July 2, 2008. Docket Nos. 142, 147.

13   **III.  THE HEIGHTENED PLEADING STANDARDS APPLICABLE TO PLAINTIFFS'**
    **CLAIM**

14

15   To survive a motion to dismiss under Section 10(b), Plaintiffs must satisfy the heightened

16   pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA. *Zucco Partners,*

17   *LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) "requires the inclusion of

18   specific facts regarding the alleged fraudulent activity, such as the time, date, places, content of

19   each fraudulent representation, the reasons that the representation is false, and the identity of the

20   person or persons engaged in the fraud." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 839

21   (N.D. Cal. 2000). In addition, the PSLRA requires Plaintiffs to plead in "great detail" the "facts

22   reflecting 'the who, what, when, where, and how' with respect to the facts underlying [a] claim."

23   *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974, 998 (9th Cir. 1999) (citations omitted).

24   As to Section 10(b), Plaintiffs must plead particularized facts demonstrating "(1) a

25   material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or

26   sale of a security, (4) transaction and loss causation, and (5) economic loss." *Zucco*, 552 F.3d at

27   990. They must set forth an explanation why the disputed statement was untrue or misleading

28   when made. *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548-49 (9th Cir. 1994). The PSLRA further

1   requires Plaintiffs to plead <u>with particularity</u> specific facts establishing <u>both</u> falsity and scienter.

2   *See* 15 U.S.C. § 78u-4(b)(1)(B); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (PSLRA

3   requires that a complaint "plead with particularity both falsity and scienter").

4        In assessing the sufficiency of a securities class action complaint "the court must consider

5   *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the

6   plaintiffs." *Gompper v. VISX*, 298 F.3d 893, 897 (9th Cir. 2002); *see also Tellabs*, *Inc. v. Makor*

7   *Issues & Rights, Ltd.,* 551 U.S. 308, 323 (2007).  The inference of scienter must be "cogent and

8   compelling, thus strong in light of other explanations."  *Id.* at 324.

9        When conducting this inquiry, a court must consider facts alleged in the complaint,

10  documents attached to or relied upon but not attached to the complaint if their authenticity is not

11  questioned, and matters subject to judicial notice.  *Id.* at 322.  While the court assumes the facts

12  alleged are true, it is not required to indulge in unwarranted inferences to save a complaint from

13  dismissal.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir.

14  2008).  Similarly, conclusions "couched as [] factual allegation[s]" are not entitled to deference.

15  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, -- U.S. --, 129

16  S. Ct. 1937, 1949-50 (2009) (*Twombly*'s pleading standard applies to all civil cases).

17  **IV.**   **<u>PLAINTIFFS FAIL TO PLEAD WITH PARTICULARITY FACTS THAT</u>**
18  **<u>ESTABLISH DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS</u>**

19       At the outset, Plaintiffs allege that NVIDIA made two misleading omissions.  The

20  gravamen of their claim is that NVIDIA issued false financial statements that neglected to include

21  an accounting charge required by FAS 5.  Secondarily, they contend that NVIDIA failed to disclose

22  a likely loss or known trend in connection with its chips, even if it could not quantify it yet.  Both

23  theories fail for three independent reasons.

24       *First*, the CAC relies exclusively on insufficient "information and belief" allegations.

25  Under the PSLRA, where allegations regarding a statement or omission are made on information

26  and belief, "the complaint shall state with particularity all facts on which that belief is formed."

27  15 U.S.C. § 78u-4(b)(1); *In re Autodesk,* 132 F. Supp. 2d at 838.  Although Plaintiffs try to bury it

28  in the first, unnumbered prefatory paragraph of the CAC, they freely admit that they "make the

1    allegations contained in this Complaint upon information and belief[.]"  CAC ¶2.  But, as explained

2    in detail below, they offer <u>no</u> particularized facts demonstrating the basis for <u>any</u> fact alleged on

3    information and belief.

4         *Second*, although Plaintiffs quibble with the <u>timing</u> (but not the substance) of NVIDIA's

5    accounting charge and related disclosures, the CAC offers no particularized contemporaneous facts

6    showing that the timing of NVIDIA's accounting was incorrect.  NVIDIA's accounting is

7    corroborated by clean audits during the class period and the absence of any restated financials.

8    Since NVIDIA's accounting was correct, Plaintiffs have not pled an actionable false statement.  *See*

9    *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in

10   one report should have been made in earlier reports do not make out a claim of securities fraud.")

11        *Third*, the CAC pleads no facts showing that NVIDIA's disclosures were false when made.

12   There are no contemporaneous facts establishing the existence of a "trend" or a potential loss

13   earlier.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002) (dismissing complaint

14   for failure to plead "contemporaneous facts in sufficient detail and in a manner that would create a

15   strong inference that the alleged adverse facts were known at the time of the challenged

16   statements").

17        A.    <u>The CAC Offers No Particularized Facts Establishing That the Timing of</u>
             <u>NVIDIA's Accounting Charge Was Incorrect Under FAS 5</u>
18

19        Plaintiffs theory of fraud rests on purported violations of GAAP.  Plaintiffs suggest that

20   NVIDIA violated FAS 5 because, according to them, it should have accrued a charge against

21   revenue, over and above its normal reserve, to account for its supposedly defective chips on

22   November 8, 2007, and not on July 2, 2008.  CAC ¶94.

23        Plaintiffs concede that NVIDIA was not required to take a charge unless <u>both</u> (i)

24   information known to it prior to the issuance of the financial statements made it "probable" that an

25   asset had been impaired as of the reporting date, <u>and</u> (ii) the loss amount could be "reasonably

26   estimated."  CAC ¶86.[9]  *See also In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002)

27   (outlining FAS 5 prerequisites); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044,

28
     _____
     [9] *See also* RJN Ex. 9 at RJN-277-78.

1  1070 n. 31 (C.D. Cal. 2008) (same).  Yet Plaintiffs offer no particularized facts showing that by

2  November 8, 2007, NVIDIA knew it was the "probable" cause of the notebook failures, that the

3  warranty-related costs could be reasonably estimated, and, importantly, that those costs exceeded

4  NVIDIA's normal reserve.

### 1.      Plaintiffs Rely on Generic Opinions and Baseless "Information and Belief" to Suggest That a Loss Was "Probable" by November 8, 2007

7      Plaintiffs opine that NVIDIA's chip problem made it "probable" that the Company would

8  incur a loss by November 8, 2007 (CAC ¶94), but provide no specific, contemporaneous facts

9  explaining *why* that was so.  Rather, they engage in impermissible hindsight pleading, questioning

10  the accuracy of NVIDIA's earlier financial statements in light of the later announcement of a chip

11  problem.   *In re K-tel*, 300 F.3d at 893 (company's later financial disclosure of loss contingency

12  insufficient to support allegation that prior disclosures were false); *In re Acceptance Ins. Cos. Sec.*

13  *Litig.*, 423 F.3d 899, 903–05 (8th Cir. 2005) (retrospective analysis of awareness of potential losses

14  by defendant cannot form basis for securities fraud claim).

15      As noted above, NVIDIA anticipates chip failures in the ordinary course of business, so

16  "[l]earning that some chips were defective would be expected[.]"  *Panther Partners, Inc. v. Ikanos*

17  *Commc'n Inc.,* 347 F. App'x 617, 620 (2d Cir. 2009).  Yet, the CAC is silent about: the rate at

18  which OEM notebooks or NVIDIA chip components were failing in November 2007; the rate or

19  volume of returns that NVIDIA received back at that time; whether NVIDIA or any OEM had

20  performed meaningful and statistically significant failure analysis at that time, the results of those

21  tests; whether NVIDIA understood the nature of the problem at that time; whether NVIDIA knew

22  that it was to blame for the notebook problems, or whether the OEM's product design, hardware, or

23  another supplier was at fault.  *See In re Read-Rite Corp.*, 2004 WL 2125883, at *4 (N.D. Cal. 2004)

24  (dismissing claims where "[t]he few allegations describing the technical problems … fail to specify

25  the magnitude of such problems. Without at least an allegation of the magnitude or severity of the

26  technical challenges existing at the time each statement was made, it cannot be inferred that

27  defendants knew or should have known … that those problems could not be overcome").

28

Here, only certain configurations of notebooks containing NVIDIA products failed at higher than normal rates, while desktops and other notebook configurations did not. *See* pages 4–5, *supra*; CAC ¶91; RJN Ex. 5. Faced with those asymmetrical computer failures, it does not follow -- as Plaintiffs say -- that NVIDIA understood at that time that it was at fault, rather than a compatibility issue or problem with computer system designs. (In fact, as the CAC itself acknowledges, NVIDIA ultimately determined that computer system thermal management designs were a contributing factor to the notebook failures.) CAC ¶91.

The CAC offers nothing to overcome the failures outlined above, or the far more compelling and plausible explanation that NVIDIA did not understand the nature, scope, or magnitude of the problem until July 2008. Instead, it offers generic assertions that "NVIDIA knew that its graphics chipsets were defective and caused notebook computers to overheat" (CAC ¶3); and "Defendants knew, at least as early as August 2007, that design problems caused NVIDIA GPUs to overheat and fail" (CAC ¶24). These are precisely the sort of bare conclusions that should be disregarded on a motion to dismiss. *Ashcroft*, 129 S. Ct. at 1950-51.

The few, threadbare facts scattered among the conclusions are pled on information and belief, and lack any particularized facts detailing the basis for that belief. For example, Plaintiffs say, on information and belief, that "[b]y November 2007, HP and Dell confronted NVIDIA with data and other information showing that dozens of computer model lines from several manufacturers were all suffering from the same problem: heat-related video failures of NVIDIA's graphics processors." CAC ¶33. But the CAC provides no specific factual allegations about how Plaintiffs came to this belief, the contents of the vague data, what "other information" was presented, who from HP and Dell met with who from NVIDIA, when the meeting occurred, or corroboration that this "confrontation" actually happened. Nor do they offer any facts explaining why these facts (if true) would have triggered a disclosure obligation on NVIDIA's behalf.

Similarly, Plaintiffs allege, again on information and belief, that "by the late summer of 2007 . . . emails were circulating internally at Dell…and between Dell and NVIDIA that discussed and emphasized the gravity of the defects in NVIDIA's GPU chips." CAC ¶30. Not only do Plaintiffs neglect to explain how they know about these emails, and so detail the basis for their

1   belief, but they offer no insight into who sent them, what was said, or how NVIDIA responded.

2   That is hardly the sort of "great detail" demanded by the PSLRA.[10]  *Silicon Graphics*, 183 F.3d at

3   974.

4         The allegations here are analogous to those dismissed in *Panther Partners,* 538 F. Supp.

5   2d 662.  In that case, plaintiffs alleged that a chip manufacturer violated the securities laws when it

6   failed to disclose a defect in one of its chips, despite being "aware" of a problem earlier.  Although

7   the claim did not implicate the PSLRA (plaintiffs asserted a Section 11 claim under the Securities

8   Act of 1933), the court still dismissed the complaint.  In so doing, it observed that plaintiffs failed

9   to show (1) the rate at which the chips were being returned at that time, (2) the volume of defective

10  chips, (3) what the defendants knew at that time, (4) how the defect experienced differed from the

11  norm, and (5) when defendants determined that the failure rate was abnormally high.  *Id.* at 673.

12        These same flaws persist here and, given the absolute pleading requirements of Rule 9(b)

13  and the PSLRA, Plaintiffs' failure to state a claim is even more stark.

14
15      **2.**    **Plaintiffs Offer No Facts Establishing That Any Loss Was "Reasonably Estimable" by November 8, 2007**

16        Even if Plaintiffs had sufficiently pled a "probable" loss by November 8, 2007 (and they

17  have not), the CAC is dead silent about whether, when or how the loss was "reasonably estimable"

18  at that time.  To bridge this gap, Plaintiffs conclude -- in pure 20/20 hindsight -- that NVIDIA must

19  have been able to quantify a loss in November.  Of course, the PSLRA requires more; Plaintiffs

20  must plead contemporaneous facts showing that NVIDIA's statements were false <u>when made</u>.

21  *GlenFed*, 42 F.3d at 1548-49.  They cannot reverse-engineer fraud by characterizing statements as

22  false in hindsight.  *See Grassi v. Info. Resources, Inc.*, 63 F.3d 596, 600 (7th Cir. 1995) (claim that

23  defendant should have written off bad investment sooner "is not fraud"); *In re Midway Games, Inc.*

24  *Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004) (allegations based on "timing issues,

25  without more, cannot give rise to a securities fraud claim").

26

27
28  [10] In fact, as explained in more detail on page 15, *supra*, these allegations and the conclusion that Plaintiffs draw are flatly contradicted by the fact that the OEMs issued software updates -- called "BIOS" -- to their customers.  *See* CAC ¶4.  The OEMs would not issue a software update to address a known hardware problem with chips.

                         - 12 -             MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT  -  CASE NO. 08-CV-4260-JW

1       Plaintiffs accrual allegations fall well short of this mark.  They omit any details showing

2 that, prior to July 2008, NVIDIA knew (1) the nature, scope, or magnitude of the chip problem, (2)

3 that it likely bore financial responsibility for the problem, or (3) how to reasonably estimate the

4 cost to fix it.  *See In re K-tel*, 300 F.3d at 893 (rejecting allegation that company should have taken

5 charge to income sooner where plaintiff failed to demonstrate that FAS 5 factors were met); *In re*

6 *Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1177-78 (W.D. Wash. 1998) (rejecting allegation that

7 timing of accounting charge was incorrect where there were no specific allegations showing that

8 defendant clearly had an obligation at that specific time to record the loss).

9
10       **3.**     **NVIDIA's "Clean" Audit Opinions Corroborate That its Accounting was Correct**

11       NVIDIA's independent auditor, PricewaterhouseCoopers, provided unqualified audit

12 opinions for NVIDIA's 2008 and 2009 fiscal years.  RJN Ex. 2 at RJN-96, Ex. 25 at RJN-448.

13 These "clean" audit opinions strongly corroborate that NVIDIA's accounting was correct --

14 particularly since Plaintiffs allege that NVIDIA took the charge in the wrong fiscal year.  *See In re*

15 *Silicon Storage Tech., Inc.*, 2006 WL 648683, at *8 (N.D. Cal. Mar. 10, 2006) (unqualified audit

16 opinion and absence of restatement corroborated absence of falsity); *Limantour v. Cray Inc.*, 432 F.

17 Supp. 2d 1129, 1157 (W.D. Wash. 2006) (holding that no false statement where accounting

18 decision was approved by auditors); *see also Panther Partners*, 538 F. Supp. 2d at 666 (finding that

19 unqualified audit opinions weighed against falsity in defective chip case).

20       As explained above, the CAC offers no facts (versus conclusions) that NVIDIA should

21 have taken the charge in November 2007.  Indeed, Plaintiffs offer nothing explaining why their

22 position, even if credited, is anything more than the difference between two permissible judgments

23 based on facts known at the time.  *See In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457 (N.D.

24 Cal. 1996) (requiring plaintiffs to plead more than differences between two permissible judgments).

25 Under these circumstances, the CAC should be dismissed.  *Metzler*, 540 F.3d at 1068–69.

26       **B.**     **Plaintiffs Offer No Particularized Facts to Support Their Disclosure Claim**

27       Like their accounting claim, Plaintiffs' disclosure claim fails to plead particularized facts

28 establishing that Defendants made material false statements or omissions about chip failure rates.

1.   **The CAC Fails to Plead Particularized Facts Establishing That the May 22, 2008 Disclosure Was False When Made**

In a tacit acknowledgment of the weakness of their disclosure claims, Plaintiffs try to plead around NVIDIA's May 22, 2008 disclosure, which revealed <u>during the class period</u> exactly the qualitative information that Plaintiffs say was hidden.  CAC ¶¶89, 95.  Plaintiffs claim that the May 22 disclosure was false and misleading because "although Defendants disclosed the MCP material set problems, they failed to make any disclosure about the more serious problem with the GPU chips."[11]  CAC ¶78.  However, as the disclosure itself makes clear, the May announcement came in response to a customer's specific "claim for incremental repair and replacement costs" associated with an <u>MCP</u> problem during the quarter.  CAC ¶89.  Tellingly, Plaintiffs offer <u>no facts</u> showing that NVIDIA received claims before then for GPU products (let alone any that were greater than the normal quarterly warranty reserve maintained by NVIDIA).  Once again, the absence of well pleaded facts is dispositive.

2.   **The CAC Fails to Plead Particularized Facts Showing That NVIDIA's Disclosures Violated GAAP or SEC Reporting Requirements**

Plaintiffs rely on exactly the same anemic allegations to support their disclosure claim under Item 303 of Regulation S-K and FAS 5, ¶10 that they used to support their accounting violations.  CAC ¶95.  For the same reasons discussed in Section IV.A.1 above, these allegations do not support any inference that there was a "known trend or uncertainty" that NVIDIA recognized during the class period, or understood was likely to come to fruition.  *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002) (citing 17 C.F.R. 229.303(a)(3)(ii) (no duty to disclose arises under Item 303 unless there is a "trend" which is "known" and likely to come to fruition)).  *See also Panther Partners*, 538 F. Supp. 2d at 672 (dismissing alleged Item 303 disclosure violation).

Nor have Plaintiffs pled particularized facts to show that there was "a reasonable possibility that a loss . . . may have been incurred" under FAS 5, ¶10.  RJN Ex. 9 at RJN-278; *Zaluski v.*

---

[11] The CAC never explains whether or how the GPU problem differed from, let alone was more serious than, the MCP problem and never differentiates between the products.

1    *United Am. Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008) (affirming dismissal of a Section

2    10(b) claim where plaintiffs failed to allege facts that gave rise to a "probability" of a loss which is

3    "the standard the GAAP uses when determining whether disclosure is necessary").  Absent detailed

4    allegations that speak to these specific GAAP and SEC disclosure standards, Plaintiffs' claim fails.

### 3.   Plaintiffs' BIOS Allegations Contradict Their Theory, and Corroborate The Timing of NVIDIA's Disclosure

7        Nor do Plaintiffs' BIOS allegations -- also made on information and belief -- advance their

8    cause.  Plaintiffs admit both that (1) BIOS is a software code that controls computer functions, and

9    does not address a problem with chips, and (2) the OEMs -- not NVIDIA -- issued the BIOS update

10   in November 2007.  CAC ¶¶28, n.4, 29, 32, 43.  Yet they offer no reason why, if it was crystal clear

11   in November 2007 that the notebook failures were caused by NVIDIA chips, the OEMs would

12   agree to issue an ineffectual software update to their customers (CAC ¶¶43-44), instead of

13   demanding immediate compensation from NVIDIA for the chip problem.

14       Plaintiffs' theory is especially puzzling in light of their allegations that the graphics chip

15   industry is "highly competitive," (CAC ¶52) and that an NVIDIA competitor offered OEMs a

16   better, cheaper, defect-free alternative (CAC ¶38).  Put simply, the OEMs had no incentive to go

17   along with any purported accounting scheme by NVIDIA.[12]  The more cogent and compelling

18   inference is that neither NVIDIA nor its OEMs understood the nature, root cause, or scope of the

19   problem in November 2007.

### 4.   Plaintiffs Mischaracterize Mr. Hara's Statements, Which Do Not Establish Falsity

22       Lacking any facts bearing on NVIDIA's accounting decisions, Plaintiffs pin their hopes on

23   comments made by Michael Hara, described as an NVIDIA Vice President.  CAC ¶25.  A careful

24   review of Mr. Hara's actual comments, rather than Plaintiffs' characterizations of them, quickly

25   reveals that they do not establish a duty to disclose or that the timing of NVIDIA's accounting

26   charge was inaccurate.

27

28   [12] In fact, NVIDIA's GPU notebook market share and its annual revenue increased over the period when Plaintiffs say the OEMs confronted NVIDIA with the problem.  *See* RJN Ex. 2 at RJN-78.

1    Mr. Hara is not an accountant, is not alleged to have had any involvement in NVIDIA's

2   accounting decisions, or even to know what FAS 5 is.  He says nothing about NVIDIA's failure

3   analysis or accounting for the chip problem.  Moreover, Mr. Hara said only that NVIDIA had been

4   "hearing about" and "working on this problem with the customers" since August 2007.  CAC ¶93;

5   RJN Ex. 8.  There is a gaping canyon between working with the OEMs to understand and analyze

6   the problem, and knowing that a loss was "probable" at that time, or even a "reasonable

7   possibility."  Again, Plaintiffs' allegations offer nothing about NVIDIA's <u>contemporaneous</u>

8   understanding of the nature, cause, or scope of the problem back in August 2007.

9   **V.     PLAINTIFFS' CONFIDENTIAL WITNESSES ARE UNRELIABLE, LACK**

10  **PERSONAL KNOWLEDGE OF NVIDIA'S ACCOUNTING, AND HAVE NO CONNECTION TO EITHER INDIVIDUAL DEFENDANT**

11    Plaintiffs try to paper over these foundational cracks by relying on information supposedly

12  obtained from eight confidential witnesses.  Although not entirely clear, Plaintiffs seem to rely on

13  the CWs to plead both falsity and scienter.  *See Ronconi*, 253 F.3d at 429 (falsity and scienter often

14  inferred from same facts); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1157 (S.D.

15  Cal. 2008) (courts often combine falsity and scienter pleading requirements into single inquiry).

16  Both attempts fail.

17    As an initial matter, CW allegations must be discounted under the opposing inferences

18  analysis required by *Tellabs*.  *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw*

19  *Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("Following *Tellabs*, courts must discount

20  allegations from confidential sources."); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57

21  (7th Cir. 2007) (*Tellabs* requires courts to "discount allegations that the complaint attributes to …

22  [CWs]").  Moreover, under the PSLRA pleading standard, allegations derived from CWs are

23  disregarded if they are vague, uncorroborated, implausible or otherwise unreliable.  Plaintiffs must

24  demonstrate with particularity that the alleged "witnesses" occupied a position that indicates their

25  possession of the information attributed to them.  A complaint must also allege how the CW came

26  to learn of the information, whether the witness learned it first-hand, and how it is corroborated by

27

28

other sources.  Where, as here, CW allegations are not corroborated by other facts, Plaintiffs must allege specific facts showing the CWs' relevant personal knowledge.  *Zucco*, 552 F.3d at 995.[13]

As summarized in the following table, none of the CWs is reliable or has personal knowledge of anything related to the chip failures, NVIDIA's accounting for the problem, or the Individual Defendants' mental state:

| CW | NVIDIA EMPLOYEE IN CLASS PERIOD | INVOLVED WITH PRODUCT DEFECT | INTERACTED WITH DEFENDANTS | INVOLVED WITH ACCOUNTING |
|---|---|---|---|---|
| CW1 | Yes | No | No | No |
| CW2 | Yes | No | No | No |
| CW3 | Yes | No | No | No |
| CW4 | No | No | No | No |
| CW5 | No | No | No | No |
| CW6 | No | No | No | No |
| CW7 | No | No | No | No |
| CW8 | No | No | No | No |

The CWs are patently unreliable.  Five of the eight CWs were not employed at NVIDIA during the class period.  CW4, CW5, and CW8 <u>never</u>, at any time, worked for NVIDIA, and CW6 and CW7 had both left by August 2006, more than a year before the class period.  CAC ¶¶26, 55-58.  Thus, none of these CWs was positioned to know <u>anything</u> about what NVIDIA knew about the chip problem in 2007, when it knew it, or who it was talking to.  Many of the CW statements are also hearsay and speculation.  *See* CAC ¶26 (CW4's double hearsay statements about what former HP employee said); ¶55 (CW5 lacks personal knowledge or involvement in problem, but is "confident" NVIDIA was aware of its scope).  *See Zucco*, 552 F.3d at 996-98 (CWs unreliable if they lack  personal knowledge of alleged transgressions, and statements are hearsay); *Oracle Corp.*, 380 F.3d at 1233 (confidential witnesses must be described with sufficient particularity to establish reliability and personal knowledge).  Further, CW6's (Software and Hardware Test Engineer) and

---

[13] *See also Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004); *Silicon Graphics*, 183 F.3d at 985; *Silicon Storage,* 2006 WL 648683, at *10; *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1178 (S.D. Cal. 2004), *aff'd in part, vacated in part on other grounds*, 183 F. App'x 604 (9th Cir. 2006); *In re Metawave Commc'n Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003); *In re Network Assoc., Inc. II Sec. Litig.*, 2003 WL 24051280, at *10 (N.D. Cal. Mar. 25, 2003); *Coble v. Broadvision Inc.*, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002).

1   CW7's (Senior Engineering Manager) assertions that NVIDIA shipped defective chips and had a

2   policy of denying problems with its products are wholly lacking in the particularized details

3   required to make these statements reliable.[14] CW ¶¶56-57. Neither CW6's or CW7's title or

4   description indicates any involvement in failure analyses, product warranty or returns, or sales.

5   *Zucco*, 552 F.3d at 995 (plaintiff must show probability that person in CW's position would

6   possess alleged information).

7           The three CWs who purportedly worked at NVIDIA for a time fare no better. CW1 was a

8   software engineer who offers only a hindsight description of the nature of the purported problem,

9   failing to show contemporaneous knowledge about anything, let alone accounting. CAC ¶24.

10  CW2, a Senior New Product Introduction Planner who worked at NVIDIA from 2005 to 2008, is

11  similarly unhelpful. Like CW1, CW2 offers only a hindsight explanation of the problem. Nor are

12  any facts alleged that establish this former "Product Introduction Planner" has any knowledge of

13  NVIDIA's accounting. CAC ¶24. CW2 speaks generically about NVIDIA's "average" or

14  "normal[]" habits when rolling out new products (CAC ¶41), but fails to show any personal

15  knowledge of the chip problem at issue here. Finally, CW3, an NVIDIA Quality Engineer from

16  2004 until 2008, states that "before they went public [with their BIOS releases in November 2007],

17  we [NVIDIA] were already talking with Dell and HP" and that NVIDIA "spent months prior to

18  November 2007 working with HP and Dell to resolve the overheating issues." CAC ¶¶25, 54.

19  Again, that NVIDIA was "talking with Dell and HP" in November 2007 is hardly surprising, and

20  does not establish that NVIDIA understood the nature, root cause, or scope of the chip problem, or

21  that it would bear its costs.

22          In addition, none of the CWs has any accounting background or responsibilities,

23  involvement in NVIDIA's accounting decisions, or any knowledge of NVIDIA's financial

24  disclosures. *See, e.g.*, *Brodsky v. Yahoo!, Inc.*, 592 F. Supp. 2d 1192, 1201 (N.D. Cal. 2008)

25  (rejecting securities fraud claim based on improper accounting because the CWs had no accounting

26  responsibilities); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal.

27

28  ---

    [14] Plaintiffs allege that CW6 worked at NVIDIA from February 2006 through July 2006, and CW7 worked at
    NVIDIA from 2002 until March 2006. *See* CAC ¶¶56 and 57.

1   2002) (accounting fraud claim not corroborated where "none of the confidential witnesses have any

2   first-hand knowledge of [defendant's] accounting decisions"). None of them interacted with,

3   attended meetings with, reported to or reviewed reports from, heard statements by, or even met the

4   Individual Defendants. *McCasland v. FormFactor, Inc.*, 2008 WL 2951275, at *8 (N.D. Cal. July

5   25, 2008) (no scienter where CWs not alleged "to have had any interaction or communication with

6   any of the defendants, or to have provided any defendant with information, or to have heard or read

7   any statement by any defendant, that contradicted or even cast doubt on a public statement made

8   during the class period.").[15]

9         For these reasons, the CWs all fail to provide any inference of falsity or scienter.

10   **VI.   PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG**
        **INFERENCE THAT EACH DEFENDANT ACTED WITH SCIENTER**

11

12         For the reasons explained above, the CAC fails to plead a false statement. The Court

13   should dismiss the CAC for that reason alone. Plaintiffs also fall well-short of their burden to plead

14   a strong inference of scienter, providing an additional, independent reason for dismissal.

15         A statement is made with scienter if it is made with actual intent to deceive investors or

16   with "deliberate recklessness," a "degree of recklessness that strongly suggests actual intent" to

17   deceive investors. *Silicon Graphics*, 183 F.3d at 977, 979. It is not enough for a complaint "to

18   allege facts from which an inference of scienter rationally could be drawn." *Tellabs*, 551 U.S. at

19   322. Rather, Plaintiffs' particularized factual allegations must give rise to a strong inference; one

20   that is "cogent and at least as compelling as any opposing inference one could draw from the facts

21   alleged." *Id.* "A defendant corporation is deemed to have the requisite scienter for fraud only if the

22   individual corporate officer making the statement has the requisite level of scienter." *In re Apple*

23   *Computer Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002). Plaintiffs cannot meet

24   their burden by pleading "collective scienter," *i.e.*, that one person made a false statement at the

25   same time that another knew the statement to be false. *Id.*

26

27

28   ―――――――――――――――
[15] *See also In re Harmonic*, 2002 WL 31974384, at *11 (N.D. Cal. 2002); *In re Northpoint Commc'n Group, Inc.*
*Sec. Litig.*, 184 F. Supp. 2d 991, 997 (N.D. Cal. 2001).

1    The circumstantial allegations of scienter set forth in the CAC rest on (1) Mr. Huang's

2    stock sales; (2) the Individual Defendants' motive to commit fraud to enhance their personal

3    financial interests; (3) the resignation of two NVIDIA executives; and (4) CW statements. Far

4    from creating a strong inference of scienter, many of these allegations affirmatively <u>negate</u> it. The

5    remaining assertions about incentive-based compensation and NVIDIA's motive to maintain its

6    competitive position are vague, legally insufficient, and fail to raise even a weak inference of

7    scienter.

8    **A.   The Defendants' Stock Trading Patterns Negate Any Inference of Scienter,**
     **Let Alone a Cogent One**

9

10   The CAC alleges that Mr. Huang's stock sales during the class period suggest scienter.

11   CAC ¶122. Not so. Plaintiffs ignore the totality of Defendants' trading patterns. First, NVIDIA

12   itself actually purchased a significant number of shares pursuant to a publicly-disclosed stock

13   repurchase program. Second, Plaintiffs do not allege any unusual trading by either Individual

14   Defendant. Mr. Burkett did not sell at all during the class period, and Plaintiffs do not allege facts

15   to show that Mr. Huang's trading pattern was "suspicious" and "dramatically out of line with prior

16   trading practices at times calculated to maximize personal benefit from undisclosed inside

17   information." *Silicon Graphics*, 183 F.3d at 986. Rather, the judicially-noticeable facts show that

18   his trades are wholly innocent and consistent. Thus, far from establishing scienter, these judicially

19   noticeable facts actually negate it.

20   **1.   NVIDIA Lacked Motive To Inflate its Stock Price While Engaged in a**
     **Billion Dollar Stock Repurchase Program**

21

22   While Plaintiffs accuse NVIDIA of plotting to artificially inflate its stock price, they

23   conveniently ignore that the Company engaged in a massive stock repurchase program that

24   extended into the class period. The existence of this repurchase program is legally significant

25   because company "stock repurchase programs actually *negate* a finding of scienter." *In re Tibco*

26   *Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) (dismissing claims for *inter*

27   *alia* failure to plead scienter). Courts have concluded that it "ma[kes] no sense to purchase the

28   stock if defendants knew the prices to be inflated." *Mathews v. Centex Telemgm't, Inc.*, 1994 WL

269734, at *7–8 (N.D. Cal. June 8, 1994); *see also McNamara v. Pre-Paid Legal Services,* 189 F. App'x 702, 712 (10th Cir. 2006) (affirming dismissal of complaint with prejudice based on defendant's "compelling" arguments that company repurchased over two million shares of its own stock during class period).

At the same time that Plaintiffs allege NVIDIA was fraudulently concealing adverse information from the market, it spent approximately $123.9 million to repurchase 6.3 million of its own shares in the first quarter of the 2009 fiscal year.[16]  RJN Ex. 3 at RJN-169.  Thus, NVIDIA spent an average of $19.66 per share on its repurchase program.  When its stock dropped to an average of $11.82 per share in the ninety days after the July 2, 2008 announcements (CAC ¶111), NVIDIA lost almost $50 million.

NVIDIA's stock repurchase program concretely shows that it had no economically-viable incentive to artificially inflate its stock price during the class period.  Had it done so, NVIDIA itself would have suffered significant "damages" likely unrivaled by those of any other shareholder. Accordingly, Plaintiffs' scienter allegations are far from cogent.  Instead, they are economically implausible and should be dismissed.  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (when a plaintiff's view of the facts defies economic reason, it yields no reasonable inference of fraudulent intent); *McNamara,* 189 F. App'x at 718 (affirming dismissal where plaintiff failed to show "alleged fraud was economically logical in light of [defendant's] repurchase of its own stock at allegedly inflated prices").

**2.   Plaintiffs Do Not, and Cannot, Allege Unusual or Suspicious Trading By Either Individual Defendant**

Only "'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." *Silicon Graphics*, 183 F.3d at 986.  To determine whether sales qualify as "suspicious," courts consider: (1) the amount and percentage of total shares sold; (2) timing of the sales; and (3) consistency of sales with prior trading history.  *Id.*  Plaintiffs bear the burden of pleading facts that satisfy these factors. *Zucco*, 552 F.3d at 1005.

---

[16]  NVIDIA made these purchases under two repurchase programs authorized by its Board of Directors between May 2005 and August 2008, with a maximum value of $2.7 billion.  *See* RJN Exs. 1 at RJN-17; Ex. 2 at RJN-87; Ex. 3 at RJN-172; Ex. 10 at RJN-308; Ex. 11 at RJN-317.

1    Plaintiffs utterly fail to meet their burden here.  First, they fail to plead any stock sales

2    whatsoever by Mr. Burkett.  As CFO during the class period, Mr. Burkett was, according to

3    Plaintiffs' theory, a necessary participant in any fraud.  That Mr. Burkett did not sell a single share

4    of stock during the class period negates any inference of fraud.

5    Second, with respect to Mr. Huang, NVIDIA's CEO, Plaintiffs allege nothing to show that

6    his sale of 186,000 shares during the class period was "suspicious" or "dramatically out of line"

7    with his prior trading.  According to the CAC, Mr. Huang sold 186,000 shares, or only 2% of his

8    total holdings at the start of the class period, and actually increased his net holdings during that

9    time.[17]  *See McCasland*, 2008 WL 2951275, at *10 (no scienter where defendants maintained

10   88.5% of their stock holdings during class period).  Moreover, Mr. Huang sold more stock in the

11   three quarters preceding the class period than he did during the three quarters of the class period.[18]

12   Finally, as Plaintiffs concede, Mr. Huang sold his shares pursuant to a 10b5-1 trading plan (CAC

13   ¶122), which negates scienter.  *See In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *8 (N.D.

14   Cal. June 28, 2005) (rejecting plaintiffs' contention that defendants' stock sales provided a basis for

15   scienter where, *inter alia*, defendants' "sales were pursuant to a Rule 10b-5(1) trading plan").

16
17   **B.    Plaintiffs' Generic Allegations of the Individual Defendants' Motive Do Not Create Any Inference of Scienter, Let Alone a Cogent One**

18   Predictably, Plaintiffs also resort to allegations that the Individual Defendants were

19   motivated to commit fraud "by their compensation arrangements, including stock option and

20   incentive payment programs."  CAC ¶115.  But "[i]f simple allegations of pecuniary motive were

21   enough to establish scienter, 'virtually every company in the United States that experiences a

22   downturn in stock price could be forced to defend securities fraud actions.'"  *Zucco*, 552 F.3d at

23   1005.  The mere existence of performance-based compensation and bonuses does not create a

24   strong inference of scienter.  *In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 321 (9th Cir.

25   2007) (allegations of motive to inflate company stock through bonus incentives tied to stock price

26   fail to show scienter).

27   [17] RJN at 9 and Exs. 4, 12, 16-24.

28   [18] Mr. Huang sold or transferred over 1,000,000 shares in the three quarters preceding the class period.  *See* CAC ¶122; RJN Exs. 13–15.

Plaintiffs neglect to connect their compensation allegations to the company's stock price or financials. *Zucco*, 552 F.3d at 1004. The CAC offers mere conclusory assertions that NVIDIA used some variable compensation for its executives during the Class Period, but shows no "strong correlation" between the allegedly misstated financial results and Defendants' compensation. CAC ¶¶117-18. For example, Plaintiffs say that Mr. Huang's "base salary was increased from $500,000 in fiscal 2007 to $600,000 in fiscal 2008," but do not explain how base compensation is linked to NVIDIA's financials or stock price. CAC ¶119. Plaintiffs' bare assertion that "[h]ad the Individual Defendants timely disclosed the problems with Company's [sic] GPUs, their compensation for fiscal 2008 would have been substantially lower," (CAC ¶120), is wholly inadequate to meet the PSLRA's strict pleading requirements. *Zucco*, 552 F.3d at 1005.

**C.      Allegations of Employee Resignations Do Not Create An Inference of Scienter**

Similarly, Plaintiffs' allegation that two NVIDIA employees resigned during the class period goes nowhere. CAC ¶47. "[C]onclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Zucco*, 552 F.3d at 1002. Mr. Burkett remains an NVIDIA consultant, RJN Ex. 27 at RJN-474, and Plaintiffs offer no facts to discount the more likely explanation that he and Mr. Garcia resigned for "unrelated personal or business reasons." *Id.* Juxtaposed against other, more plausible explanations, these rote allegations do not create even a weak inference of scienter.

**D.      The CW Statements Do Not Create Any Inference of Scienter**

As noted at pages 16-19 above, the CWs are patently unreliable and offer no facts whatsoever about the Individual Defendants. They add nothing to a scienter inquiry.

**E.      Plaintiffs' Theory That NVIDIA Concealed Problems With Its Product to Protect Its Competitive Position is Implausible and Not Compelling**

Despite these glaring flaws, Plaintiffs likely will argue that, viewed "holistically," the CAC is greater than the sum of its parts. It is not. Most of the allegations here affirmatively negate scienter, and so overwhelm the few sparse facts that, in their most liberal reading, only arguably provide some weak inference of intent. More fundamentally, Plaintiffs' entire theory of fraud does

1   not cross "the line between possibility and plausibility" (and in fact is highly improbable).

2   *Twombly*, 550 U.S. at 557.  As Plaintiffs tell it, NVIDIA hid problems with its GPUs to "maintain a

3   lead market share" in the "highly competitive" graphics chips industry, and avoid falling behind its

4   rivals.  CAC ¶52.  But that theory ignores that NVIDIA is a component part supplier.

5        NVIDIA's market share depends on the satisfaction of its customers, the OEMs.  As the

6   CAC itself acknowledges, NVIDIA's customers would be the <u>first</u> to learn of an NVIDIA chip

7   defect, and could simply purchase component part chips from other suppliers.  *See* CAC  ¶38

8   (admitting that NVIDIA faced increasing "competitive pressure" from its customers in the form of

9   a "product failure backlash").  NVIDIA therefore could not possibly conceal chip problems from

10  the very customers upon which it relied to maintain its competitive position.  Put simply, NVIDIA

11  had no motive to try to hide that which Plaintiffs admit its customers already knew (CAC ¶¶52, 54),

12  and could not protect its market position by hiding chip problems from investors.  *See Thornton v.*

13  *Micrografx, Inc.*, 878 F. Supp. 931, 937-38 (N.D. Tex. 1995) (no scienter "based upon a

14  nonsensical premise" that required court to "leave its common sense at the courthouse steps").

15       Plaintiffs' theory is neither cogent nor as compelling as other, innocent explanations for

16  the timing of NVIDIA's accounting charge and related disclosures, *viz.* that it did not understand

17  the nature, root cause, or scope of its chip problems prior to its public announcement.

18  **VII.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION**

19       To plead loss causation, Plaintiffs must allege a "causal connection between the material

20  misrepresentation and the loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

21  Plaintiffs must allege that "the *subject* of the fraudulent statement or omission was the cause of the

22  actual loss."  *In re Maxim Integrated Pdts, Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1044-45 (N.D.

23  Cal. 2009) (Ware, J.) (dismissing complaint in part for failure to plead loss causation).  Plaintiffs

24  ignore that NVIDIA's July 2, 2008 press release disclosed <u>both</u> the chip problem <u>and</u> that

25  NVIDIA's second quarter results would miss market expectations and lowered prior financial

26  guidance.  RJN Ex. 6 at RJN-237.  Thus, they fail to explain, as they must, why NVIDIA's stock

27  price decline is attributable to the chip problem, rather than NVIDIA's disappointing financial

28  results and lower guidance.  *Metzler*, 540 F.3d at 1064–65 (finding unwarranted an inference that

1  the market learned of defendant's alleged fraud during the class period because (1) the first

2  disclosure did not cause negative long-term reaction in defendant's stock price and (2) the second

3  disclosure "contained a far more plausible reason for the resulting drop in [defendant's] stock price

4  - the company failed to hit prior earnings estimates"); CAC ¶¶110-114 (describing NVIDIA stock

5  price drop).   Plaintiffs' omission is especially acute here because NVIDIA's stock barely moved

6  when the company disclosed chip problems on May 22, 2008.

7  **VIII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF SECTION 20(A)**

8         Plaintiffs' Section 20(a) claims fails because they have not pled a primary violation of

9  Section 10(b).  *See Zucco*, 552 F.3d at 990; *In re Rigel Pharm., Inc. Sec. Litig.*, 2009 WL 5125344

10 (N.D. Cal. Dec. 21, 2009).

11 **IX.   THE COURT SHOULD DENY LEAVE TO AMEND**

12         Courts deny leave to amend where, as here, amendment is futile.  *Leadsinger, Inc. v. BMG*

13 *Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008); *Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d

14 1048, 1052-53 (9th Cir. 2003).  NVIDIA's stock repurchase, the absence of suspicious trading,

15 clean audit opinions, and the corroborative effect of the BIOS allegations forever negate an

16 inference of fraud.  Further, Plaintiffs had 16 months between filing suit and filing the CAC, and

17 offer only a few unreliable CWs.  These facts strongly indicate that they have no additional facts to

18 plead, so dismissal with prejudice is proper.  *Zucco*, 552 F.3d at 1007; *Metzler*, 540 F.3d at 1072.

19 **X.   CONCLUSION**

20         For the foregoing reasons, this Court should dismiss the CAC with prejudice.

21

22  DATED:  March 8, 2010                    Respectfully submitted:

23                                          ORRICK, HERRINGTON & SUTCLIFFE LLP

24                                          By:  _____*/s/ Michael D. Torpey*_____

25                                               Michael D. Torpey

26                                          Attorneys for Defendants
                                            NVIDIA CORPORATION,
                                            JEN-HSUN HUANG and MARVIN BURKETT

27

28