**\*E-FILED 10/19/10\***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re NVIDIA CORPORATION SECURITITES LITIGATION, | CASE NO. 08-CV-04260 -RS<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

## I. INTRODUCTION

Plaintiffs Roberto Cohen, the New Jersey Carpenters Pension Fund, and the New Jersey Carpenters Annuity Fund bring this action against defendants NVIDIA Corporation ("NVIDIA" or the "Company"), Jen-Hsun Huang, and Marvin Burkett for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the Securities Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5. Plaintiffs have sued on behalf of themselves and all persons who purchased or otherwise acquired NVIDIA common stock between November 8, 2007 and July 2, 2008 (the "Class Period"). After several class actions were filed in this Court, Cohen, the New Jersey Carpenters Pension Fund, and the New Jersey Carpenters Annuity Fund were named lead plaintiffs on December 23, 2008. On January 22, 2010 plaintiffs filed a Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (the "CAC"). Defendants have moved to dismiss the CAC. For the reasons stated below, the motion to dismiss is granted with leave to amend.

## II. BACKGROUND

NVIDIA is a Silicon Valley-based semiconductor company that designs graphics chips, including media communications processor chipsets ("MCPs") and graphics processing units ("GPUs"). These chips, which constitute a significant portion of NVIDIA's business, are sold to Original Equipment Manufacturers ("OEMs"), such as Dell and Hewlett-Packard ("HP"). As alleged in the CAC, between August and September 2007, NVIDIA received reports from HP and Dell that notebook computers equipped with NVIDIA chips were failing at higher than normal rates due to thermal-stress caused by the GPUs. While NVIDIA and the OEMs tested the notebooks to determine the root cause of these failures, HP and Dell issued BIOS updates in late 2007 to help mitigate some of the problems.[1] In the CAC, plaintiffs aver that these BIOS updates were a

---

[1] A BIOS (Basic Input/Output System) is special software that updates the code imbedded in a computer and is intended to assure that the computer components function together.

temporary, stop-gap measure that NVIDIA employed as it worked to design replacement chips.  The replacement GPU chips were then distributed in May 2008.  According to an NVIDIA Senior New Product Introduction Planner ("CW2") identified in the CAC, a batch of replacement GPU chips typically takes approximately a year to roll out on account of the redesign, manufacture, and quality testing required.

On May 22, 2008, NVIDIA disclosed in its Form 10-Q for the quarter ended April 27, 2008 that the Company had received a customer claim from one of its OEMs for incremental costs due to the notebook failures.  Specifically, the 10-Q stated:

> During the first quarter of fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products.  This product was included in a significant number of the customer's notebook products that have been sold to end users, and has also been shipped to other of our customers in significant quantities. We are evaluating the potential scope of this situation, including the nature and cause of the alleged defect and the merits of the customer's claim, and to what extent the alleged defect might occur with other of our products.  We are currently unable to estimate the amount of costs that may be incurred by us beyond the normal product warranty accrual that we have taken related to this claim and the alleged defect and, therefore, we have not recorded any additional related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

On July 2, 2008, NVIDIA issued a press release announcing that it would be required to take a $150 million to $200 million charge against its cost of revenue to cover these incremental costs, which it characterized as anticipated customer warranty, repair, return, and replacement expenses arising from defects in certain versions of its previous generation MCP and GPU notebook products. In particular, the press release said:

> The previous generation MCP and GPU products that are impacted were included in a number of notebook products that were shipped and sold in significant quantities. Certain notebook configurations of these MCP and GPU products are failing in the field at higher than normal rates. While we have not been able to determine a root cause for these failures, testing suggests a weak material set of die/package combination, system thermal management designs, and customer use patterns are contributing factors.

The Company ultimately took a $196 million accounting charge as a result of the chip defects.  This charge was in excess of the regular reserve against the cost of revenue that NVIDIA

1   regularly takes in anticipation of any problems with its chipsets.  The press release issued on July 2,

2   2008 also announced that NVIDIA expected its second quarter revenue and gross margins to be

3   lower than previously recorded.[2]  The next day, NVIDIA's stock price fell from a July 2, 2008 close

4   of $18.03 per share to a close of $12.49 per share.[3]

5          In addition to CW2, the CAC refers to a number of confidential witnesses that plaintiffs offer

6   in support of their allegations.  These witnesses include a software engineer who worked for

7   NVIDIA from 2000 through 2008 ("CW1"), a quality engineer who worked for the Company from

8   2004 until 2008 ("CW3"), a reporter covering the chip defects ("CW4"), an environmental compliance

9   engineer ("CW5"), an NVIDIA software and hardware test engineer from February 2006 through July

10  2006 ("CW6"), a senior engineering manager who worked for the Company from 2002 until March

11  2006 ("CW7"), and an administrator for a technology website who specialized in hardware graphics

12  and software news from 2004 through June 2008  and who has also worked as a technical support

13  employee for Dell from 2000 through 2004 ("CW8").[4]  The CAC also avers that Michael Hara, a

---

14       [2] In deciding a motion to dismiss under Rule 12(b)(6), courts may consider documents
     attached to the complaint and incorporated therein by reference, *Kaufman and Broad-South Bay v.*
15   *Unisys Corp.,* 822 F. Supp. 1468 (N.D. Cal. 1993) (overruled on other grounds), as well as
     documents referred to in the complaint and whose authenticity is not in question.  *Townsend v.*
16   *Columbia Operations,* 667 F.2d 844, 848-49 (9th Cir.1982).  Although the CAC does not attach the
     full July 2, 2008 press release, plaintiffs refer to, and rely upon, that press release in making their
17   claims.  Defendants then attach the full press release, the authenticity of which plaintiffs do not
     dispute, to their motion to dismiss.  Therefore, the complete press release is properly considered in
18   ruling on the motion to dismiss.

19       [3] Defendants have requested that the Court take judicial notice of a number of documents.
     Judicial notice is limited to facts not subject to reasonable dispute and either generally known in the
20   community or capable of accurate and ready determination by reference to sources whose accuracy
     cannot be reasonably questioned. Fed. R. Evid. 201; *see Lee v. City of Los Angeles*, 250 F.3d 668,
21   688-690 (9th Cir. 2001).  Courts may take judicial notice of daily closing prices of a company's
     common stock.  *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1475 n.2 (N.D. Cal. 1992), *aff'd*.
22   11 F.3d 865 (9th Cir. 1992).  The Court, then, takes judicial notice of the daily closing prices of
     NVIDIA's common stock as reported by Yahoo! Finance and provided by defendants.

23

24       [4] CW1 stated that the defect with the GPU chips was a heating and cooling problem, such
     that the chips would crack if they were heated too much, then cooled, and then heated again.
25   According to the CAC, CW3 stated that NVIDIA was talking to HP and Dell about the chip defects
     before the BIOS releases in November 2007.  The reporter covering NVIDIA (CW4) is alleged to
26   have interviewed a former senior HP employee, who said that by mid-2007 the chip defects had
     caused a significant change in the average defect rate for all HP laptops.  The CAC avers that CW5

1    Vice President of Investor Relations and Communications for NVIDIA, gave a speech on September

2    4, 2008 during a Citigroup Technology Conference in which he addressed the chip defects and the

3    timing of NVIDIA's accounting charge.[5]

4         As to the individual defendants, the CAC avers that Huang and Burkett each had a significant

5    financial motive to inflate the value of NVIDIA's stock.  Specifically, Huang, NVIDIA's Chief

6    Executive Officer, and Burkett, its former Chief Financial Officer who resigned his position on

7    March 21, 2008 but remained with the Company until after the Class Period, each received

8    compensation based upon corporate performance targets.  Plaintiffs maintain that these targets would

9    not have been met had the chipset problems been disclosed.  In addition, Huang adopted a 10b5-1

10   trading plan (the "10b5-1 Plan") through which he was able to exercise options for NVIDIA

11   common stock.  The CAC avers that, under the 10b5-1 Plan, Huang purchased and sold 186,000

12   shares in March 2008, netting $3 million.  According to a number of Exchange Act Form 4's

13   submitted by defendants accompanying their motion to dismiss, the accuracy of which plaintiffs do

14   not dispute, the 10b5-1 Plan was adopted on August 23, 2007 and then subsequently amended, and

15   the exercise of the 186,000 options constituted 2% of Huang's total holdings in NVIDIA stock at the

16   start of the Class Period.

17        Plaintiffs allege that NVIDIA made two misleading omissions during the Class Period with

18   regards to its graphics cards.  First, the CAC avers that the Company's Exchange Act filings were

19   false and misleading because they failed to disclose known defects in NVIDIA's graphics cards and

20   the resulting impact on the Company's financial results.  In particular, the CAC avers that materially

21   ─────────────────────────────────────

22   was aware of numerous instances in which NVIDIA failed to take responsibility for Company
     problems, and that CW6 and CW7 said NVIDIA's policy is to deny if problems arise and to delay

23   taking any remedial action when they do.  Lastly, according to CW8, NVIDIA's chips had a history
     of thermal failures, which the Company has been reluctant to acknowledge.

24        [5] Although the CAC does not attach Hara's full September 4, 2008 speech, it relies upon

25   statements Hara made during that speech.  In their motion to dismiss, defendants attach the full
     statement, the authenticity of which plaintiffs do not dispute.  Therefore, the complete statement by

26   Hara is properly considered in ruling on the motion to dismiss.

false and misleading statements and omissions were made in the May 22, 2008 Form 10-Q, which, while it disclosed the MPC material set problems, did not disclose the problems with the GPU chips. The CAC also alleges that the Form 10-Q filed on November 21, 2007, the Form 10-K filed on March 21, 2008, and the Form 8-K filed on November 8, 2007, each of which failed to disclose any of the issues regarding either the MPC or GPU chipsets, were also misleading.[6]  Second, the CAC avers that NVIDIA issued false financial statements during the Class Period that failed to address the accounting charge related to the chipset failures, the disclosure of which plaintiffs allege was required by the Financial Accounting Standards Board Statement No. 5 ("FAS 5").  Defendants move to dismiss the CAC pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  The parties presented oral argument on the motion in this Court on June 24, 2010.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)).  A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* Claims grounded in fraud are also subject to Rule 9(b), which provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy that rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

---

[6] In addition to the July 2, 2008 press release and the September 4, 2008 statements from Michael Hara, the CAC refers to NVIDIA Form 10-Qs filed on November 21, 2007, May 22, 2008, and August 21, 2008, NVIDIA Form 10-K filed on March 21, 2008, and NVIDIA Form 8-Ks filed on November 8, 2007 and July 2, 2008.  As their authenticity is not in question, these documents are properly considered in ruling on the motion to dismiss.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true).

## IV. DISCUSSION

A.      Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security… any manipulative or deceptive device or contrivance in contravention of such rules as the [Securities Exchange Commission] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 (Rule 10b-5). To state a claim under Section 10(b), a plaintiff must allege: "(1) misrepresentation or omission of a material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Pursuant to the requirements of the PSLRA, the CAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, the PSLRA requires that the CAC "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In applying this

heightened pleading requirement, the Ninth Circuit has defined the required state of mind as

"deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d

970, 974 (9th Cir. 1999). In short, while Section 10(b) claims may be based on reckless conduct, the

PSLRA pleading requirement mandates that plaintiffs "state specific facts indicating no less than a

degree of recklessness that strongly suggests actual intent." *Id.* At 979.

1. *Material Misrepresentations or Omissions*

Plaintiffs have presented two theories relative to NVIDIA's material misrepresentations or

omissions: (1) that the Company issued false financial statements that neglected to include an

accounting charge for the chip failures in violation of FAS 5; and (2) that the Company failed to

disclose the abnormal failure rates of the chips in its Securities Exchange Commission ("SEC")

filings made during the Class Period. As discussed below, plaintiffs ultimately fail to allege with the

requisite particularity under the PSLRA or Rule 9(b) that any of NVIDIA's SEC filings or financial

statements during the Class Period contained material misrepresentations or omissions.

a. FAS 5

The parties have agreed that FAS 5, a generally accepted accounting principle ("GAAP"),

guides accounting for loss contingencies.[7] Under FAS 5, an "estimated loss from a loss

contingency" must be accrued when: (a) "it is probable that an asset had been impaired or a liability

had been incurred at the date of the financial statements," and (b) "the amount of the loss can be

reasonably estimated." FAS 5. According to this FASB standard, a "loss contingency" is "an

---

[7] GAAP are the official standards adopted by the Financial Accounting Standard Board (the "FASB"). The SEC treats FASB standards, such as FAS 5, as authoritative. *See Dreiling v. America Online Inc.*, 578 F.3d 995, 998-999 (9th Cir. 2009) (citing *United States v. Ebbers,* 458 F.3d 110, 125 (2d Cir. 2006); *see also* 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."). Violations of GAAP standards are not themselves dispositive on a Section 10(b) claim, but can be evidence of scienter. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("[S]ignificant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity.").

existing condition, situation, or set of circumstances involving uncertainty as to possible... loss" while "probable" means "the future event or events are likely to occur." *Id*. Additionally, as defendants point out in the motion to dismiss and which plaintiffs do not dispute, NVIDIA regularly takes a financial reserve against its cost of revenue in anticipation of chip failures and product warranties. *See* RJN Ex. 2 at RJN-49, 73, 103. Therefore, any evaluation of whether the Company should have taken an accounting charge under FAS 5 prior to July 2008 must also consider whether an "estimated loss" from the chip failures would have exceeded the normal reserve at that time.

i.      *"Probable Loss"*

Although the question of scienter will be addressed more thoroughly below, in an omission claim the issues of falsity and knowledge are necessarily intertwined. *See In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1113 (9th Cir. 1989) (a statement may be actionable under Section 10(b) where "the speaker is [ ] aware of [ ] undisclosed facts tending to seriously undermine the accuracy of the statement."). Therefore, in evaluating whether the CAC sufficiently alleges a failure by NVIDIA to take a FAS 5 charge, the Court must look at what allegations plaintiffs make that the Company knew a "probable loss" could result from the purportedly higher than normal failure rates in it GPU chips. In support of their claim that, by November 8, 2007, NVIDIA knew the chip failures would result in a liability requiring the Company to incur an accounting charge, plaintiffs argue that the CAC alleges "contemporaneous facts regarding OEM customer complaints [ ]; well-placed NVIDIA employees knowledgeable of the defects at issue [ ]; the Company's design process [ ]; the Company's early awareness of OEM complaints [ ]." Opp. at 9. They also maintain that averments in the CAC as to Hara's after-the-fact statements as well as to emails between the Company and Dell indicate that NVIDIA was aware the chip failure rate was abnormally high and would result in an accounting charge. None of these alleged facts, however, establish the "who, what, where, when, and how" required by Rule 9(b) or the specificity or particularity required by the PSLRA to survive a motion to dismiss.

As to the OEM complaints, while it is noteworthy that HP and Dell (two major OEMs) notified NVIDIA simultaneously of problems with laptops that contained NVIDIA graphic processors, the CAC nonetheless fails to allege sufficiently that these complaints create a strong inference that the Company knew, or was deliberately reckless in ignoring, that by late 2007 it was responsible for the laptop problems. *See Silicon Graphics*, 183 F.3d at 974. Although the CAC alleges that in August 2007 "HP… approached NVIDIA to inform the Company that its GPUs were to blame for thermal-stress failures on at least a dozen different notebook lines" (CAC ¶ 26) and that "by November 2007 HP and Dell confronted NVIDIA with data and other information showing that dozens of computer model lines from several manufacturers were all suffering from the same problem" (CAC ¶ 33), these allegations at their core are simply conclusory statements from which plaintiffs incorrectly attribute knowledge to the Company. In short, none of these averments specify the "who, what, where, when, and how" that allegations in fraud under Rule 9(b) require – who from HP and Dell informed whom at NVIDIA, what data or information did they share, where the information was presented, or how the plaintiffs came to learn of these facts. Similarly absent is the "great detail" that the PSLRA demands. *See Silicon Graphics, 183 F.3d* at 984 (existence of internal reports contradicting positive public statements made by defendant's officers did not meet the requirement for a strong inference of deliberate recklessness under the PSLRA because plaintiff failed "to state facts relating to the internal reports, including their contents, who prepared them, which officers reviewed them and from whom she obtained the information."). Similarly, plaintiffs' averment that "by late summer of 2007… emails were circulating internally at Dell… and between Dell and NVIDIA that discussed and emphasized the gravity of the defects in NVIDIA's GPU chips," (CAC ¶ 30) fails to offer any details as to who sent the emails, what the emails said, or how plaintiffs came to learn about the emails.

Additionally, plaintiffs' averments as to the BIOS updates issued by the OEMs fail to support the proposition that NVIDIA knew by late 2007 that its chipsets were the cause of the thermal-stress failure in HP and Dell notebook computers. According to the CAC, plaintiffs infer from these BIOS

updates that NVIDIA and the OEMs worked in concert to delay disclosure of the chip failures in order to give the Company time to disseminate redesigned replacements GPUs.  CAC ¶¶ 42-44.  In their opposition, however, plaintiffs state just the opposite when they maintain that "there is nothing to suggest that these OEMs were aware of the true nature, root cause, or scope of the problem." Opp. at 20.  In contrast, defendants argue that the reasonable inference from the BIOS updates is not that the OEMs and NVIDIA agreed to issue an ineffectual software patch to buy time, but instead that neither understood the nature or cause of the computer failures and that the updates were an initial (and failed) attempt to resolve the problem.  Mot. to Dismiss at 15.  The Court need not address the relative plausibility of these competing two inferences, however, because the CAC alleges no particular facts to suggest that the OEMs understood the nature of the problem with the chipsets, nor does it contain any averments that the OEMs issued the BIOS updates to buy NVIDIA time to replace the GPUs.  In other words, the CAC fails to allege who from NVIDIA contacted whom at the OEMs, what they said about the BIOS updates, why the OEMs issued them, or how plaintiffs learned of this information.  Based simply on the facts alleged, then, and not on any of the CAC's conclusory statements, plaintiffs' have not shown that the OEM complaints or BIOS updates suggest the Company knew by November 2007 that the chip failures would result in a "probable loss" requiring an accounting charge.

With regards to the confidential witnesses, purportedly including the "well-placed NVIDIA employees knowledgeable of the defects at issue," the CAC again fails to present more than conclusory statements in support of the notion that NVIDIA was aware of a "probable loss" requiring an accounting charge.  Of the eight confidential witnesses the CAC lists, two (CW8 and CW4, a reporter who simply interviewed an unnamed senior NVIDIA employee) were never employed by NVIDIA, making it unlikely that they have personal knowledge of whether the Company knew there would be a "probable loss," exceeding the normal reserve, resulting from the allegedly higher than normal failure rates in it GPU chips.  *See Zucco Partners v. Digimarc*, 552 F.3d 981, 996 (9th Cir. 2009) (confidential witnesses do not raise a strong inference of scienter

where they are not employed by the defendant, lack personal knowledge, report only unreliable hearsay, or allege only conclusory assertions of scienter).  While plaintiffs argue that CW8, a former technical support employee for Dell, had personal experience providing support to Dell computers containing NVIDIA chips, this experience allegedly occurred between 2000 and 2004, well before the Class Period and the problems with the chips relevant to this action arose.  CW6 (a software and hardware test engineer) and CW7 (a senior engineering manager), while both NVIDIA employees, each worked for the Company prior to the Class Period and are alleged to have merely made broad statements that NVIDIA as a general practice would ship defective chips or deny problems.  Neither of these confidential witnesses, then, provides any particularized details about the problems with the GPUs or MCUs at issue here, let alone any indication that either had involvement in developing the chipsets or in any of NVIDIA's accounting decisions.

Moreover, of the confidential witnesses who worked at NVIDIA during the Class Period, none establish that the Company was aware of the scope or cause of the problems with the chipsets.  CW5 (an environmental compliance engineer) stated only that the Company's policy was to let customers discover problems on their own.  Again, averments as to NVIDIA's general policy from a witness who had no involvement in these chipsets or in NVIDIA's accounting practices do not support a finding that it knew of a "probable loss" for purposes of FAS 5.  CW1 (a software engineer) and CW2 (a Senior New Product Introduction Planner), while they do describe the nature of the heating/cooling problem with the particular chips in question, each provide only hindsight explanations and give no details as to the degree to which they actually worked on or tested these chips, how they came to learn of the heating/cooling problem, or whether they reported that problem to anyone.  Lastly, CW3 (a quality engineer) stated that NVIDIA was "talking to HP and Dell" (CAC ¶ 25) about the chip defects before the BIOS releases in November 2007, but provides no information about the nature of those conversations or whether, during their course, it became apparent that NVIDIA was aware of the root cause of the chip problem.  Indeed, the CAC contains no averments that CW3 ever participated in any conversations with the OEMs, nor does it allege that

he/she has any other basis for personal knowledge of what was discussed.  Indeed, the fact that NVIDIA was in communication with OEMs does not, in and of itself, suggest that either participant knew what the cause was, or who was responsible for, the laptop failures.  In short, then, while the CAC includes titles and job descriptions for each of the confidential witnesses, it "fails to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Zucco Partners*, 552 F.3d 996.  Additionally, even if the CAC were to establish personal knowledge for each of the witnesses, none of them "allege contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002).

Plaintiffs also argue that, because NVIDIA was able to release its initial batch of redesigned GPUs in May 2008, it must have known about the nature of the defects prior to November 8, 2007. In support of this, they allege, through CW2, that a batch of replacement GPU chips typically takes approximately a year to roll out to account for the redesigning, manufacturing, and quality testing required.  In response, defendants argue that NVIDIA is constantly introducing new and updated products into the marketplace and that the timing of the May 2008 release of the redesigned GPUs cannot form the basis for an inference that the Company knew of a problem with its chips.  Again, the Court need not choose between competing inferences because the CAC fails to allege with sufficient particularity a tie between the release of the redesigned chips in May 2008 and the thermal-stress failure caused by the GPUs.  CW2 simply confirmed that "each new product usually takes approximately one year to roll out" (CAC ¶ 41), but makes no allegations that he/she knows how long it took to redesign the replacement GPU chips or when that process began.  Although the fact replacement units were released in May 2008 is certainly supportive of plaintiffs' contentions, the averments as to the circumstances surrounding that release are insufficient for purposes of Rule 9(b) or the PSLRA.

Lastly, plaintiffs rely upon Hara's September 2008 remarks, in which he addressed the chip defects and the timing of NVIDIA's accounting charge.  In particular, the CAC alleges that Hara said: "We've been working on this problem with customers for well over a year, going all the way back to August of last year… We've been hearing about this and working on [the problem] for over a year…"  CAC ¶ 93, RJN Ex. 8.  As with the statements from CW3, however, the fact that Hara acknowledges NVIDIA and the OEMs were "working on the problem" does not warrant an inference that the Company knew a "probable loss" would flow from the chip failures.  "A complaint can establish that a statement was false when made by alleging '[a] later statement by the defendant along the lines of 'I knew it all along.''"  *Yourish v. California Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) (citing *GlenFed,* 42 F.3d at 1549 n. 9).  In other words, a "later statement may suggest that a defendant has a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement," *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).[8]  Nothing in Hara's statement, however, contradicts any of NVIDIA's earlier disclosures nor suggests that the Company had omitted to account for a "probable loss" as required by FAS 5.  In fact, his statement is simply an acknowledgment that the Company was working with OEMs to uncover the problem, and not an admission that it knew the cause, scope or nature of the chip problem or that any loss would exceed the normal reserve.

In spite of the significant number of plaintiffs' averments, upon inspection it becomes clear that, for pleading purposes under the heightened PSLRA standard, they are insufficient to attribute to the Company knowledge that the problems with the HP and Dell laptops were a result of NVIDIA chip failures leading to a "probable loss" exceeding the normal reserves and requiring the Company

---

[8] Indeed, as the CAC alleges, NVIDIA stated in its June 2, 2008 press release that "[w]hile we have not been able to determine a root cause for these failures, testing suggests a weak material set of die/package combination, system thermal management designs, and customer use patterns are contributing factors."  CAC ¶ 91.  In other words, according to the press release in which NVIDIA announced that it would be taking a charge under FAS 5, as of the close of the Class Period the Company believed that there were a number of factors (including problems with the chipsets) for the computer failures.  Plaintiffs have not alleged facts sufficient to suggest otherwise.

CASE NO. 3:10-CV-02858-RS

1    to take an accounting charge.  Therefore, on this basis alone, plaintiffs have failed to plead a

2    violation of FAS 5.

3            ii.        *"Reasonably Estimable"*

4            Having failed sufficiently to allege a "probable loss," the CAC is similarly deficient in its

5    averments as to whether an accounting charge due to the chip failures would have been "reasonably

6    estimable."  Indeed, although a complaint must allege contemporaneous facts showing that a

7    statement or omission was false when made, *see GlenFed*, 42 F.3d at 1548-49, the CAC makes no

8    averments as to what a "reasonably estimable" amount would have been prior to July 2008, whether

9    NVIDIA ever attempted to calculate that amount, or even how such a calculation could have been

10   made.  In their opposition to the motion to dismiss, plaintiffs argue that NVIDIA could have

11   "multiplied the total sales by the respective defective rates for each defective product line to

12   reasonably estimate the loss contingency for each defective product line."  Opp. at 11.  The CAC,

13   however, never alleges what the known rate of defect was, whether NVIDIA ever made such a

14   calculation, or whether any "reasonably estimable" loss exceeded the regular reserve.  While

15   plaintiffs' contention, presented at oral argument, that the fact NVIDIA was able to estimate the loss

16   contingency in July 2008 suggests that they could have estimated the loss at least in their May 22,

17   2008 10-Q is well taken, the CAC offers no factual allegations in that regard.  Again, the CAC

18   makes no averments as to what such an estimate before July 2008 would have been, nor does it

19   allege that the Company knew everything by November 2007 (or at least by May 2008) that it knew

20   in July 2008 with which to make that estimate.  In short, the CAC makes no allegations, let alone the

21   detailed variety required by the PSLRA, as to NVIDIA's "reasonably estimable" loss under FAS 5.

22   Therefore, because plaintiffs fail to allege a "probable loss" or a "reasonably estimable" amount with

23   the required sufficiency, their Section 10(b) claim, to the extent it is based on a FAS 5 violation,

24   must be dismissed with leave to amend.

25   //

26   //

1

       b.  Misstatements in SEC Filings

2

     Plaintiffs also allege that defendants made false and misleading statements and omissions

3

during the Class Period by failing to disclose the abnormal failure rates of the chips in violation of

4

the GAAP and SEC reporting requirements.  In particular, plaintiffs maintain that NVIDIA's

5

periodic SEC filings (including the May 22, 2008 10-Q that disclosed the MPC material set

6

problems but made no reference to the GPU units) violated SEC Regulations S-X and S-K.  Item 303

7

of Regulation S-K requires that a company disclose "known trends or uncertainties that have had or

8

that the registrant reasonably expects will have a material favorable or unfavorable impact on net

9

sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii); *see also*

10

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).  Regulation S-X requires that

11

publicly traded companies present their annual statements in accordance with GAAP.  17. C.F.R. §

12

210.4-01(a)(1).

13

     As an initial matter, "[i]t is well established that violation of an exchange rule will not

14

support a [Section 10(b) or Rule 10b-5] claim."  *In re VeriFone Securities Litigation*, 11 F.3d 865,

15

870 (9th Cir. 1993) (citations omitted).  Moreover, for the same reasons that the CAC fails to

16

establish a FAS 5 violation, plaintiffs do not sufficiently allege a violation of the SEC or GAAP

17

reporting requirements.  None of the averments as to the OEM complaints, the confidential

18

witnesses, the redesigned GPUs or Hara's statement suggest that chip failures constituted a "known

19

trend or uncertainty" or that such failures would be material information to a reasonable investor.

20

*See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Materiality [in a fraud on the market

21

case] is established by 'showing that a reasonable shareholder would consider the misrepresentation

22

or omission important, because it altered the total mix of available information.'") (citations

23

omitted).  Indeed, as discussed above, none of the averments sufficiently allege that NVIDIA knew

24

its chips were the cause of the problem prior to the July 2008 disclosure or that it knew the cost of

these defects would exceed the normal reserve.[9]  None of plaintiffs' allegations, then, establish that

25

26

    [9] The CAC includes a thorough description of various GAAP principles that plaintiffs allege NVIDIA violated.  CAC ¶ 108.  The CAC fails to present, however, any factual averments, let alone

NVIDIA's periodic filings violated SEC or GAAP reporting requirements.  That, coupled with plaintiffs' failure to establish a material misrepresentation or omission based on a violation of FAS 5, leads to the conclusion that the CAC fails to allege falsity as required in a Section 10(b) claim and therefore must be dismissed with leave to amend.

2.  *Requisite Mental State*

A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), which under the PSLRA must be based on "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  *Silicon Graphics*, 183 F.3d at 979.  When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).  "The inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in the light of other explanations."  *Id*. At 324.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*.  However, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id*.

Plaintiffs allege that there is a strong inference defendants acted with scienter for the same reasons that they allege the presence of "probable loss" requiring an accounting charge under FAS 5; that the statements from the confidential witnesses and Hara, the OEM complaints, the BIOS updates and the redesigned GPUs together reveals scienter.  For the same reasons discussed above, however, as to why none of these allegations warrant attributing knowledge of the impact of the chip defects to NVIDIA, none establish a strong inference that defendants acted with deliberate recklessness.  Notwithstanding that inadequacy, plaintiffs offer three other alternative bases for a finding of

---

averments of sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, to support the allegation that the Company violated these principles.

CASE NO. 3:10-CV-02858-RS

scienter as to the individual defendants: (1) that the chips are part of NVIDIA's core operations, (2) that there was unusual stock trading, and (3) that Burkett and Alex Garcia (NVIDIA's former head internal auditor) resigned during the Class Period.

a. Core Operations

"Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis. The allegations, read as a whole, must raise an inference of scienter that is 'cogent and compelling,' thus strong in light of other explanations." *South Ferry LP v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 324). Knowledge of facts critical to a business' core operations may be imputed to an individual corporate officer, but it is only in unusual circumstances where scienter need not be alleged specifically to each defendant. *See id.* at 786; *see also Zucco*, 552 F.3d at 1001 ("reporting false information will only be indicative of scienter where the falsity is patently obvious"). In other words, these allegations may conceivably satisfy the PSLRA standard "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry*, 542 F.3d at 786. The Ninth Circuit described such "rare circumstances" in *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 989 (9th Cir.2008). There, the defendant had received four stop-work orders that were devastating to its revenue stream, and which the plaintiffs alleged defendants never disclosed. *Id.* at 987. The court inferred scienter from the defendants' involvement in the company's core operations because the "facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* at 989.

Plaintiffs argue that, given the importance of the GPU and MCP chips to NVIDIA's financial health and to its corporate identity, defendants Huang (as the Chief Executive Officer) and Burkett (as the Chief Financial Officer) may be imputed with knowledge of the chip defects. While the CAC alleges that the chips are a significant portion of NVIDIA's business, it fails to establish this as one of the "rare circumstances" where scienter need not be alleged. Indeed, both *Berson* and *Siracusano*

1   *v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), which plaintiffs invoked during oral

2   argument, involved complaints in which the adequacy of the falsity averments were not in dispute.

3   Here, by contrast, the CAC fails to allege that the root cause of the laptop failures, and therefore the

4   possibility of a substantial accounting charge, was known to anyone prior to the July 2008

5   disclosure.  Without sufficiently alleging actual falsity, then, plaintiffs cannot rely on the concept of

6   core operations to infer scienter as to either of the individual defendants.[10]

7          b. Stock sales

8          Plaintiffs argue that both the Company and the individual defendants were motivated to

9   conceal the chip defects in order to inflate the price of NVIDIA stock.  Specifically, they allege that

10  insider sales of stock during the Class Period support an inference of scienter.  However, only one

11  defendant, Huang, is alleged to have sold any stock during the Class Period; and his sales constituted

12  only 2% of his total holdings at its commencement, he actually increased his net holdings during that

13  time, and sold more stock in the three quarters preceding the Class Period than he did during it.[11]

14  CAC ¶ 122; RJN Exs. 13-15.  Insider stock sales are suspicious "only when the level of trading is

15

16          [10] At oral argument plaintiffs also invoked *Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736
    (9th Cir. 2008) for the proposition that, even if the CAC fails to plead scienter sufficiently as to

17  Huang and Burkett individually, they have alleged scienter against NVIDIA under a theory of
    collective scienter whereby it can be imputed to a corporation as long as any employee has

18  knowledge of the falsity of a statement.  In *Glazer*, where a Section 10(b) claim was based on three
    false statements made in a merger agreement attached to the defendant corporation's Form 10-Q,

19  however, the Ninth Circuit denied an attempt to employ collective scienter and required the plaintiff
    "to plead scienter with respect to those individuals who actually made the false statements in the

20  merger agreement."  549 F.3d at 745.  While the *Glazer* court did not foreclose the possibility of
    collective scienter, it limited it to "circumstances in which a company's public statements were so

21  important and so dramatically false that they would create a strong inference that at least *some*
    corporate officials knew of the falsity upon publication."  *Id.* at 744. (emphasis in original) (citing

22  *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir.2008) for an example of such
    a dramatically false statement where "General Motors announced that it had sold one million SUVs

23  in 2006, and the actual number was zero.").  Here, plaintiffs fail to allege any such statements that
    could be considered "so important and so dramatically false." Indeed, as discussed above, they fail to

24  allege with the required specificity that the possibility of a substantial accounting charge was known
    to anyone prior to the July 2008 disclosure, and therefore that its omission was materially false.

25          [11] NVIDIA actually repurchased shares during the Class Period through a previously announced
    stock repurchase plan.

26

dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Vantive*, 283 F.3d at 1092; *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock *before* the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock *during* the class period.").  Here, Huang, as a net acquirer during the Class Period whose stock sales constituted only 2% of his holdings and were less than the three previous quarters, did not exhibit an intention to maximize profits from an artificially inflated stock price.

Plaintiffs also argue that the compensation packages for Huang and Burkett support an inference of scienter because they included stock options and incentive payment programs that were tied to NVIDIA's performance.  The simple fact the defendants had performance-based compensation, however, does not support an inference of scienter because "[i]f simple allegations of pecuniary motive were enough to establish scienter, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'"  *Zucco*, 552 F.3d at 1005 (citations omitted).  Here, the CAC fails to allege how the compensation packages for Huang or Burkett were linked to NVIDIA's financial performance or stock price.  Without more particular allegations connecting the two, these averments, as with the averments of suspicious stock sales, fail to support the requisite strong inference of scienter for either of the individual defendants.

### c. Employee Resignations

Lastly, plaintiffs point to the fact that Burkett and Garcia each resigned from their respective positions at NVIDIA during the Class Period as an inference of scienter.  CAC ¶ 47.  "Although resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter…[m]ere conclusory allegations that a financial manager resigns or retires during the class period… cannot support a strong inference of scienter."  *Zucco*, 552 F.3d at 1004.  Here, the CAC states nothing more than that these two employees resigned, offering no specifics as to the circumstances surrounding their resignations.  Moreover, even after resigning, Burkett

CASE NO. 3:10-CV-02858-RS

1    remained as NVIDIA's Chief Executive Officer in an interim capacity.  Plaintiffs' allegations as to

2    these employee resignations, therefore, fail to support a strong inference of scienter.

3           In sum, plaintiffs' allegations do not satisfy the threshold for scienter established in *Silicon*

4    *Graphics* and *Tellabs*.  Even when viewed cumulatively, these allegations do not prompt a strong

5    inference that either the Company or the individual defendants acted with deliberate reckless or

6    conscious misconduct, and therefore plaintiffs have failed to allege a violation of Section 10(b) or

7    Rule 10b-5.

8           3. *Loss Causation*

9           "Loss causation is the causal connection between the [defendant's] material

10   misrepresentation and the [plaintiff's] loss."  *Dura Parms., Inc. v. Broudo*, 544 U.S. 336, 342

11   (2005).  "So long as the complaint alleges facts that, if taken as true, plausibly establish loss

12   causation, a Rule 12(b)(6) dismissal is inappropriate."  *In re Gilead Sciences Sec. Litig*., 536 F.3d at

13   1057.  While plaintiffs allege that the $196 million charge negatively impacted NVIDIA's financial

14   condition as well as its reputation in the market, these allegations do not reveal the necessary causal

15   link between the alleged fraud and the drop in the Company's stock price.  Rather, they point to a

16   *correlation* and not a *causation*.  "So long as there is a drop in a stock's price, a plaintiff will always

17   be able to contend that the market 'understood' a defendant's statement precipitating a loss as a

18   coded message revealing the fraud.  Enabling a plaintiff to proceed on such a theory would

19   effectively resurrect what *Dura* discredited - that loss causation is established through an allegation

20   that a stock was purchased at an inflated price."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

21   540 F.3d 1049, 1064 (9th Cir. 2008).  Moreover, plaintiffs fail to address the "far more plausible

22   reason for the resulting drop in [NVIDIA's] stock price - the [C]ompany failed to hit prior earnings

23   estimates."  *Id*. at 1065.  Therefore, plaintiffs' allegations do not adequately plead loss causation and

24   for this additional reason the CAC must be dismissed with leave to amend.

     B.  Section 20(a) of the Exchange Act

25

26

1    To prove a prima facie case under Section 20(a), plaintiffs must prove: (1) "a primary violation of

2    federal securities law" and (2) "that the defendant exercised actual power or control over the primary

3    violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because plaintiffs

4    have failed to plead a primary securities violation, they have also failed to plead violation of Section

5    20(a).

6                                          V. CONCLUSION

7              For the reasons stated above, defendants' motion to dismiss is granted with leave to amend.

8    Plaintiffs must file any amended complaint within 30 days of the date of this order.  Otherwise, the

9    action will be dismissed with prejudice.

10

11             IT SO ORDERED.

12

13   Dated:  October 19, 2010                    _____

14                                               Richard Seeborg
                                                 United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26