KIM MILLER (178380)
MELISSA RYAN CLARK (*Pro Hac Vice*)
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: melissa.clark@ksfcounsel.com

-and-

LEWIS KAHN (*Pro Hac Vice*)
PAUL BALANON (*Pro Hac Vice*)
SARAH CATE BOONE (268813)
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: paul.balanon@ksfcounsel.com
Email: sarah.boone@ksfcounsel.com

BARRY A. WEPRIN (*Pro Hac Vice*)
LEIGH SMITH (*Pro Hac Vice*)
JEAN LEE (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com
Email: lsmith@milberg.com
Email: jlee@milberg.com

MICHIYO MICHELLE FURUKAWA (234121)
**MILBERG LLP**
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NVIDIA CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To: All Actions | CIVIL ACTION NO. 08-cv-4260-RS<br><br>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

1.      Lead Plaintiffs Roberto Cohen and the New Jersey Carpenters Pension Fund and New Jersey Carpenters Annuity Fund (the "Funds") (collectively, "Lead Plaintiffs"), bring this securities fraud action on behalf of themselves and all persons who purchased or otherwise acquired the common stock of NVIDIA Corporation ("NVIDIA" or the "Company") between November 8, 2007, and July 2, 2008, inclusive (the "Class Period").

2.      Lead Plaintiffs, on behalf of themselves and the Class they seek to represent, make the allegations contained in this Complaint upon information and belief (except as to allegations specifically pertaining to Lead Plaintiffs and their counsel, which are based on personal knowledge) against Defendants NVIDIA and the Company's founder and CEO, Jen-Hsun Huang. Lead Plaintiffs base their information and belief on the investigation conducted by and under the supervision of Lead Counsel, which included, among other things: (a) reviewing and analyzing: (i) publicly available information concerning NVIDIA and the industries and markets in which NVIDIA operates, (ii) filings with the U.S. Securities and Exchange Commission ("SEC"), (iii) annual reports, (iv) press releases, (v) published interviews and conference calls, (vi) news articles and other media reports, and (vii) reports of securities analysts and investor advisory services; (b) consulting with an expert, John R. Rigg, who has nearly twenty-five years experience in graphics architecture and application-specific integrated circuits and a B.S. in Electrical Engineering and Computer Science from the University of Colorado; and (c) interviewing numerous individuals, including, but not limited to, confidential witnesses ("CWs") who are former NVIDIA employees who worked at the Company before and during the Class Period and who are knowledgeable about NVIDIA's business and operations and/or about the industries and markets in which NVIDIA operates, as well as former and current employees of NVIDIA's customers.

3.      The CWs include the following persons:

a.  CW 1, a former manager with HP's product engineering group who was part of the team that did the root cause analysis for NVIDIA's defective chipset;

b.  CW 2, who worked as a Senior New Product Introduction ("NPI") Planner at NVIDIA from April 2005 until September 2008;

c.  CW 3, who worked as an NVIDIA Test Operator/Chip Programmer from

November 2007 until April 2008. CW 3's responsibilities included testing NVIDIA chips before they were sold;

d.  CW 4, who worked with NVIDIA from 2001 until 2008 as a Systems Software Engineer and developed driver code for graphics chips;

e.  CW 5, who was a Senior Quality Assurance Engineer working on quality assurance of MCPs at NVIDIA from September 2006 until February 2007;

f.  CW 6, who worked for NVIDIA as a Systems Software Engineer from 2000 to October 2008;

g.  CW 7, who worked in the PG Test Group at Dell in 2007 testing prototypes for high-end gaming and office programs, including NVIDIA products;

h.  CW 8, who worked as a computer repair technician with a small company between 2006 and 2008;

i.  CW 9, who is a former Senior Applications Engineer for the Motherboard Chipset Product Line at NVIDIA from January 2008 until September 2008 and worked directly with customers designing motherboards using NVIDIA's MCPs;

j.  CW 10, who is a former NVIDIA IT Manager and Senior Field Service Engineer and worked at the Company between January 2001 and March 2007;

k.  CW 11, who was a Senior Engineering Manager who worked at NVIDIA from December 2002 until March 2006;

l.  CW 12, who worked from 1998 to 2004 as a Sales Director for Infineon Technologies Corporation, a company from which NVIDIA purchased memory for their chips. CW 12's job required regular direct contact with NVIDIA and its employees;

m.  CW 13, who worked as an NVIDIA Environmental Compliance Engineer from August 2007 to September 2008;

n.  CW 14, who was a Director of IC Quality and Reliability for NVIDIA from 2000 to 2001 and reported directly to Defendant Huang for the first seven to eight months of CW 14's employment;

o.  CW 15, who worked as an NVIDIA Staffing Systems and Compliance Analyst from January 2002 until February 2007;

p.  CW 16, who worked from August 2004 until June 2008 as an Administrator for a website selling enhanced NVIDIA drivers; and

q.  CW 17, who is a former NVIDIA Senior Signal Integrity Engineer who worked for the Company from June 2005 until June 2007.

## JURISDICTION AND VENUE

4.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5.

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

2

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.      In furtherance of and in connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of the NASDAQ (National Association of Securities Dealers Automated Quotations), a national securities exchange.

## THE PARTIES

**Lead Plaintiffs**

8.      Roberto Cohen purchased the Company's common stock during the Class Period, as set forth in his previously-filed Certification, and suffered damages as a result of his purchases of NVIDIA common stock at prices that were artificially inflated by Defendants' materially false and misleading statements regarding NVIDIA's products, financial results, business practices, and customer relationships.

9.      The Funds purchased the Company's common stock during the Class Period, as set forth in their previously-filed Certifications, and suffered damages as a result of their purchases of NVIDIA common stock at prices that were artificially inflated by Defendants' materially false and misleading statements regarding NVIDIA's products, financial results, and business practices.

10.      By Order of the Court dated December 23, 2008, Roberto Cohen and the Funds were appointed Lead Plaintiffs.

**Defendants**

11.      Defendant NVIDIA is a corporation originally organized under the laws of the State of California in 1993 and subsequently reorganized under the laws of the State of Delaware in 1998. NVIDIA is an international company that maintains its principal place of business in

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

3

this District at 2701 San Tomas Expressway, in Santa Clara, California. NVIDIA went public in January 1999 and its common stock trades on NASDAQ under the ticker symbol "NVDA." NVIDIA is a sophisticated technology company: According to the Company's Class Period 10-K, as of January 27, 2008, NVIDIA "had 4,985 employees, 3,255 of whom were engaged in research and development. . . ." NVIDIA claims that: "A fundamental aspect of our strategy is to actively recruit the best 3D graphics and HD video, networking and communications engineers in the industry, and we believe that we have assembled an exceptionally experienced and talented engineering team."

12.     Defendant Jen-Hsun Huang co-founded NVIDIA in April 1993 and has served as its President and Chief Executive Officer ("CEO"), and as a member of the board of directors, since NVIDIA's inception. As NVIDIA's CEO, Defendant Huang is also NVIDIA's chief operating decision maker, or CODM, who reviews financial information on an operating segment basis for purposes of making operating decisions and assessing financial performance. In addition to serving as the Company's chief spokesperson to the public and building and maintaining NVIDIA's important customer relationships, he was heavily involved in the production and design of NVIDIA products.

**BACKGROUND**

**The Technology**

13.     NVIDIA's main revenue generators prior to and during the Class Period were its graphics processing unit ("GPU"), which NVIDIA claims to have invented in 1999, and its media and communications processor ("MCP").

14.     A graphics processing unit, or GPU, is a component found in most consumer computer systems, including laptops. GPUs are responsible for rendering images to the computer's display. GPUs require a significant amount of power and produce a significant amount of heat. A media communications processor, or MCP, is a component in certain consumer computer systems that integrates the system memory interface, Ethernet communications controller, audio processor, and GPU all on one device. Advanced versions of

this device also provide accelerated support for motion video processing.

15.     Each GPU and MCP "package," like that pictured below, consists of the "die," which is a silicon chip, mounted onto the "substrate," the green circuit board which routes signals and attaches the die to other notebook components.



16.     The die is connected to the substrate via "bumps" of solder that carry signals and power. The bumps in NVIDIA's problem GPUs and MCPs were made of high-lead solder and were attached to the substrate using a eutectic solder paste, which uses lower amounts of lead and more tin. Also between the die and substrate is "underfill," a glue-like material that acts as an additional bonding agent to fortify the connection between the die and the substrate, provides mechanical support, and provides a moisture barrier to protect the bumps. For purposes of this complaint, the solder and the underfill are referred to as the "Material Set."



17.     NVIDIA's GPUs and MCPs were its core businesses, growing annually and together comprising nearly 80% of the Company's revenues. NVIDIA's revenue from its GPU and MCP businesses, as reported in the Company's Class Period Forms 10-Q and Form 10-K, is as follows:

| NVIDIA's Revenue (In Thousands) | | | | |
|---|---|---|---|---|
| | MCP | GPU | Consolidated | GPU and MCP Rev. as % of Total |

|  |  |  |  | Rev. |
|---|---|---|---|---|
| Q3:FY08 | $198,151 | $689,909 | $1,115,597 | 80% |
| FY 2008 | $710,353 | $2,518,281 | $4,097,860 | 79% |
| Q1:FY09 | $195,093 | $701,489 | $1,143,388 | 78% |

18.     NVIDIA sold its GPUs and MCPs to original equipment manufacturer ("OEMs") for use in those OEMs' notebook (*i.e.*, laptop) and desktop computers. These OEMs included Dell, Hewlett-Packard ("HP"), Sony, Apple, Asus, and Toshiba, among others.

19.     Prior to the Class Period, NVIDIA was informed that a material number of its MCPs and GPUs were causing serious problems in laptop computers in which they had been installed. At HP alone, for example, CW 1, a former manager with HP's product engineering group who was part of the team that conducted the root cause analysis for NVIDIA's chipset problem, reported that HP was seeing failures of 4,000 DPPM (defective parts per million). According to CW 1, rates as low as 1,000 DPPM indicate a real problem.

20.     In addition, also prior to the Class Period, NVIDIA's key OEMs (including at least HP and Dell) were complaining to NVIDIA of problems with the NVIDIA chips placed in the OEMs' laptops. In particular, HP had identified and informed NVIDIA of a specific defect in the GPUs' and MCPs' Material Set that was causing serious problems in HP laptops containing these chips. Defendants knew and/or deliberately disregarded that this problematic Material Set had been used across various products, in numerous laptops, among several of its top manufacturers, and would require that NVIDIA replace a material number of its GPUs and MCPs. Indeed, in the settlement of *NVIDIA GPU Litigation*, CO8-04312JW (N.D. Cal.) (final approval hearing set for 12/20/10), NVIDIA's consumer litigation relating to damaged chips in Dell, HP, and Apple notebooks, NVDIA agreed to replace GPUs and/or MCPs in 22 Dell notebook configurations, 21 HP notebook configurations, and 1 Apple notebook configuration.

21.     Moreover, prior to the Class Period, Defendants knew that NVIDIA faced the substantial risk that the number of chips involved materially exceeded the number that fail in the

1   ordinary course of business, and NVIDIA would have to replace them or lose its major OEM

2   customers, who accounted for the vast bulk of the Company's revenues.

3         22.     Nevertheless, Defendants failed to disclose these materially adverse facts and

4   risks throughout the Class Period. Instead, ignoring their obligations under the federal securities

5   laws to timely and fully disclose all information that would be material to investors' investment

6   decisions, Defendants denied responsibility for the problems with the Material Set and delayed

7   disclosing the severity of the problem and its potential impact in terms of replacement and

8   warranty costs until July 2, 2008, when Defendants took responsibility for these costs and

9   disclosed, in part, that NVIDIA would "take a $150 million to $200 million charge against cost

10   of revenue to cover anticipated customer warranty, repair, return, replacement and other

11   consequential costs and expenses arising from a weak die/packaging material set in certain

12   versions of [its] previous generation MCP and GPU products used in notebook systems." This

13   charge was in excess of NVIDIA's normal reserves for product failures.

14         23.     Following disclosure of the material, adverse facts, NVIDIA's stock plummeted

15   by 31% from an intraday high of $18.78 per share on July 2, 2008 to an opening of $12.98 per

16   share on July 3, 2008—an overnight loss of over $3 billion in NVIDIA market capitalization—

17   thereby damaging Lead Plaintiffs and the Class.

18         24.     In the two years following the end of the Class Period, including as recently as

19   August 2010, Defendants continued to take charges related to the defective Material Set. As of

20   August 2010–after reducing the charge by tens of millions of dollars in insurance

21   reimbursements—**the net charge related to this undisclosed defect was nearly half a billion**

22   **dollars, at $475.9 million.**

23   **Issues With NVIDIA's GPUs and MCPs In 2006**

24         25.     Problems with NVIDIA's GPUs and MCPs arose in late 2006 when certain of

25   NVIDIA's chips experienced cracks from pressure applied during testing at NVIDIA.

26         26.     This problem arose at a crucial time for NVIDIA, as a merger was about to close

27   between NVIDIA's two largest competitors, Advanced Micro Devices ("AMD") and Array

28

Technologies Incorporated ("ATI"), which collectively became AMD. According to CW 2, a former Senior NPI Planner at NVIDIA, NVIDIA hoped to use the inevitable transition, integration, and consolidation period associated with the AMD/ATI merger as an opportunity to enlarge NVIDIA's GPU market share, and as a result, "NVIDIA had to push as hard as possible." Regarding the merger, NVIDIA's Vice President of Investor Relations, Michael Hara, told Reuters: "[W]hat we've already felt and seen I think gives us the energy to push faster. While AMD and ATI figure out what their future looks like, we know what ours looks like."

27.     To resolve the cracking problem quickly, NVIDIA transitioned some of the solders used in its chips from a eutectic solder to a high-lead solder, which is more malleable and less susceptible to cracking from pressure during testing. This hasty, untested alteration from the chip's original manufacture design enabled NVIDIA to ship a working chip, but NVIDIA could not be certain about the durability of the chip or how it would function under all intended uses.

28.     While high-lead solder is more malleable, it is also known to be more susceptible to fatigue during use. That weakness can be magnified when combined with eutectic solder paste, because the two different materials expand at different rates when heated, placing stress on the joints where the solders are connected. To protect against these potential weaknesses, the solder bumps must be well-supported by the underfill, and the combined Material Set must be rigorously tested. In the case of NVIDIA's GPUs and MCPs, however, NVIDIA used an underfill with a low glassification temperature, or low-Tg, meaning it turned soft at low temperatures, and failed to provide sufficient support for the solder bumps.

29.     Inadequate quality assurance is not unusual at NVIDIA. CW 3, a former NVIDIA Test Operator/Chip Programmer, tested NVIDIA chips before they were sold. CW 3 discussed the testing process that must be performed before chips are sent to the customer stating: "Before we send it to the customer, they have to make sure it's 100 percent or 200 percent, that it's in the high quality, to make sure there is no damage on it. . . . There is high quality graphics, so we have to test it, like for five minutes, like ten minutes." However, according to CW 3, some employees did not even test the chips, merely placing them at the next level. "We have a code

like where employees should . . . for eight hours we should program for like more than thirty chips, but some employees, they just want to get the numbers. **They're not doing their job. They just sent it to the customer without even testing them. They did not even program it for a lot of (issues)."** CW 3 reported that some personnel were terminated for these actions, and that, as a result of these practices, many customers called in complaining about problems.

30.    CW 4 stated: "If something went wrong and the customers did not provide us with a broken unit, we just sat there and tried to figure it out from some simulation. The company was incredibly cheap about stuff like that."

31.    CW 5 stated that NVIDIA did not provide training like that provided by companies such as Microsoft or HP: "Basically you have to know stuff on your own or learn on the job."

32.    CW 6, a former NVIDIA Systems Software Engineer, reported that the thermal problem was due to a failure of testing. CW 6 stated that the testing group only tested by incrementally increasing the temperature on the system, but did not test for "wild swings in temperatures." Such testing was crucial because temperature cycling, a known occurrence in laptops, contributed to the chips' malfunction.

33.    CW 2 reported that units go through two phases of thermal-related testing before they are shipped: "production testing," which takes about five seconds, and "system level testing" which is as long as six minutes. CW 2 reported that "there is no way the underfill would be affected by that" testing, because the time is too short.

**OEMs, Including HP and Dell, Address Problem with NVIDIA**

34.    Defendants' own representatives have admitted that NVIDIA was working on the chip problems prior to the start of the Class Period. According to a September 2008 statement by NVIDIA Vice President of Investor Relations Michael Hara, made at a Citigroup Presentation, NVIDIA had "been working on this problem with the customers for <u>well over a year</u>, going all the way back to August of [2007]." Indeed, at the June 24, 2010, motion to dismiss hearing in this action, counsel for the Company admitted that NVIDIA was talking to HP and Dell about

the problems at this time. Transcript at p. 12: 1-5, 7-19.

35.     However, a witness who worked on the chip problem places Defendants' knowledge even earlier. According to CW 1, a former manager with HP's product engineering group who was part of the team that did the root cause analysis for NVIDIA's defective chipset, HP had engaged NVIDIA in late 2006 to evaluate this problem. CW 1 reported: "We [HP] were concerned due to the failure rate [of the GPUs in our laptops], and we started auditing the records from NVIDIA— their RMA [returned merchandise authorization] records— around the 2006 time frame." At that time, NVIDIA was blaming the "excessive failures" on "customer-induced damage or [OEM] design issues."

36.     CW 1 explained that HP had "found issues with . . . fractures at the bump level between the die and the substrate" and stated that it was obvious that the cause was a thermal transition of the underfill material.

37.     CW 1 reported that by the time HP extended its product warranties in November 2007, it had known about the chip problem for about a year, i.e., since late 2006. CW 1 reported that "communications between HP an NVIDIA began in 2006, with HP asking questions, and asking NVIDIA to conduct failure analysis." CW 1 advised that HP "**highlighted the data to NVIDIA, shared the data with NVIDIA,**" every step of the way, but NVIDIA continued to push back and say that it was not the Company's fault. According to CW 1, this was a $170 million case for HP in terms of direct cost impact, not including the indirect cost impact; **"This investigation was not one that we were willing to let go."**

38.     CW 1 reported that the communications regarding the problems were conducted at a high-level: "These were executive level guys." CW 1's boss was a senior technical employee, a Director of Quality, who, according to CW 1, is a highly credible source when it comes to technical data. "This guy is not going to be communicating with guys that are at manager level or engineering level."

39.     According to CW 1, NVIDIA initially attempted to deflect responsibility for these problems, blaming customer use patterns and OEM design problems. However, HP's product

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

10

engineers were quickly able to identify that NVIDIA's parts had physical damage that was caused through normal use and, based on this analysis, had determined that the failure was NVIDIA's responsibility.

40.     CW 1 reported that the data regarding—and details of—this hardware defect were shared with NVIDIA, and in the face of NVIDIA's push-back: "In the first quarter of 2007, we [HP] began engaging them [NVIDIA] much much heavier, at an executive level." CW 1 reported that there were "email communications and conference call communications." CW 1 reported that "we were hassling these guys and having them come on site – they were shipping these products to everybody." CW 1 stated: "NVIDIA was on-site with HP, into the factories, having conversations at the director level, toward the end of the first quarter [of 2007]."

41.     CW 1 stated that "testing [at HP] began end of 2006, and by early 2007, we had solid findings, started reproducing failures in our labs." By early 2007, according to CW 1, HP "had overwhelming data demonstrating root cause – it was really, really, clear." By this time, according to CW 1, HP was sharing all of its data with NVIDIA.

42. **CW 1 further explained that the root cause of the materials problem had been identified by HP in early 2007 and reproduced by NVIDIA by mid-2007.** In early 2007, HP had identified the thermal profile that would cause the underfill to go through a phase transition – weakening, and allowing the solder joints to crack. CW 1 reported that, "at least by the middle of 2007, we [HP] had them [NVIDIA] perform our [thermal] profile in their labs and they reproduced it."

43.     In addition, information provided by Charlie Demerjian, a reporter with 25 years experience working with computers and who covered NVIDIA's chip defects and spoke to dozens of people about the problems, confirms this timeline. In particular, Mr. Demerjian spoke with HP employees regarding the GPU and MCP problems. He stated that in January 2007, computers sold by HP were failing. According to an HP engineer who spoke with Mr. Demerjian, the problems with NVIDIA's 7000 series had failure rates as high as 50%. According to Mr. Demerjian, HP started a "root cause analysis" and by summer 2007, HP employees knew

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

11

that NVIDIA's GPUs were having problems associated with heat cycling.

44.     Mr. Demerjian also spoke with a former employee of HP who stated that HP used an internal defect tracking system named ACER, to which the former employee had access. Mr. Demerjian reports that, according to the former HP employee, HP noticed a systematic problem with NVIDIA chips on HP laptops in January 2007. By mid 2007, the problems with NVIDIA chips were so serious that they caused a significant change in HP's average defect rate.

45.     Dell was also notifying NVIDIA of problems with its GPUs by early 2007. CW 7, who worked for Dell testing prototypes, including NVIDIA products, recalled that Dell saw problems with NVIDIA GPUs in **early 2007.** CW 7 communicated directly with NVIDIA regarding this problem and reported that the Company eventually admitted that it was their chip causing the problem, and that it was not a Dell issue.

46.     In addition, several CWs reported that NVIDIA had the resources and ability to identify and accept responsibility for the problem quickly. CW 1 noted that HP's personnel are not "semiconductor guys," so if they were able to deduce the problem within months, with far less sophisticated equipment than NVIDIA has, then NVIDIA should have been able to deduce it even quicker. CW 1 stated: "They [NVIDIA] took their sweet time." In addition, CW 1 believed that NVIDIA had to have known early on that its packaging material was at fault because it was the only company in the industry using this cheap material. "They made a supply selection for a reason." CW 1 intimated that this product was cheaper and had lower thermal tolerances.

47.     Mr. Demerjian explained that a company like HP or Dell could probably identify the GPU as the failure point in the laptop's performance within a week or so, because you see corruption on the screen when you get the video. While it may take NVIDIA longer to identify the specific problem with the video chip, NVIDIA had sufficient information to know at a very early stage that the problem was caused by its product, in this case, when the video and internet problems were seen and the physical problems were identified.

48.     Plaintiffs' consultant, Mr. Rigg, confirmed that failures of the GPU are easily identifiable. Soft failures of the GPU (e.g., those where critical paths fail

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

12

but the chip is still somewhat functional) result in visual artifacts on the laptop's screen, such as pixilation, random lines, or incorrectly drawn polygons. Hard failures (e.g., mechanical damage) can result in blank screens and loss of communication with the CPU and are permanent after the failure first occurs.

49.     In addition, according to Mr. Rigg, if a laptop contains a suspect GPU within the system, the GPU can be replaced quickly and easily to verify the GPU failure. If the GPU is embedded on the motherboard, failure identification can be made through CPU communication and thermal monitoring, in addition to the symptom identification of visual artifacts.

50.     More specifically, each of a laptop's major components, including the GPU, has an on-board temperature monitor, allowing its temperatures to be read instantaneously. Thus, when a thermal-related GPU problem arises, NVIDIA and its OEMs can immediately ascertain whether the GPU is running within the temperature specifications provided by NVIDIA. If the chip is failing within the provided specifications, as was the case with NVIDIA's problematic chips, either the chip itself is failing (which was NVIDIA's responsibility) or NVIDIA provided the wrong product specifications (which was also NVIDIA's responsibility).

51.     CW 2 confirmed that at least two temperature-related specifications are provided with GPUs and MCPs: one describing the amount of heat the chip will generate, and one providing the amount of heat the chip can tolerate. Indeed, CW 2 noted that the specifications given to OEMs for at least one of NVIDIA's affected chips, the G86, was very different from what NVIDIA had promised, but NVIDIA tried to keep it quiet and fix it somehow.

52.     When asked whether it would take NVIDIA eight months to identify a thermal problem, CW 2 stated: "No, no it doesn't. To figure out if the chip runs hot in the Dell system and if that is leading to failures, well, that takes about a month."

53.     Problems with NVIDIA's chips continued to occur throughout 2007. For example, failures with a particular NVIDIA chip manifested as wireless problems in certain HP laptop configurations. According to the Declaration of Richard Hunt Hodge ("Hodge Declaration"), filed by HP in *Nygren v. Hewlett-Packard Co.*, 07-cv-05793-JW (N.D. Cal), *see*

Dkt. No. 239, a consumer action alleging, *inter alia*, that HP sold laptops with a heat cycling problem that caused wireless features to fail, HP began investigating wireless failures associated with certain of its laptops in fall 2007. ¶48. In the course of this investigation, HP examined several thousand motherboards, which contained NVIDIA chips, from customers whose wireless had failed. *Id.* When these motherboards were examined, HP discovered the same problem that CW 1 and Mr. Demerjian reported that the company had seen throughout late 2006 and early 2007: "cracking at the L1 solder bump joint between the die of the substrate." *Id.*

54.     Moreover, according to the Hodge Declaration, within days of discovering these cracks in this NVIDIA chip model, "HP concluded that these L1 cracks were the probable cause of the wireless issue under investigation." ¶49. By the end of that same month, "HP hypothesized that repeated temperature mini-cycling" could cause such cracks. ¶50. In sum, it took HP less than two months to hypothesize that temperature cycling caused the problematic cracks in the solder bumps, sufficient information to identify that NVIDIA would be responsible for replacing the chip.

55.     In addition, CW 2 and Mr. Riggs confirmed that thermal-related GPU problems would necessitate replacement of the GPU.

56.     According to CW 2, because the underfill is located between the die and the substrate, and the die itself generates the high temperatures associated with the GPU, it is nearly impossible to divert heat away from the underfill.

57.     Mr. Rigg indicated that post-manufacture "fixes" to reduce thermal stresses in laptops are not feasible solutions. For example, an increase in the speed of the laptop's fan may help to cool the laptop, but it will also drain the battery, run loudly, and likely only delay discovery of the problem. Alteration of the GPU's heat sink, the component designed to quickly move heat away from the GPU, would require significant changes to the computers' entire architecture, an unrealistic, and impractically costly, post-manufacture option.

58.     Moreover, Mr. Rigg noted that the estimated cost of repair to replace a GPU far exceeds the individual cost of the GPU. With BGA (ball grid array) type packaging, the cost of

rework to remove the part and install a new one usually exceeds the production cost of a new card and may exceed the cost of a new motherboard. In any event, a "fix" of a GPU or MPC problem would inevitably involve shipping a replacement board (either new or remanufactured) to the consumer, shipping the failing board back to the factory, and the accompanying costs for a replacement part and the labor to rework and test the failing board.

59.     Defendants initiated steps to rectify the problem, indicating their knowledge and/or deliberate disregard of the source of the problem, well before the July 2008 disclosure. As shown below, these steps included participating in the preparation of BIOS updates issued by HP and Dell and the issuance of Product Change Notifications to OEMs.

60. In November 2007, HP issued updates to their notebooks' BIOS (basic input/output system, the computers' core software which controls basic operations and serves as an interface between the computers' hardware and software) which would cause the fans on its affected laptop computers to run continuously, in an attempt to prevent the thermal cycling that had been identified as causing the GPUs to fail.

61. At least as early February 4, 2008, Dell also issued a BIOS update related to the GPU and MCP problem. For example, Dell offered a February 4, 2008, BIOS update for its Vostro 1500, which were sold with NVIDIA 8400 and 8600 graphics cards, providing "[a]dded enhancement for thermal control."

62. Mr. Demerjian explained that the BIOS is not a permanent fix for thermal issues, but "delays the problem until after the warranty period." Mr. Demerjian reported that BIOS updates "can't be done without NVIDIA's help" "because NVIDIA writes the BIOS and Dell just tweaks them. NVIDIA will come in and say: 'here is the recommendation.'" He advised that Dell or HP would not put a fix on without NVIDIA's knowledge, "especially if they knew there was a lawsuit in the making."

63.     In addition, according to an August 25, 2008, article written by Charlie Demerjian, the Company issued Product Change Notifications ("PCNs"), dated May 22, 2008, to its OEMs, notifying these customers of the availability of redesigned GPUs. These PCNs were

designated by NVIDIA as "Class 1," a rating classification indicating a major overhaul of an existing chipset. The PCN notified OEMs of a change in the problematic underfill—from Namics 8439-1 material to Hitachi 3730—in NVIDIA's G86 desktop products, which share the same chip as the G86 products used in laptops.

64.     Mr. Demerjian advised that by the time the PCN was issued on May 22, 2008, NVIDIA had already done the research, development, and thermal testing to approximate field conditions, which "takes months. It is not a quick thing to do. Every time you change the material, you've got to do it again. This could not have been done in weeks." CW 8, who worked as a computer repair technician with a small company, confirmed that PCNs usually mean that a manufacturer is making a significant change to a product without changing a product number. CW 8 stated: "there's definitely a lead time, at least four to six months" required to engineer a fix and get a product change on production lines

65.     Thus, Defendants had identified and had begun remedying the underfill problem months prior to the May 22, 2008, PCN.

66.     Mr. Demerjian published another article regarding PCNs just a few days later, on August 28, 2008. That article revealed the existence of a Class 1 PCN for NVIDIA's G92 desktop products, which related to changing the "bump material from high Pb [lead] to Eutectic Solder." According to the article, the PCN, with a submit date of June 13, 2008, noted that "Nvidia will transition from using high-lead solder (95%Pb/5%Sn) to eutectic solder (63%Sn/37%Pb) flip-chip bump material for the G92 product family."

67.     An August 25, 2008, TG Daily article noted that "**What supports the theory that a high-lead solder bump in fact is at fault is the fact that Nvidia ordered an immediate switch to use eutectic solders instead of high-lead versions in the last week of July [2008]**," however, as demonstrated by the PCNs, that change was actually initiated much earlier, indicating Defendants' knowledge of the source of the problem well before the July disclosure.

68.     Indeed, a September 10, 2008, TG Daily article announcing the filing of a securities class action against NVIDIA, stated: "**Transitioning to a different solder bump**

**material requires substantial engineering effort, testing and qualification** and that may have been the case here."

69.     In addition, CW 9 reported that around March 2008, NVIDIA made a change to the MCP operating temperature and power product specifications provided to OEMs by adding a warning regarding operating temperature and power specifications. The warning recommended minimizing the amount of temperature cycling, i.e., cycling fans on and off. CW 9 said that at the time the inclusion of this note did not make any sense to him/her because the MCP products did not have anything to do with power cycling. CW 9, a former Senior Applications Engineer for the Motherboard Chipset Product Line at the Company, worked directly with customers designing motherboards using NVIDIA's MCPs. CW 9 learned about this change through an email from his/her supervisor, who was an applications manager.

70.     Moreover, the hardware defects present in NVIDIA's products were concrete evidence, before the filing of the Company's November 8, 2007, Form 8-K, that the GPU and MCP problems were NVIDIA's responsibility.

71.     As soon as Defendants were informed that HP had discovered cracks in the solder in its GPUs, Defendants knew or should have known—but for their reckless disregard of the facts—that the origin of the problem was their use of high-lead solder and low-Tg underfill, a Material Set which was present in a number of the Company's GPUs and MCPs.

72.     High-lead solder is known to be susceptible to fatigue. An October 15, 2008, article on The Tech Report entitled "AMD offers its take on GPU packages, failures," addressed the opinion of AMD's director of packaging and interconnect technologies on NVIDIA's product defects. According to the article, "AMD thinks [high-lead bumps are] **more prone to fatigue and need 'comprehensive reliability engineering to be used successfully.'**" The article noted that "the silicon GPU die and package substrate . . . have different thermal expansion coefficients—2 parts per million/°C for the silicon and 30 ppm/°C for the substrate . . . which puts a **significant stress on the bumps**."

73.     This weakness is magnified when high-lead solder is used with eutectic solder

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

17

paste, in part because the two different materials expand at different rates when heated. For example, TG Daily published a September 28, 2008, article discussing a scientific research report that analyzed the strength of a composite solder joint (one with a combination of high-lead solder bumps and eutectic paste, like that used in NVIDIA's problematic chips) with a homogenous eutectic solder joint (using only eutectic solder). The article, entitled "Nvidia GPU Solder Joints at a Disadvantage Over ATI, Scientist Says," explained that the scientist concluded the purely eutectic solder joints had a longer life than the high-lead composite joints, stating, in part:

> The research report surfaced late last week on the Electronic Thin Film lab of the Department of Materials Science and Engineering at the University of California at Los Angeles (UCLA), a known authority in material sciences. Author K. N. Tu investigated high-lead (90Pb10Sn) as well as eutectic SnPb (60Pb40Sn) and their exposure to fatigue cracking under thermal stress.
>
> **Nvidia's use of high-lead solder joints and temperatures higher than 70 degrees Celsius are generally believed to be the reasons of the GPU failures reported by the company. The underfill is used to redistribute thermal stress: According to Tu, if "the underfill has [a] low glass transition temperature, it becomes soft at the device operation temperature, and the thermal stress will be taken up mostly by the solder joints.** The solder joint at the corners will fail first." In each cycle, there is elastic deformation as well as plastic deformation.
>
> The analysis is based on the thought that "when the total plastic energy or work-done to the solder is beyond a threshold value, it will crack due to excessive work hardening and sever plastic deformation." **The critical observation is that the plastic energy produced in the high-lead layer is about 100 times larger than in the eutectic SnPb joint - which leads the scientist to believe that "cycle times needs to fail" are "100 times longer" with the eutectic solder bump.** Taking into account that he assumed an "ideal model" for his analysis, he concludes that "it is reasonable to say that it is at the least 10 times longer" in a real life model.
>
> **The translation is that eutectic solder joints may have a longer life than the high-lead joints, which would ultimately give such a semiconductor a longer life**. We were not able to find out whether Tu's research was actually commissioned by Nvidia or AMD/ATI, but the timing of the release clearly suggests that the results are aimed at shedding some light on the material issue in Nvidia's GPUs.

(Emphasis added.)

74.     The article continued:

> ***Overall, Tu believes that the high-lead solder joint "has a built-in weakness" due to the thin layer of eutectic SnPb solder in the joint.*** "The eutectic SnPb has a low yield

stress and it will deform first and lead to stress concentration and to accumulate high plastic strain energy," Tu writes. In contrast, the "homogeneous eutectic SnPb solder joint tends to have a uniform composition and much lower plastic deformation so the accumulation of plastic strain energy per unit volume is lower."

"If we define the failure by an energy criterion, the eutectic SnPb solder joint may have at least ten times longer life-time than the composite solder joint," Tu wrote.

(Emphasis added.)

75.     In order to overcome these potential weaknesses, the Material Set must include an underfill that will take stress off the bumps. However, NVIDIA's defective MCPs and GPUs used an underfill with a low "glassification temperature," or Tg, the point at which the underfill goes through a "phase transition" from a solid to a softer state, losing its strength and ability to support the bumps. According to CW 1, Mr. Demerjian, and news covering the GPU and MCP problem, during this phase transition in the problem chips, the die and substrate began to separate, placing stress on the solder bumps, and causing them to fracture at the joints connecting the die and substrate. Because the bumps carry power, signals, and ground, fractures in these GPU and MCP solder connections manifested as graphics and Internet connectivity problems.

76.     The fact that the Material Set was the reason for the problem was a matter of simple physics and metallurgy well known by NVIDIA and its senior executives and engineers: the high-lead solder joints were susceptible to cracking. While, ideally, the underfill would take the stress off of the bumps, and prevent this cracking from happening, NVIDIA's low-Tg underfill was not capable of doing this. Once NVIDIA saw cracks in the solder joints of its chips, it was immediately clear that the underfill had failed to support the bumps, and the chips' weak Material Set was contributing to the problems seen by HP and Dell.

77.     When asked about heat cycling, CW 9, a former Senior Applications Engineer for the Motherboard Chipset who worked with NVIDIA's MCPs, stated that packages are supposed to be made to temperature cycle, i.e. designed to deal with a "low power" state, a "normal state" and a "stand-by state." According to CW 9, if you didn't design for temperature cycling, you would not have a product.

78.     In addition, Defendants were on immediate alert that the cracks in the solder most likely stemmed from a thermal-related issue because the failures arose only in laptops. Indeed, as

VP Hara acknowledged in his September 2008 Citigroup Presentation, when GPU issues are seen in laptops, "we know" it is a thermal problem:

> [W]hat's happened is you are taking a relatively good part but that part happens to be put in a condition where it causes abnormal failure rates and **it happens to be only in notebooks. So, we know that since it's in a notebook, it's due to those thermal conditions, right?** So fundamentally what is happening is that when you take some of these parts that we put in notebooks, and the way the notebook is handling the thermal cycle, it's allowing some of these parts to hit at what we call a critical junction temperature. . . . And so the question is why in some instances are they seeing failure? It's really due to the fact that this condition of – if we take that material underfill, you stick it in a notebook. They have the high thermal cycle and it's hitting that critical junction temperature, which causes it to fail

(Emphasis added.)

79.     Furthermore, Defendants were keenly aware of the potential for issues with the Material Set in their GPUs and MCPs because they had just transitioned to high-lead solder the year prior. According to the Hodge Declaration, "In late October/early-November 2006, HP learned that a limited number of C-51 chips  had been damaged in September 2006 as a result of excessive pressure applied during NVIDIA manufacturing and testing." ¶36. Mr. Hodge, who was HP's "Distinguished Technologist within the Notebook Quality, Service & Customer Experience Division of HP's Person System Group ("PSG")" and who "previously served as Director of Engineering and Quality for the Notebook Division with the PSG's Early Warning and Prevention Team ("EWP") from 2003 through July 2009," explained in his declaration that:

> NVIDIA [] altered its material set . . . to prevent the recurrence of the pressure issue. The C-51 chips affected by the pressure issue were manufactured using a eutectic solder compound. ***On September 27, 2006, NVIDIA transitioned to high-lead solder material for the C-51 chip. High-lead is more malleable than eutectic and capable of absorbing more pressure from the chip during validation testing."*** ¶42.

80.     In a May 9, 2007, email from Mr. Hodge to Ike Harris, copying four others, with the subject "Quanta and NVIDIA," Mr. Hodge wrote:

> Ike, just an FYI.. we are working an escalation on the Atlantis program, a consumer box [laptop] built by Quanta [HP's original design manufacturer]. The first few months of production have a very high failure rate in the field (about 130k units). Most of the failures were traced to an issue identified and corrected during early warning. . .

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

20

**There are other issues on the product that involve NVIDIA and a change of the solder composition at the famous L1 joint between the die and the substrate**. In this case, NVIDIA damaged some of the ICs during their factory test. **Part of the solution however was to move away from Eutectic solder.** I was aware of this when I put the Ryan paper together. It does not change the results but it does set up a nasty conversation if you were not prepared . . .

81.      Mr. Hodge's May 2007 email is indicative of known industry concerns with the "famous L1 joint" and the use of high-lead solder. Defendants knew and/or deliberately disregarded that their GPU and MCP problems likely stemmed from this hasty, under-tested manufacturing change initiated in 2006.

82.      As stated in the Hodge Declaration in addressing a particular chip that had manifested with wireless issues in certain of HP's laptops: "Eutectic soldering and eutectic soldering paste react to temperature fluctuation in harmony and, therefore, eutectic based C-51 chips are not susceptible to the heat cycling issue that was identified in late October 2007." ¶62.

83.      However, after the change initiated in 2006, NVIDIA had used the defective Material Set in a material number of its GPUs and MCPs and continued to do so until just after the Class Period. As confirmed by the Hodge Declaration, "NVIDIA transitioned back to eutectic soldering bumps in or around July 2008." ¶62.

**NVIDIA Stalled the Disclosure Until the Company Had a Replacement Product to Offer.**

84.      CW 1 advised that it is a bit of a game when you engage a company like NVIDIA over multi-million dollar problems**.** CW 1 explained that NVIDIA would do the "PhD runaway" to appear cooperative while trying to slow HP down. According to CW 1, NVIDIA would "throw you curve balls and ask you to conduct a bunch of experiments," "throw PhDs at you, try to slow you down, keep you busy," and that this was ongoing through the first quarter of 2007.

85.      According to CW 1, "At least by the middle of 2007, we had them [NVIDIA] perform our [thermal] profile [that had been identified as causing the problem] in their labs and they reproduced it." CW 1 reported that NVIDIA confirmed to HP that it was able to reproduce the problem. But CW 1 said that NVIDIA "never admitted to getting to root cause, and they peddled the same story for as long as possible, that they were still investigating, even though they were able to reproduce and see the same side effect that HP was seeing. They [NVIDIA]

probably had the data before we [HP] did."

86.     CW 1 stated that it wasn't until 2008 that NVIDIA "finally gave up, decided to take the write-off, and give HP some money." CW 1 stated: "I can't imagine them getting into 2008 and not realizing until 2008, that would just be an impossibility." CW 1 considers it "amazing" that NVIDIA, with full access to HP's failure rates, would not be on red alert and investigating this problem at an extreme level. "They [NVIDIA] have quite a bit of capability, including several PhDs and lots of privately accessible lab space. I can't imagine them not identifying it."

87.     An October 11, 2007, article on www.firingsquad.com entitled "nSide NVIDIA" reports on a tour, including photographs, of "NVIDIA's Silicon Failure Analysis Lab" and remarks on "Howard Marks [NVIDIA's Director of Silicon Technology Failure Analysis] and his elite team." According to the article: "The scanning electron microscopes that NVIDIA houses are second to none and have a resolution of approximately 1 nm. On the used market, they're worth about half a million dollars – I imagine NVIDIA spent much more. . .  While the scanning electron microscope lets the failure analysis team see the errors, the gallium ion beam can be used to cut the electrical connections between individual transistors or even deposit material to create new electrical connections. That is, not only can NVIDIA troubleshoot defective chips in-house, they can also patch the chip to test their hypothesis." "NVIDIA also employs several other tools to help them. The failure analysis lab often has to find a single errant transistor out of 681 million (that's the number of transistors inside GeForce 8800)."

88.     NVIDIA also employs numerous scientists and engineers. David B. Kirk served as NVIDIA's chief scientist during the Class Period.  Dr. Kirk holds B.S. and M.S. degrees in mechanical engineering from the Massachusetts Institute of Technology, and M.S. and Ph.D. degrees in computer science from Caltech;  is the inventor of 50 patents and patent applications relating to graphics design, and has published more than 50 articles on graphics technology; serves on the U.S. Commerce Department's Information Systems Technical Advisory Committee; and was honored by the California Institute of Technology in 2009 with a

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

22

Distinguished Alumni Award, its highest honor, for his work in the graphics-technology industry.

89.     Despite the sophistication, experience, and data provided by leading OEMs that allowed NVIDIA to identify the problem and its root cause by the middle of 2007, Defendants were motivated to conceal the problems until the July 2008 disclosure, because, among other reasons, "[t]he previous generation MCP and GPU products that are impacted were included in a number of notebook products that were shipped and sold in significant quantities" (July 2008 disclosure), the affected parts were at or nearing their end of life (September 2008 statement by VP Hara), and "[a]ll newly manufactured products and all products currently shipping in volume have a different and more robust material set" (July 2008 disclosure).

90.     VP Hara acknowledged at the Citigroup Presentation that the disclosure of the thermal-related GPU problems came after or close to the end of the products' useful life, stating:

> Two of the three parts that are failing the most actually are, have been end of lifed for over six months. So, we are not even shipping these parts anymore. One additional part that has seen a little bit less failure but still failing is probably at, it's end of lifed here pretty shortly.

91.     Thus, Defendants stalled the disclosure of the material, adverse facts for several months, if not a full year, until the failing products were at the end of their life-cycle and the Company had new products to market.

**Thermal issues were a known concern with NVIDIA'S GPUs, especially in laptops, and NVIDIA had experienced thermal-related GPU problems in the past.**

92.     CW 6 stated that hardware engineers would routinely look at thermal issues and that NVIDIA had a special thermal team.

93.     CW 10, a former NVIDIA IT Manager and Senior Field Service Engineer who worked at the Company between January 2001 and March 2007, stated that one of the requirements for NVIDIA's employees' laptops was that they contain NVIDIA hardware. CW 10 stated that: "There was a time there where we were [predominantly] buying Toshiba laptops. They were like M4's and M5's I think was the model numbers. **I know I had all sorts of**

**overheating issues that required the replacement of graphics systems in them**. . . . No one from the chain of command told me formally that it was our product and we were at fault or anything like that**, but I can tell you that I certainly noticed a pattern of failures that were related to overheating in the GPU**." CW 10 related that these were NVIDIA parts and s/he had them replaced. CW 10 related, "it was a problem. It was definitely a problem." CW 10 saw a variety of failures throughout CW 10's employment, but "certainly there was a cluster of them at some period of time related to overheating that I fought with. I was just as irate about it as anybody else." CW 10 reported that s/he constantly received laptops with failed video graphics sub-systems.

94.     When CW 10 was advised by Lead Plaintiffs' investigators that NVIDIA publicly acknowledged a graphic chip problem in July 2008, CW 10 stated: **"That's a year after I saw the problem, at least a year, probably more. . . . . The more I'm thinking about it, I think that problem was an issue for me pretty close to when I left** [**in March 2007**]. I was still fighting that problem up to when I finally left NVIDIA. It seemed like there was six-month period there where I was routinely getting Toshibas back that were bad. It was sort of one of these deals where you would call the place to repair it and they would just sort of go **'Okay. I know what the problem is.' It was routine for the depots conducting the repair work."**

**NVIDIA Has a History of Delaying the Disclosure of Known Problems**

95.     CW 11, a Senior Engineering Manager who worked at NVIDIA from December 2002 until March 2006, stated that "It was basically their modus operandi, is what would cause the core problem. Basically, if you're arrogant, you think you never do wrong, there will be a case like something like this will happen." CW 11 confirmed that throughout his/her employment, NVIDIA operated with a "failure to recognize real problems. They just won't admit it. That's the problem. Many times it sells so badly that they cannot deny it anymore. . . like the problem that happened [with the GPUs.]" CW 11 reiterated: "Basically, I told you that they will not admit that there is going to be a problem," and noted that this failure to take responsibility happened, "all the time, on every product."

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

24

96.   CW 11 elaborated, stating that "if a reliability guy tells the product group, 'You got a problem,' they say 'Good. You figure out how we can ship.' That's the way they operate, rather than 'What can I do to alleviate the problem or fix it?'" CW 11 stated that NVIDIA gets "bolder and bolder each time when whatever they ship actually has a low failure rate or low return. They keep pushing it, the next generation. So they keep pushing it closer and closer to the precipice. That's the edge of the reliability and beyond that there will be one hundred percent failure, so there is no margin. Whenever they need to ship something, they would just waive all of the reliability, especially if the reliability test shows that there is a problem."

97.   CW 12, a former Sales Director for Infineon Technologies Corporation, a company from which NVIDIA purchased memory for their chips, had regular, direct contact with NVIDIA and its employees. CW 12 stated that NVIDIA was notorious for blaming other entities for product related problems: "A lot of times it's easy for them to just blame [a customer's component] and not the graphics chips. So their first area of default was always to say 'This is your problem. You fix it.' Some of the time they were right in saying that and some of the time they were wrong, but their default was always to say 'This is not our problem. This is your problem.'"

98.   CW 13, who worked as an NVIDIA Environmental Compliance Engineer from August 2007 to September 2008, stated that NVIDIA has a history of failing to take responsibility for Company problems. Accordingly, CW 13 stated, "I do know that there were times when I was there when there were issues. They said, **'Just don't say anything'. . . . There were times there when I said 'Well, shouldn't we notify so-and-so about the potential for this problem?' The company response was in the negative. 'You just shut up and do your job. We'll take care of it.' The company had the following mentality: 'Don't say anything to muck the waters.'" When CW 13 expressed concerns on issues, management replied to refrain from being involved, because when one's name is involved, the Company would start saying that you are affecting the profit and shipping schedules.** CW 13 stated that it would not surprise him "one bit with the way that they did things and plus their razor-thin profit

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

25

margins, to just not say anything about it because it was just the way that they did business." Regarding the thermal-related GPU issue, CW 13 stated that he heard about the problem when they made the July 2008 announcement, but "**You know and I know that they knew about it long before that. . . . I think they do a good job of covering their ass**." (Emphasis added.)

99.     CW 14, a former Director of IC Quality and Reliability for NVIDIA who reported to Defendant Huang for the first seven to eight months of his/her employment, related that, during his/her employment, NVIDIA was aware of a chip design problem, but failed to take responsibility for it until roughly two to three months after the customer discovered the problem. CW 14 stated that "**one of the reasons that I'm not there is because we should have told [the customer] a whole lot sooner. . . . We knew what it [the problem] was and we kept hemming and hawing, like how many are out in the field. They said a couple of hundred monitors. They knew where everything was. Our customer had contained the problem, but we weren't telling them what it was. We knew way ahead of time about the problem." CW 14 reported: "They would rather payout ten million dollars to the customer than have it come out. We just kind of didn't say anything for a few months. We finally did. It was a design problem." CW 14 described the situation as one of those where "we'll pay you some money and we'll just make it go away."** (Emphasis added.)

100.    CW 15, a former NVIDIA Staffing Systems and Compliance Analyst, stated that s/he was told: "**I don't care what you do, just make us look good**." CW 15 believed: "That sort of behavior permeates out. **So if you've got a class action lawsuit for the GPUs, I am positive that there was some action by some manager that said 'Don't do anything about it. It will make us look bad**.'" CW 15 further maintained that NVIDIA has a philosophy of non-accountability, stating that **NVIDIA management is "so arrogant that they think that they're never going to get caught on anything."** (Emphasis added.)

101.    CW 16, a former Administrator for a website selling enhanced NVIDIA drivers, related that NVIDIA has a hostile way of dealing with actions against it. CW 16 stated: "It's funny that you called me, because **I've seen a lot of hostile actions from that company.**" CW

16 discussed failure rates from NVIDIA's fabrication process and noted, **"NVIDIA tends to be a little 'scrooge-ish' when it comes to scrapping their failure percentage rates.** This isn't the first time I've heard about this.** They've had a lot of fiascos in the past with like the GeForce 2 Ultra, a lot of overheating issues. This is the first that I've actually heard of consumers actually trying to call them on it." (Emphasis added.)

102.   NVIDIA was also accused by its insurance companies of being unwilling to admit to the details and extent of the GPU and MCP problem. In a declaratory judgment action filed against NVIDIA by National Union Fire Insurance Company of Pittsburg, Pa. ("National Union") on May 8, 2009 (09-cv-2046 (N.D. Cal.)), National Union brought an action regarding "claims asserted by Dell, Toshiba, Apple, Quanta, Compal, Asus, Samsung, Fujisu-Siemens, and other claimants that may bring or have brought claims against NVIDIA . . . alleg[ing] that the graphics processing units ("GPUs") designed and sold by NVIDIA and used in notebook computers have failed. . . ." National Union alleged that **"NVIDIA has failed and even refused to provide material information about the Chip Claims to National Union, despite repeated and specific requests. . . NVIDIA has cloaked its refusals to provide information under the guise of preserving commercial relationships with the Chip Claimants. National Union, however, has requested only objective, material and non-proprietary information, such as the records of the repairs made by Chip Claimants to the affected Computers."**

103.   National Union issued to NVIDIA a general commercial liability policy and an umbrella policy covering occurrences or claims during the policy period January 31, 2008, to January 31, 2009 (the "Policy Period").  According to the National Union Action, NVIDIA made claims under the policies for the chip defects after the end of the class period but, in fact, National Union alleges NVIDIA knew the extent of the problem prior to the start of the Policy Period, i.e., before January 28, 2008:

"87.  The National Union Policies potentially provide coverage for those sums that the insured becomes legally obligated to pay as damages because of "property damage" only if, prior to the policy period, no authorized and/or specified insured or employee knew that the "property damage" had occurred, in whole or in part.

"88.  To the extent the Chip Claims seek to impose a legal obligation to pay

damages because of "property damage," NVIDIA, the insured, and/or authorized employees knew that such "property damage" had occurred, in whole or in part, prior to January 31, 2008."

National Union Complaint ¶¶ 87-88.

104.    On April 28, 2010, National Union filed a declaratory judgment action, *National Union Fire Insurance Co., of Philadelphia, PA v. NVIDIA Corp.*, CV 10-1812 (N.D. Cal) seeking a declaratory judgment, alleging that, after the review of 600,000 pages of documents produced to the class action plaintiffs in the consumer action related to the defective chips, NVIDIA's insurers determined that their policies did not cover the defective chips and determined that Defendants had "prior knowledge," stating that: "To the extent the GPU Litigation seeks to impose a legal obligation to pay damages because of 'property damage,' NVIDIA, the insured, and/or authorized employees knew that such 'property damage' had occurred, in whole or in part, prior to January 31, 2008, the effective date of the National Union Policies."

105.    In a California state court action, *Great American Insurance Company of New York v. NVIDIA Corporation*, 09-cv-133413 (Santa Clara), filed by another one of NVIDIA's insurers, "Great American," NVIDIA is accused of: being aware of and troubleshooting problems with its GPU products at least as far back as August 2007; **being informed and aware that HP was the subject of a class action lawsuit filed November 14, 2007, related to problems with NVIDIA chips and that HP would seek indemnification from NVIDIA for all loss and damage associated with that suit**; and knowing that the same material set used in the chips that were failing in the HP notebooks was being used in other NVIDIA chips and, therefore, the high field failures would continue to be experienced in the future. Thus, Great American alleged that NVIDIA's January 2008 request for an excess liability policy from Great American was obtained fraudulently, through NVIDIA's concealment of material information regarding the risk being evaluated by Great American. (Emphasis added.)

**High Level Departures**

106.    On March 27, 2008, in the midst of the Company's financial crisis and just months before the Company disclosed the truth regarding the thermal problems, Defendants

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

28

revealed that Company CFO Marvin Burkett would step down from his role as Company CFO. That release stated:

> Marvin D. Burkett, Chief Financial Officer of NVIDIA Corporation, informed us on March 21, 2008 of his intention to retire. Mr. Burkett is expected to remain with us as Chief Financial Officer while a search is conducted to find his replacement, and he may continue in some capacity with us thereafter. We have commenced the process to recruit a new Chief Financial Officer.

107.   In February 2009, Mr. Burkett became a senior advisor to the Company, and he remains in this role as of the date of this filing.

108.   In June 2008, the month before the truth wad disclosed, NVIDIA's Senior Director and Head of Internal Audit, Alex Garcia, also left the Company.

109.   In January 2009, NVIDIA replaced David B. Kirk, who had served as the Company's Chief Scientist for the previous 12 years. Dr. Kirk remains with NVIDIA as a fellow as of the time of this filing.

## THE DISCLOSURE

110.   On July 2, 2008, well over a year after Defendants were alerted to the GPU and MCP problems, the Company disclosed that flawed chip materials caused notebook computers containing these products to fail at unusually high rates. Defendants further disclosed that the Company would take a $150 to $200 million charge to cover warranty, repair, return, replacement, and other costs "arising from a weak die/packaging material set in certain versions of our previous generation MCP and GPU products used in notebook systems."

111.   As the July 2, 2008 NVIDIA press release filed with the SEC via Form 8-K, stated:

> On July 2, 2008, NVIDIA Corporation stated that it would take a **$150 million to $200 million** charge against cost of revenue to cover anticipated customer **warranty, repair, return, replacement** and other consequential costs and expenses arising from a **weak die/packaging material set** in certain versions of our previous generation MCP and GPU products used in notebook systems. **All newly manufactured products and all products currently shipping in volume have a different and more robust material set.**

> The previous generation MCP and GPU products that are impacted were included in a number of notebook products that were shipped and sold in **significant quantities**. Certain notebook configurations of these MCP and GPU products are

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

29

failing in the field at higher than normal rates. **While we have not been able to determine a root cause for these failures, testing suggests a weak material set of die/package combination, system thermal management designs, and customer use patterns are contributing factors.** We have developed and have made available for download a software driver to cause the system fan to begin operation at the powering up of the system and reduce the thermal stress on these chips**. We have also recommended to our customers that they consider changing the thermal management of the MCP and GPU products in their notebook system designs. We intend to fully support our customers in their repair and replacement of these impacted MCP and GPU products that fail.**

**We have begun discussions with our supply chain regarding reimbursement to us for some or all of the costs we have incurred and may incur in the future relating to the weak material set.** We will also seek to access our insurance coverage. We continue to not see any abnormal failure rates in any systems using NVIDIA products other than certain notebook configurations. However, we are continuing to test and otherwise investigate other products. There can be no assurance that we will not discover defects in other MCP or GPU products.

(Emphasis added.)

112.    In the July 2008 Disclosure, Defendants denied having identified a "root cause for these failures" and blamed "system thermal management designs," i.e., OEM design, and "customer use patterns" as contributing factors to the products' failure, and stated that NVIDIA had "begun discussions with [its] supply chain regarding reimbursement" for the problems. Thus, investors learned that **NVIDIA was forced to take a $150-200 million charge that did not stem from NVIDIA's acceptance of fault for this issue, but rather from Defendants' need to "fully support our customers in their repair and replacement of these impacted MCP and GPU products that fail."** (Emphasis added.)

113.    At this time, investors learned that Defendants' prior Class Period statements regarding NVIDIA's financial condition, results, products, relationships with customers, and business prospects were materially false and misleading when made because Defendants failed to disclose: the defects in the Company's GPUs and MCP; that NVIDIA's key OEMs were holding NVIDIA accountable for these problems; and/or that NVIDIA had every indication that these problems were NVIDIA's responsibility. Investors also learned that the problem was so widespread – having occurred in GPUs and MCPs in "a number of notebook products," "shipped and sold in significant quantities," to multiple "customers"– that NVIDIA would be forced to

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

30

contribute to the repair and replacement of these GPUs regardless of whether NVIDIA was at fault in order to maintain critical relationships with their key OEMs.

114.    According to the July 2008 Disclosure, the Company had already taken extraordinary, secret steps in a period of at least 11 months since Defendants were informed of these product problems. Defendants revealed in the disclosure that they had already "developed and [] made available for download a software driver to cause the system fan to begin operation at the powering up of the system and reduce the thermal stress on these chips," identified a "weak die/packaging material set" and "problems with system thermal management designs;" made other recommendations to its customers, and "begun discussions with [its] supply chain regarding reimbursement;" and could confirm that "[a]ll newly manufactured products and all products currently shipping in volume have a different and more robust material set." However, despite these extremely serious steps taken by NVIDIA, prior to the July 2008 Disclosure, Defendants had not revealed *any* problem with NVIDIA's GPUs, or set aside *any* money for such contingencies, even as recently as the Company's 10-Q filed less than six weeks prior on May 22, 2008.

115.    When investors learned the material, undisclosed facts, NVIDIA's stock plummeted by 31% from an intraday high of $18.78 per share on July 2, 2008 to an opening of $12.98 per share on July 3, 2008—an overnight loss of over $3 billion in NVIDIA market capitalization—thereby damaging Lead Plaintiffs and the Class.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

116.    On November 8, 2007, the first day of the Class Period, NVIDIA filed with the SEC a Form 8-K, which included a November 8 press release touting the Company's first billion dollar quarter, 3Q:08, which according to Defendant Huang "was just the beginning." Defendant Huang commented:

> We are very proud to have achieved our first billion dollar quarter. And, while it is a wonderful milestone to reach, **we believe this is just the beginning….Our core businesses are continuing to grow as the GPU becomes increasingly central to today's computing experience in both the consumer and professional market segments**.

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

31

(Emphasis added.)

117.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, while Defendants were touting that the GPU was becoming "central to today's computing experience" and that NVIDIA's "core business are continuing to grow," Defendants failed to disclose that its key OEMs, including at least Dell and HP, had complained of significant problems with NVIDIA's GPUs, and that Defendants knew and/or deliberately disregarded that NVIDIA would have to compensate customers for repair, warranty, and replacement charges for its products, and/or assist customers with repairs and warranty support for problems related to these chips. These statements failed to disclose that the key product lines at the center of these "core" and "central" businesses were experiencing abnormal failure rates, forcing NVIDIA to develop BIOS updates to protect its OEMs' notebook computers from further damage, all inundating NVIDIA with claims for refunds and replacement.

118.    On February 13, 2008, Defendants filed with the SEC a current report on Form 8-K, that included as an exhibit a February 13, 2008, press release titled "NVIDIA Reports Record Results for Fourth Quarter and Fiscal Year 2008." Defendant Huang was quoted in the February 13 press release:

> **Fiscal 2008 was another outstanding and record year for us. Strong demand for GPUs in all market segments drove our growth. Relative to Q4 one year ago, our discrete GPU business grew 80%.**

(Emphasis added.)

119.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure

for repair, replacement, and warranty costs. Moreover, Defendant Huang's statement that "[s]trong demand for GPUs in all market segments drove our growth" failed to disclose that this growth would not be sustainable because NVIDIA's products were failing and the Company would be forced to provide refunds and warranty support for a material amount of its 6, 7, 8, and 9 series GPUs, as well as face long-standing reputational and financial damage, including write-offs of excess inventory of unsellable, damaged products.

120.    The next month, on March 21, 2008, NVIDIA filed with the SEC, on Form 10-K, its annual report for the period ended January 27, 2008. Regarding the Company's strategy to "achieve market segment leadership," the Company's March 21, 2008, Form 10-K, stated, in part:

> Build Award-Winning, Architecturally-Compatible 3D Graphics, HD Video, Media Communications and Ultra-Low Power Product Families for the PC, Handheld and Digital Entertainment Platforms**. Our strategy is to achieve market segment leadership in these platforms by providing award-winning performance at every price point. By developing 3D graphics, HD video and media communications solutions that provide superior performance and address the key requirements of these platforms, we believe that we will accelerate the adoption of 3D graphics and rich digital media.**

121.    With respect to the Company's research and development strategy, the 10-K noted:

> Sustain Technology and Product Leadership in 3D Graphics and HD Video, and Media Communications and Ultra-Low Power. We are focused on using our advanced engineering capabilities to accelerate the quality and performance of 3D graphics, HD video, media communications and ultra-low power processing in PCs and handheld devices. A fundamental aspect of our strategy is to actively recruit the best 3D graphics and HD video, networking and communications engineers in the industry, and we believe that we have assembled an exceptionally experienced and talented engineering team. Our research and development strategy is to focus on concurrently developing multiple generations of GPUs, including GPUs for high-performance computing, MCPs and mobile and consumer products that support PMPs, PDAs, cellular phones and other handheld devices using independent design teams. **As we have in the past, we intend to use this strategy to achieve new levels of graphics, networking and communications features and performance and ultra-low power designs, enabling our customers to achieve superior performance in their products**.

122.    The foregoing statements were materially false and misleading when made

because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, Defendants had known and/or deliberately disregarded for at least several months, if not an entire year, that their products were not providing "superior performance," but in truth, were failing and would need to be replaced, and that the Company would be forced to pay for additional repairs for damage related to these graphics products.

123. With respect to relationships with OEMs and other customers, the 10-K stated, concerning strategy:

> **Target Leading OEMs, ODMs and System Builders.** Our strategy is to enable our leading PC, handheld and consumer electronics OEMs, ODMs and major system builder customers to differentiate their products in a highly competitive marketplace by using our products. We believe that design wins with these industry leaders provide market validation of our products, increase brand awareness and enhance our ability to penetrate additional leading customer accounts. **In addition, we believe that close relationships with OEMs, ODMs and major system builders will allow us to better anticipate and address customer needs with future generations of our products.**

(Emphasis added.)

124. The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, Defendants knew and/or deliberately disregarded that NVIDIA's "close relationships with [its] OEMS, ODMs and major system builders" had not "allow[ed] [NVIDIA] to better anticipate and address customer needs," but instead had allowed NVIDIA to learn, several months, if not a year, prior to this statement, that these OEMs and major system builders were experiencing material, undisclosed problems with several of NVIDIA's GPUs, for which NVIDIA would be required to provide costly replacements and fund related repairs. In addition, Defendants failed to disclose that these

relationships were at risk, because these key OEMs and system builders were holding NVIDIA accountable for product defects in the Company's core products.

125.    With respect to devotion of Company resources, the 10-K notes:

Increase Market Share. We believe that substantial market share will be important to achieving success. We intend to achieve a leading share of the market in areas in which we don't have a leading market share, and maintain a leading share of the market in areas in which we do have the lead, **by devoting substantial resources to building families of products for a wide range of applications that offer significant improvement in performance over existing products.**

(Emphasis added.)

126.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, NVIDIA had not "devot[ed] substantial resources" to products "that offer significant improvement over existing products," but instead had dramatically cut new product development spending in the quarters in which the problematic GPUs and MCPs were being developed and sold. Compared to the same quarters of the previous years, new product development spending was down: 31% in the quarter ending in November 2007, 64% in the quarter ending in July 2007, and 44% in the quarter ending in April 2007. The negative impact of these spending cuts was evident as Defendants began to see material, widespread problems with the products developed and shipped in these quarters at least as early as August 2007.

127.    With respect to the Company's "expertise" in HD graphics, the 10-K stated:

Use Our Expertise in Digital Multimedia. We believe the synergy created by the combination of 3D graphics, HD video and the Internet will fundamentally change the way people work, learn, communicate and play. **We believe that our expertise in HD graphics and system architecture positions us to help drive this transformation**. We are using our expertise in the processing and transmission of high-bandwidth digital media to develop products designed to address the requirements of high-bandwidth concurrent multimedia.

(Emphasis added)

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

35

128.    NVIDIA's Form 10-K also stated, with respect to the "technical expertise" of sales team and "highly skilled team" of engineers:

**Members of our sales team have a high level of technical expertise and product and industry knowledge to support the competitive and complex design win process. We also employ a highly skilled team of application engineers to assist the Channel in designing, testing and qualifying system designs that incorporate our products.** We believe that the depth and quality of our design support are keys to improving the Channel's time-to-market, maintaining a high level of customer satisfaction within the Channel and fostering relationships that encourage customers to use the next generation of our products.

**In the GPU and MCP segments we serve, the sales process involves achieving key design wins with leading OEMs and major system builders and supporting the product design into high volume production with key ODMs, motherboard manufacturers and add-in board manufacturers.** These design wins in turn influence the retail and system builder channel that is serviced by add-in board and motherboard manufacturers. Our distribution strategy is to work with a number of leading independent contract equipment manufacturers, or CEMs, ODMs, motherboard manufacturers, add-in board manufacturers and distributors each of which have relationships with a broad range of major OEMs and/or strong brand name recognition in the retail channel. In the CPB segment we serve, the sales process primarily involves achieving key design wins directly with the leading handheld OEMs and supporting the product design into high-volume production. Currently, we sell a significant portion of our processors directly to distributors, CEMs, ODMs, motherboard manufacturers and add-in board manufacturers, which then sell boards and systems with our products to leading OEMs, retail outlets and to a large number of system builders.

(Emphasis added.)

129.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, Defendants' statements regarding the "high level of technical expertise and product and industry knowledge" as well as the "highly skilled team of application engineers to assist in . . . designing, testing, and qualifying system designs" were materially false and/or misleading when made because, prior to and throughout the Class Period, Defendants employed a shoddy and haphazard system of testing that allowed

defective products to be widely distributed. CWs reported that NVIDIA failed to test for temperature swings, saw thermal problems in the testing stages and yet allowed products to be shipped anyway, and knew that some employees had falsely claimed to have tested parts simply to meet testing quotas. Moreover, once these problems were identified by customers, NVIDIA was notorious for failing to take responsibility for known product defects and failed to employ efficient failure analysis techniques.

130.    On May 8, 2008, Defendants filed with the SEC a current report on Form 8-K, that included as an exhibit a May 8, 2008, press release titled "NVIDIA Reports Results for First Quarter Fiscal 2009." Defendant Huang was quoted in the press release stating:

> ***The growth of GPUs continues to outpace the PC market. We shipped 42 percent more GPUs this quarter compared to the same period a year ago, resulting in our best first quarter ever.*** This is the era of visual computing. With a few hundred million GeForce GPUs in the market, developers can now confidently create applications with dazzling graphics. Amazing applications with beautiful graphics are showing up on the Web constantly, driving even faster adoption of GPUs. ***We expect this positive feedback loop to continue to drive our growth***.

(Emphasis added.)

131.    The foregoing statements were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs. Moreover, Defendant Huang's statement that "[t]he growth of GPUs continues to outpace the PC market. . . We expect this positive feedback loop to continue to drive our growth," made just months before the Company revealed it would be forced to take a $150-$200 million charge for its GPUs and MCPs, failed to make any mention of the significant *negative feedback* the Company had been receiving for *months*, if not a *full year*, from its key OEMs.

132.    On May 22, 2008, NVIDIA filed with the SEC, on Form 10-Q, its quarterly report for the quarter ended April 27, 2008, the Form 10-Q included a section titled "Product Defect

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

37

Contingencies" which stated:

> During the first quarter fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products. This product was included in a significant number of the customer's notebook products that have been sold to end users, and has also been shipped to other of our customers in significant quantities. We are evaluating the potential scope of this situation, including the nature and cause of the alleged defect and the merits of the customer's claim, and to what extent the alleged defect might occur with other of our products. We are currently unable to estimate the amount of costs that may be incurred by us beyond the normal product warranty accrual that we have taken related to this claim and the alleged defect and, therefore, we have not recorded any additional related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

133.    This statement, which came less than six weeks before Defendants quantified their $150-$200 million charge, was materially false and misleading when made because Defendants knew and/or deliberately disregarded, *inter alia*, the following:

- More than "one of [NVIDIA's] customers" had already approached NVIDIA regarding the "die/packaging material set defect."

- This problematic "die/packaging material set defect" was present in more than "one of [NVIDIA's] MCP products" and was actually present in several GPUs and MCPs, many of which were already presenting problems.

- According to CW reports, Defendants had been aware of the MCP and GPU problems for over a year by the time of this statement, and by Defendants' own admissions, had been aware of this problem for at least nine months by the time of the Form 10-Q.

- Although Defendants made cursory disclosures regarding the MCP problems, they failed to make any disclosure about the more serious problem with the GPUs.

- MCP repair would be more costly than product replacement, thus, Defendants knew and/or deliberately disregarded that this product defect would require product replacement. Moreover, because NVIDIA provided the chips to OEMs already soldered to the motherboards, the MCP failures would necessitate replacement of the entire motherboard. Defendants knew the cost of the product and motherboards, knew how many products were placed in notebook computers, and thus could reasonably ascertain the minimum costs of product replacement.

**Defendants' Materially False and Misleading Risk Statements**

134.    The November 21, 2007, Form 10-Q, included a discussion of the purported

"risk" of the future possibility of product defects, stating, in part:

> **We could suffer a loss of market share if our products contain significant defects.**
>
> Products as complex as those we offer may contain defects or experience failures when introduced or when new versions or enhancements to existing products are released. **In the past, we have discovered defects and incompatibilities with customers' hardware in some of our products. Similar issues in the future may result in delays or loss of revenue to correct any defects or incompatibilities.**… Our products typically go through only one verification cycle prior to beginning volume production and distribution. As a result, our products may contain defects or flaws that are undetected prior to volume production and distribution. **If these defects or flaws exist and are not detected prior to volume production and distribution, we may be required to reimburse customers for costs to repair or replace the affected products in the field**. We also face the risk of product recalls or product returns. A significant number of product returns due to a defect or recall could damage our reputation, result in our customers working with our competitors, and could adversely impact our financial results. We may also be required to incur additional research and development costs to find and correct the defect, which could divert the attention of our management and engineers from the development of new products. These costs could be significant and could adversely affect our business and operating results. We may also suffer a loss of reputation, loss of revenues and/or a loss in our market share, any of which could materially harm our financial results.

(Emphasis added.)

135.   The risk language contained in the Company's November 21, 2007 Form 10-Q was materially false and misleading when made because it addressed only "past" problems with defects and incompatibilities and the risk associated with "future" issues, without ever disclosing that the Company was *currently* receiving complaints regarding significant defects for which they had *already* "invest[ed] additional research and development efforts to find and correct the issue. . . divert[ing] [NVIDIA's] management's and engineers' attention from the development of new products and technologies," and which were *already* negatively impacting market acceptance, damaging the Company's reputation, and forcing the Company to repair and replace products

136.   A very similar risk discussion concerning the purported future possibility of product defects was included in the Company's Form 10-K dated March 21, 2008:

***If our products contain significant defects our financial results could be negatively impacted, our reputation could be damaged and we could lose market share.***

Our products are complex and may contain defects or experience failures when first introduced or when we release new versions or enhancements. Past products have and future products or enhancements may contain defects, errors or bugs. Our products typically only go through one verification cycle prior to volume production and distribution. As a result, our products may contain undetected defects or flaws prior to volume production and distribution. If any of our products or technologies contains a defect, compatibility issue or other error, we may have to invest additional research and development efforts to find and correct the issue. Such efforts could divert our management's and engineers' attention from the development of new products and technologies and could increase our operating costs and gross margin. Additionally, an error or defect in new products or releases or related software drivers after commencement of commercial shipments could result in failure to achieve market acceptance or loss of design wins. Also, we may be required to reimburse customers for costs to repair or replace the products in the field, which could cause our revenue to decline. A product recall or a significant number of product returns could be expensive, damage our reputation, or result in our customers working with our competitors. Costs associated with correcting defects, errors, bugs or other issues could be significant and could materially harm our financial results.

137.    The risk language contained in the Company's March 21, 2008, Form 10-K was materially false and misleading when made because it addressed only "past" problems with defects and incompatibilities and the risk associated with "future" issues, without ever disclosing that the Company was *currently* receiving complaints regarding significant defects for which they had *already* "invest[ed] additional research and development efforts to find and correct the issue. . . divert[ing] [NVIDIA's] management's and engineers' attention from the development of new products and technologies," and which were *already* negatively impacting market acceptance, damaging the Company's reputation, and forcing the Company to repair and replace products.

138.    The May 22, 2008, Form 10-Q again contained a risk discussion concerning the purported future possibility of product defects, which included, in part, the following:

***If our products contain significant defects our financial results could be negatively impacted, our reputation could be damaged and we could lose market share.***

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

40

Our products are complex and may contain defects or experience failures when first introduced or when we release new versions or enhancements. Such defects or failures could be due to any number of issues in design fabrication, packaging, materials and/or use within a system. Past products have and future products or enhancements may contain defects, errors or bugs. Our products typically only go through one verification cycle prior to volume production and distribution. As a result, our products may contain undetected defects or flaws prior to volume production and distribution. If any of our products or technologies contains a defect, compatibility issue or other error, we may have to invest additional research and development efforts to find and correct the issue. Such efforts could divert our management's and engineers' attention from the development of new products and technologies and could increase our operating costs and decrease our gross margin. Additionally, an error or defect in new products or releases or related software drivers after commencement of commercial shipments could result in failure to achieve market acceptance or loss of design wins. Also, we may be required to reimburse customers, including for their costs to repair or replace the products in the field, which could cause our revenue to decline. A product recall or a significant number of product returns could be expensive, damage our reputation, and could result in the shifting of business to our competitors. Product liability claims brought against us, even if unsuccessful, would likely be time consuming and costly to defend. Costs associated with finding and correcting defects, errors, bugs or other issues could be significant and could materially harm our financial results and have other adverse results.

During the first quarter of fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products. This product was included in a significant number of the customer's notebook products that have been sold to end users, and has also been shipped to other of our customers in significant quantities. We are evaluating the potential scope of this situation, including the nature and cause of the alleged defect and the merits of the customer's claim, and to what extent the alleged defect might occur with other of our products. We are currently unable to estimate the amount of costs that may be incurred by us beyond the normal product warranty accrual that we have taken related to this claim and the alleged defect and, therefore, we have not recorded any additional related costs or a liability in our Condensed Consolidated Financial statements as of, and for the three months ended, April 27, 2008.

139.    This foregoing statement was materially false and misleading when made because Defendants knew and/or deliberately disregarded, *inter alia*, and omitted to disclose, the following material adverse information:

- More than "one of [NVIDIA's] customers" had already approached NVIDIA regarding the "die/packaging material set defect."

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

41

- This problematic "die/packaging material set defect" was present in more than "one of [NVIDIA's] MCP products" and was actually used in several GPUs and MCPs, many of which were already presenting problems.

- According to CW reports, Defendants had been aware of the MCP and GPU problems for over a year by the time of this statement, and by Defendants' own admissions, had been aware of this problem for at least nine months by the time of the Form 10-Q.

- Although Defendants made cursory disclosures regarding the MCP problems, they failed to make any disclosure about the more serious problem with the GPUs.

- MCP repair would be more costly than product replacement, thus, Defendants knew/and or deliberately disregarded that this product defect would require product replacement. Moreover, because NVIDIA provided the chips to OEMs already soldered to the motherboards, the MCP failures would necessitate replacement of the entire motherboard. Defendants knew the cost of the product and motherboards, knew how many products were placed in notebook computers, and thus could reasonably ascertain the minimum costs of product replacement.

**Defendants' Materially False and Misleading Statements and Omissions regarding SOX Compliance**

140.    Pursuant to the certification requirements of the Sarbanes-Oxley Act of 2002, Defendant Huang attested in identical language appearing in the Form 10-Q for the period ended September 30, 2007, the 10-K for the period ended January 27, 2008, and the Form 10-Q for the quarter ended April 27, that each of those filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…"

141.    The foregoing attestations by Defendant Huang were materially false and misleading when made because Defendants failed to disclose material information regarding the Company's business and financial condition, relating, in part, to the quality of NVIDIA's key products, the Company's business strategy, its relationships with OEMs and key customers, and its exposure for repair, replacement, and warranty costs.

**POST-CLASS PERIOD EVENTS**

**Ongoing Impact of the Fraud**

142.    Shawn Webster, an analyst with JPMorgan, downgraded NVIDIA from Overweight to Neutral on July 3, 2008, stating that the "$150-$200 million charge for flaws in

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

42

shipped products [is] . . . *overwhelming evidence of broken execution*." (Emphasis added.) Webster rejected NVIDIA's excuses that a weaker global end market had contributed to NVIDIA's weak results. According to Webster, the personal computer global end market was stable and *NVIDIA's weak results were NVIDIA-specific as a result of the chip failures that resulted in the $150-$200 million charge*.

143. The previously undisclosed GPU and MCP problems continued to impact NVIDIA's financial result for years after the July 2008 disclosure by damaging the Company's reputation, leaving the Company with excess, unsellable inventory, and by preventing the Company from keeping up with demand for the Company's remaining marketable products.

144. On August 12, 2008, NVIDIA announced 2Q:FY09 results, stating that "revenue decreased to $892.7 million compared to $935.3 million for the second quarter of fiscal 2008, a decrease of five percent" and "a net loss of $120.9 million, or a loss of $0.22 per share." Defendants noted that the Company "recorded a $196 million charge [toward the top of the range previously disclosed by Defendants] against cost of revenue to cover anticipated customer warranty, repair, return, replacement and associated costs arising from a weak die/packaging material set in certain versions of our previous generation MCP and GPU products used in notebook systems"

145. On September 18, 2008, the Company announced its intention to lay off 6.5 percent of its workforce, or about 360 workers, a move that would require the Company to take a $7 to $10 million charge to 3Q:FY09 to cover severance and reduction costs.

146. On May 7, 2009, after the close of the markets, NVIDIA filed a press release with the SEC via Form 8-K, which reported revenue of "*$664.2 million compared with $1.2 billion for the first quarter of fiscal 2009, a decrease of 42 percent*" and "*a net loss of $201.3 million, or $0.37 per share.*" (Emphasis added.)

147. On August 6, 2009, NVIDIA revealed that it would be forced to take an additional charge related to the GPU and MCP problems this time, of an additional $119.1 million, bringing the total sum paid related to this chip malfunction to $315.1 million

148. On July 28, 2010, after the close of the markets, NVIDIA issued a press release stating that NVIDIA "**expects revenue for the second quarter ending Aug. 1, 2010, to be lower than the guidance provided with the company's financial results for its first quarter**. Total revenue is now estimated at $800 million to $820 million, compared with the range of $950 million to $970 million provided on May 13, 2010."

149. Following this disclosure, analysts expressed concerns that the reported revenue reduction was due to a glut of graphic chips inventory. For example, on July 28, 2010, analyst Shawn Webster, an analyst now with Macquarie expressed his concern that NVIDIA's lowering of its expected revenue was due to excess GPU inventory.

150. Again, on August 12, 2010, Defendants announced that NVIDIA was forced to take another material charge related to the GPU and MCP problem. In its CFO commentary on 2Q:FY11 results, Defendants revealed that revenue was "$811.2 million, down 19.0 percent from $1.0 billion in the prior quarter." The commentary identified a "large inventory write-down" as well as a "special charge," noting, in part:

> During the second quarter we recorded an additional net charge of $193.9 million related to a weak die/packaging material set that was used in certain versions of our previous generation MCP and GPU products shipped before July 2008 and used in notebook configurations. . . . ***Together with the $282.0 million of net charges we announced previously related to this same issue, this brings the total net charge to $475.9 million.***

(Emphasis added.)

151. Thus, following the July 2, 2008, disclosure that NVIDIA would have to take a $150 million to $200 million charge to cover costs and expenses arising from the weak die/packaging material set, NVIDIA's disclosures regarding the scope and magnitude of the GPU and MCP problem continued for at least two years, and may still be ongoing. For example:

- On August 12, 2008, the Company filed a Form 8-K with a press release announcing that the actual amount of this charge was **$196 million.**

- In the Company's August 6, 2009, Form 8-K and press release regarding the Company's financial results for the second quarter of fiscal year 2010, Defendants revealed that NVIDIA took "**an additional net charge of approximately $119.1** million to cover costs related to a weak die/packaging material set that was used in certain versions of its previous-generation chips."

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

44

- The Company's August 20, 2009, Form 10-Q regarding 2Q:10 noted that the $119.1 million charge taken in 2Q:10 "included an additional accrual of $164.5 million for related estimated costs, offset by reimbursements from insurance carriers of $44.5 million that we recorded during the second quarter of fiscal year 2010."

- In the Company's November 19, 2009, Form 10-Q, Defendants noted that "During the third quarter of fiscal year 2010, the warranty charge was further offset by reimbursements from insurance carriers of $24.1 million."

- On August 12, 2010, NVIDIA, announced the settlement of *The NVIDIA GPU Litigation* CO8-04312JW, a consolidated consumer class action covering NVIDIA chips in computers manufactured by Dell, HP, and Apple sold primarily between March 2006 and December 2008. In this settlement, NVIDIA agreed to replace all the defective covered MCP and GPU chips at its expense and to provide certain other relief. In the Company's August 12, 2010, CFO commentary relating to the consumer settlement, Defendants announced they were taking another "net charge of **$193.9 million** related to a weak die/packaging material set. . . ***bring[ing] the total net charge to $475.9 million."***

## Confirmation of the Problem

152. In a September 4, 2008, presentation at a Citigroup Technology Conference, NVIDIA's Vice President of Investor Relations, Michael Hara, addressed the problems with NVIDIA's GPUs and MCPs. VP Hara explained the technical aspects of the problem, stating:

> Now, when you look at the way our chip is constructed, the [inaudible] on the substrate and there is basically these little metal bumps that are touching that substrate for connection. And in between those bumps there is material to help basically hold it together. And that material underfill, if it's put through enough of the stress and hits this critical junction temperature enough, it causes that underfill to basically weaken, and it separates the bumps from the substrate, causing electrical disconnect. . .

153. VP Hara admitted at the September 2008 Citigroup Presentation that NVIDIA had been "hearing about this and working on it for over a year," i.e. since before August 2007, and had "already put many corrective procedures in place," and "most of the problems have already been recovered." In particular, he stated:

> ***We've also been working on this problem with the customers for well over a year, going all the way back to August of last year. And actually most of the problems have already been recovered.*** So, we know where every chip went, so when we looked at the data, we took all the parts that we felt would be affected by it. We looked at every chip and every customer and every design. We did a lifecycle test. We did a failure analysis of if they were going to fail, when would they have failed. Okay, so the problem would have showed up earlier or later. So we did that. We graded them all on a bell curve, so we kind of know how many are out there; how

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

45

many went into notebooks versus desktops; how many have already failed based on a certain period of time and then it falls off over its lifecycle and part of that. So we feel that we have a very conservative and ample amount of charge already taking place.

***And also remember, since we've been hearing about this and working on it for over a year, we've put many corrective procedures in place to minimize the future failures.***

(emphasis added).

154.   A September 28, 2008, TG Daily article analyzing a scientific research report regarding the strength of solder materials reiterated that the transition from high-lead to eutectic solder could not have been an overnight decision, stating, in part:

If Tu's findings are accurate, then one could conclude that simply switching to eutectic solder joints will cure Nvidia's headache. However, there are a couple of issues that may prevent a one-to-one transition. ***First, a transition requires a redesign of the power distribution through a chip, since the melting point of eutectic joints is much longer than in high lead.***

Also, according to Tu, [while the] "the high-lead solder is known to have better resistance to electromigration, eutectic solder is not, especially when current crowding occurs at the cathode entrance where the electrons enter the solder bumps." The scientist states that it is unclear whether "electromigration will enhance the failure caused by temperature cycle or power cycle", ***but it appears to be clear that a simple switch without further research is simply not possible with a product that is shipped in millions of units.***

155.   On October 10, 2008, TG Daily published an article entitled "Apple suggests Nvidia is dishonest about GPU failures." The article, stated, in part:

Apple took an unusually hard shot at Nvidia's credibility yesterday: Apple said that it found that GeForce GPUs used in some Macbook Pro systems are failing, while Nvidia "assured" the company that the supply to Apple was not affected by what appears to be a GPU packaging issue.

Apple quietly confirmed the GPU failures in a post on its support pages, which seems to have been first reported by Gizmodo. **The post's phrasing is very unusual and puts the blame for the failures as well as their late discovery on Nvidia**. There is lots of room for interpretation what Apple tries to say, but the sharp wording at least suggests that Nvidia had no idea which of its GPUs are affected by the packaging problems. On the other end of the spectrum, Apple may also say, in a very careful way, that Nvidia simply lied about the extent of its chip packaging problem.

From the Apple website:

> *"In July 2008, Nvidia publicly acknowledged a higher than normal failure rate for some of their graphics processors due to a packaging defect. At that same time, Nvidia assured Apple that Mac computers with these graphics processors were not affected. However, after an <u>Apple</u>-led investigation, Apple has determined that some MacBook Pro computers with the Nvidia GeForce 8600M GT graphics processor may be affected."*

(Emphasis added).

156.   A September 10, 2008, TG Daily article addressing the filing of the securities class action against NVIDIA stated, "If Nvidia in fact concealed critical information, the impact of this suit could go far beyond the 'compensatory damages' the law firm is seeking – and expand to a much broader recall that not only could cost Nvidia billions of dollars, but drive the company into bankruptcy. Replacing 15 million chips [the low end estimate from TG Daily's August 25 article] at a notebook repair cost of $150 - $250 is expensive and can't be covered by the company's cash reserve of $1.6 billion."

**ADDITIONAL ALLEGATIONS REGARDING DEFENDANT HUANG'S SCIENTER**

158.   Defendant Huang co-founded NVIDIA in 1993 and has served as its President, Chief Executive Officer, and member of its Board of Directors since the Company's inception more than 17 years ago. Defendant Huang has a technical background, and holds electrical engineering degrees from Oregon State University and Stanford University. The Company claimed to be particularly dependent on Defendant Huang; he was the only employee named in NVIDIA's personnel-related Q3:08 risk disclosure which stated, in part, "The loss of the services of any of our executive officers, technical personnel or other key employees, particularly Jen-Hsun Huang, our President and Chief Executive Officer, would harm our business." (Notably, Defendant Huang's name was absent from the 10-Q that was filed just days before the July Disclosure.)

159.   Throughout the Class Period, Defendant Huang was also NVIDIA's "chief operating decision maker," or CODM. According to the Company's 3Q:08 10-Q, 2008 10-K, and 1Q:09 10-Q, as CODM, Defendant Huang "reviews financial information presented on an operating segment basis for purposes of making operating decisions and assessing financial

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

47

performance." Each of those Class Period SEC filings, which were signed and/or certified by Defendant Huang, stated that "financial information for four operating segments [was reported] to our CODM." These four operating segments included the Company's GPU business, MCP business, professional solutions business, or PSB, and consumer products business, or CPB. Defendant Huang thus certified that he reviewed the financial information–which includes information regarding sales, income, revenues, inventory, product returns and product warranty liabilities, inventory reserves (the money set aside for inventory that the Company will be unable to sell), and sales allowances (price reductions for problems or deficiencies)—for, *inter alia*, the Company's GPUs and MCPs, which were the Company's core products.

160.    Defendant Huang, as CEO and CODM, took a hands-on role in the production and design of these products. In fact, CW 17, a former NVIDIA Senior Signal Integrity Engineer who worked for the Company from June 2005 until June 2007, identified Defendant Huang's instructions regarding the number of bumps on the chips as a possible cause of the chip problem. According to CW 17, Defendant Huang stated that he did not want an undue number of bumps on the package because he saw them as a reliability risk. As a result, NVIDIA employees began "rationalizing" the number of bumps they used. CW 17 explained that if there are too few bumps, the product can have signal integrity problems, electro-migration problems, and reliability issues. However, Defendant Huang did not want to see any extra connections, as he believed that too many connections could also lead to reliability issues. CW 17 noted that these guidelines applied generally to all chips, and because the direction came from CEO Defendant Huang, people went to great lengths to comply, stating: "Occasionally, big companies, senior executives, being experts in everything, come up with a blank statement and everyone runs around like a [chicken with its head cut off] to comply. It may or may not be implemented or even followed, but certainly people were saying 'Oh, we got to cut this down because we got too many of these. He [Huang] wants to see an explanation for every extra one we have."

161.    On August 23, 2007, while in possession of material nonpublic information regarding the widespread problems with the Company's core products, Defendant Huang

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

48

adopted a 10b5-1 plan which allowed him to exercise options for NVIDIA common stock and net $3 million through the sale of 186,000 shares in March 2008, just months before the truth began to be revealed.

## NO SAFE HARBOR

162.    The federal statutory safe harbor for certain forward-looking statements does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent that Lead Plaintiffs plead any purportedly forward-looking statements as actionable, those statements lacked meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any purportedly forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NVIDIA who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## CLASS ACTION ALLEGATIONS

163.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired NVIDIA common stock between November 8, 2007 and July 2, 2008, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, and assigns and any entity in which Defendants

have or had a controlling interest.

164.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, more than 554,733,685 shares of common stock were outstanding and actively traded in an efficient market on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NVIDIA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

165.   Lead Plaintiffs' claims are typical of those of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law.

166.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. The Court has appointed Lead Counsel who are competent and experienced in class and securities litigation.

167.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether statements and/or omissions made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business operations, and financial statements or condition of NVIDIA; (c) whether Defendants knew or were deliberately reckless in disregarding that their statements and omissions were materially false and misleading; (d) whether the price of NVIDIA common stock was artificially inflated; and (e) the extent to which members of the Class have sustained damages as a result of the conduct alleged and the proper measure of damages.

168.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

50

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress their wrongs on an individual basis. There will be no difficulty in the management of this action as a class action.

169.    At all relevant times, the market for NVIDIA's securities was an efficient market for the following reasons, among others:

- NVIDIA's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, the Company filed periodic public reports with the SEC;

- NVIDIA was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

- NVIDIA regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

170.    As a result, the market for NVIDIA securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of NVIDIA common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and are entitled to a presumption of reliance with respect to Defendants' material misstatements and omissions.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST DEFENDANT NVIDIA

171.    Lead Plaintiffs repeat and re-allege each and every allegation referenced above as if fully set forth herein.

172.    During the Class Period, Defendant Nvidia carried out a plan, scheme, and course

of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of NVIDIA's securities; and (c) cause Lead Plaintiffs and other Class members to purchase NVIDIA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendant NVIDIA took the actions set forth herein.

173.   Defendant NVIDIA, intentionally or recklessly, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the alleged statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NVIDIA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

174.   Defendant NVIDIA, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects as specified herein.

175.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NVIDIA's securities was artificially inflated during the Class Period. In ignorance of this fact, and relying directly or indirectly on Defendant NVIDIA's false and misleading statements or upon the integrity of the market in which the securities trade, and/or upon the absence of material adverse information known to or disregarded with deliberate recklessness by Defendant NVIDIA, but not disclosed in public statements by Defendant NVIDIA during the Class Period, Lead Plaintiffs and the other members of the Class acquired NVIDIA securities during the Class Period at artificially high prices and were damaged thereby.

176.   At the time of Defendant NVIDIA's alleged misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them

to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true undisclosed financial condition and business prospects of NVIDIA, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NVIDIA securities, or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices paid.

177.    By virtue of the foregoing, Defendant NVIDIA violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder and is liable to lead Plaintiff and the other members of the Class

## COUNT II

## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST DEFENDANT HUANG

178.    Lead Plaintiffs repeat and re-allege each and every allegation referenced above as if fully set forth herein.

179.    During the Class Period, Defendant Huang, with actual knowledge or deliberate recklessness, disseminated or approved the materially false and misleading statements specified above, which failed to disclose material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

180.    During the Class Period, Defendant Huang was privy to confidential and proprietary information concerning NVIDIA, its operations, finances, financial condition, and present and future business prospects. As a result of his positions with NVIDIA, Defendant Huang had access to materially adverse non-public information about the Company's business, finances, products, markets, and present and future business prospects *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees, and *via* reports and other information provided to them in connection therewith. Because of his possession of this information, Defendant Huang knew of or was deliberately reckless in disregarding the adverse facts specified herein that were not disclosed to, and were being concealed from, the investing public during the Class Period.

181.    Defendant Huang is liable as a direct participant in the wrongs complained of herein. In addition, Defendant Huang, by reason of his status as a senior executive officer and/or director, was a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his position of control, Defendant Huang was able to and did, directly or indirectly, control the conduct of NVIDIA's business.

182.    In addition, as a result of his position with the Company, Defendant Huang controlled and/or possessed the authority to control the contents of NVIDIA's reports, press releases, and presentations to securities analysts and, through them, to the investing public. Defendant Huang was provided with copies of the Company's reports and press releases alleged by Lead Plaintiffs to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendant Huang had the opportunity to commit the fraudulent acts alleged herein.

183.    As the most senior executive officer and as a controlling person of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Securities Act of 1933 and traded on the NASDAQ, Defendant Huang had a duty to promptly disseminate accurate and truthful information regarding NVIDIA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, and earnings, as well as present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of NVIDIA's common stock would reflect truthful and accurate information. Defendant Huang's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

184.    Defendant Huang is liable as a direct and active participant in the intentional and/or reckless conduct alleged herein that operated as a fraud or deceit on purchasers of NVIDIA common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (a) deceived the investing public regarding

NVIDIA's business, operations, and management and the intrinsic value of NVIDIA common stock, and (b) caused Lead Plaintiffs and members of the Class to purchase NVIDIA common stock at artificially inflated prices. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's core business, finances, and operations. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendant Huang.

185.   Given the magnitude of the risks facing NVIDIA regarding the chips – and the substantial expense of the replacement of a full generation of graphics processors, Defendant Huang knew, or was deliberately reckless in not knowing, that the defects identified herein: (i) were highly material to NVIDIA's investors; and, therefore (ii) required meaningful public disclosure and appropriate accounting adjustments to reserve against the rising tide of warranty repair and replacement costs.

186.   As a result, Defendant Huang intentionally or with deliberate recklessness (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the alleged statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NVIDIA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

187.   Defendant Huang, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of NVIDIA as specified herein.

188.   Defendant Huang's primary liability arises from the following facts, explained in detail in the earlier allegations of the Complaint: (a) he was founder, CEO, President and a board

member of NVIDIA during the Class Period; (b) by virtue of his responsibilities and activities, including personal attendance at and instruction of others at meetings relating to the core issues of this case, Huang was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; and (c) Defendant Huang was aware of the Company's dissemination of information to the investing public, information that he knew, or was deliberately recklessness in disregarding, was materially false and misleading.

189.    Defendant Huang had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate recklessness for the truth in that he failed to ascertain and to disclose such facts, even though available to him. Defendant Huang made these material misrepresentations and/or omissions for the purpose and effect of concealing substantial material risks to NVIDIA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

190.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NVIDIA's securities was artificially inflated during the Class Period. In ignorance of this fact, and relying directly or indirectly on Defendants' false and misleading statements or upon the integrity of the market in which the securities trade, and/or upon the absence of material adverse information known to or disregarded with deliberate recklessness by Defendant Huang, but not disclosed in public statements by Defendant Huang during the Class Period, Lead Plaintiffs and the other members of the Class acquired NVIDIA securities during the Class Period at artificially high prices and were damaged after the truth was revealed and the artificial inflation was removed from the stock as a result.

191.    At the time of Defendant Huang's alleged misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true undisclosed financial condition and business prospects of NVIDIA, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NVIDIA securities,

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

56

or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices paid.

192.    By virtue of the foregoing, Defendant Huang violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and is liable to lead Plaintiff and the other members of the Class.

**COUNT III**

**VIOLATIONS OF SECTION 20(a)**
**OF THE EXCHANGE ACT AGAINST DEFENDANT HUANG**

193.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.    Defendant Huang acted as a controlling person of NVIDIA within the meaning of Section 20(a) of the Exchange Act. By virtue of his high-level positions as Company founder, CEO, president, and board member throughout the Class Period, ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the Company's Class Period disclosures, Defendant Huang had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements and omissions which Lead Plaintiffs contend are materially false and misleading.

195.    In particular, Defendant Huang had direct and supervisory involvement in the day-to-day operations of the Company, attended key meetings and events and instructed employees and management of the Company how to address these issues with customers and others, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

196.    In addition to the myriad public statements Defendant Huang made during the Class Period regarding the technology, success, and growth of the Company's GPUs and MCPs, CW 4 stated that Defendant Huang was the one who addressed the GPU and MCP problem during an all-hands meeting in the summer of 2008.

197.    Defendant Huang was provided with or had unlimited access to copies of the

Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially false and/or misleading prior to and/or shortly after their issuance and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

198.   NVIDIA violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of his positions as a controlling person of NVIDIA, Defendant Huang is liable for violations of Section 10(b) and Rule 10b-5 and pursuant to Section 20(a) of the Exchange Act.

199.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

200.   WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action, and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' Counsel as Class Counsel;

B.   Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

201.   Lead Plaintiffs hereby demand a trial by jury.

Dated: December 2, 2010            _____/s/ Kim E. Miller_____
                                   Kim E. Miller (178380)
                                   Melissa Ryan Clark (*Pro Hac Vice*)
                                   **KAHN SWICK & FOTI, LLC**
                                   500 Fifth Avenue, Ste. 1810
                                   New York, NY 10110

Telephone: 212-696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: melissa.clark@ksfcounsel.com

Lewis S. Kahn (*Pro Hac Vice*)
Paul Balanon (*Pro Hac Vice*)
Sarah Cate Boone (268813)
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

Barry A. Weprin (*Pro Hac Vice*)
Leigh Smith (*Pro Hac Vice*)
Jean Lee (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com
Email: lsmith@milberg.com
Email: jlee@milberg.com

Michiyo Michelle Furukawa (234121)
MILBERG LLP
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

Jonathan K. Levine (220289)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: jkl@girardgibbs.com

*Liaison Counsel for Lead Plaintiffs and the Class*

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

59

David A.P. Brower (*pro hac vice*)
**BROWER PIVEN**
 A Professional Corporation
488 Madison Avenue
New York, NY 10022
Telephone: (212) 501-9000 9000
Facsimile: (212) 501-0300

*Additional Counsel for Lead Plaintiff Roberto Cohen*

Albert J. Kroll
**KROLL HEINEMAN, LLC**
Metro Corporate Campus
99 Wood Avenue South, Suite 307
Iselin, NJ 08830

*Additional Counsel for Lead Plaintiff the Funds*

Second Consol. Amended Class Action Complaint
for Violation of Federal Securities Laws No. 08-cv-4260 RS

60

**CERTIFICATE OF SERVICE**

I hereby certify that this Second Consolidated Amended Class Action Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 2, 2010.

                                                 /s/ Kim E. Miller
                                                    Kim E. Miller