KIM MILLER (178380)
MELISSA RYAN CLARK (*Pro Hac Vice*)
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: melissa.clark@ksfcounsel.com

BARRY A. WEPRIN (*Pro Hac Vice*)
LEIGH SMITH (*Pro Hac Vice*)
JEAN LEE (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com
Email: lsmith@milberg.com
Email: jlee@milberg.com

LEWIS KAHN (*Pro Hac Vice*)
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

MICHIYO MICHELLE FURUKAWA (234121)
**MILBERG LLP**
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE NVIDIA CORPORATION SECURITIES LITIGATION <br><br> This Document Relates To: All Actions | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CIVIL ACTION NO. 08-cv-4260-RS

OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Date: May 19, 2011
Time: 1:30 p.m.
Judge: Hon. Richard Seeborg
Courtroom: 3, 17th Floor

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   FACTUAL BACKGROUND .................................................................. 6

III.  PLAINTIFFS ADEQUATELY ALLEGE DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS WITH SCIENTER .......... 7

   A.  Applicable Standards for Materiality, Falsity, and Scienter ...................... 7

   B.  Materiality and Defendants' Duty to Disclose ..................................... 9

   C.  Item 303 and Defendants' Duty to Disclose ...................................... 11

   D.  Defendants' Attempts To Undermine Plaintiffs' Scienter and Falsity Allegations by Factually Contradicting the Complaint Must Fail ......................... 15

      1.  The Hodge Declaration, CW 1, and Mr. Demerjian Strongly Support the Core Allegations of the Complaint ............................................... 15

      2.  Plaintiffs' Technology Consultant, Mr. Rigg, and Industry Insider Mr. Demerjian Corroborate Plaintiffs' Allegations ............................... 21

      3.  The Existence Of Other Lawsuits Supports Falsity and Scienter ......... 22

      4.  Mr. Hara's Admissions Support Falsity and Scienter ..................... 23

      5.  The Articles Challenged By Defendants Support Falsity and Scienter ..... 23

      6.  The BIOS Updates And PCNs Support Falsity and Scienter .............. 24

   E.  Huang's Individual Scienter Is Amply Pleaded ................................. 25

   F.  Defendants' Scienter is Also Established Under the Core Operations and Collective Scienter Doctrines .................................................... 29

      1.  The Core Operations Doctrine Supports Scienter ........................ 30

      2.  The Collective Scienter Doctrine Applies Here .......................... 31

   G.  Plaintiffs' Well-Placed CWs Support the Allegations of the Complaint ......... 32

   H.  The Alleged Misstatements and Omissions are Actionable ..................... 35

      1.  Defendants' Statements Do Not Constitute Inactionable Puffery and Are Not Subject To The Safe Harbor ............................................... 36

      2.  Defendants' Historical Statements Are Materially Misleading ............ 38

      3.  NVIDIA's Risk Disclosures Are Actionable ............................. 39

      4.  The May 22, 2008, Disclosure Was Materially False and Misleading ...... 40

IV.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ................. 40

V.    THE COMPLAINT ADEQUATELY PLEADS §20(a) LIABILITY ................... 45

# TABLE OF AUTHORITIES

**Cases**

*Apple Computer* 886 F.2d 1109 (9th Cir 1989) ............................................................. 39

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988).......................................................... 9, 10

*Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008)................ 26, 30, 32, 34

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)............................ 7

*Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546 (5th Cir. 2007).. 28

*Chiarella v. United States*, 445 U.S. 222 (1980) ...................................................... 14

*City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005) ................................................................................................... 22, 37

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................... 40

*Fecht v. The Price Co.*, 70 F.3d 1078 (9th Cir. 1995) .............................................. 9

*Freudenberg v. E\*Trade Financial Copr.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................... 28

*Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736 (9th Cir. 2008) ........................... 32

*Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir. 1999)...................................... 22

*Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir. 2001) ............................................. 22

*Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981) ................................... 39

*In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002) ... 45

*In re Biogen Idec, Inc. Sec. Litig.,* No. 05-10400, 2008 WL 4810045 (D. Mass. Oct. 25, 2008) 28

*In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181 (N.D. Cal. 2010)................. 34

*In re Caere Corp. Sec Litig.*, 837 F.Supp. 1054 (N.D. Cal. 1993) ................................. 38

*In re Connetics Corp. Sec. Litig.*, No. 07-CV-2940, 2008 WL 3842938 (N.D. Cal. Aug.14, 2008) ............................................................................................... 7

*In re Convergent Tech. Sec. Litig*, 948 F.2d 507, 511 (9th Cir. 1991) ........................... 15, 38

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................... 27

*In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005) ......................................... 8, 32

*In re DDi Corp. Sec. Litig.*, 2005 WL 3090882 (C.D. Cal. 2005)................................... 9

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ................................... 41

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................... 21, 33

*In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal 2007) ................. 39

*In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050 (9th Cir. 1993) ............................ 15

*In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038 (N.D. Cal. 2009) ........... 42

*In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007) ................................... 42

*In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal. 2009) ........................................ 42

*In re Openwave Sys. Sec. Litig.,* 528 F. Supp. 2d 236 (S.D.N.Y. 2007)................................... 8

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ..................................... 15

*In re Silicon Storage Tech., Inc., Sec. Litig.*, No. 05-0295, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ......................................................................................................... 21

*In re Syncor Intern. Corp Sec. Litig.*, 239 Fed.Appx 318 (9th Cir. 2007)................................... 8

*In re Tibco Software, Inc.*, No. 05-2146, 2006 WL 1469654 (N.D. Cal. May 25, 2006)............. 35

*In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................... 36

*In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472 (N.D. Ga. 1997) ................................... 37

*In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993) ......................................... 15

*Jacobson v. Hughes Aircraft Co.*, 105 F.3d 1288 (9th Cir. 1997) ................................ 15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 513 F.3d 702 (7th Cir. 2008)................................ 30

*Matrixx Initiatives Inc. v. Siracusano*, 563 U.S __, 2011 WL 977060 (March 22, 2011)..... passim

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008)........... 42

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000) ........................................................... 24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226 (9th Cir. 2004) ... 27, 32

*P'ship v. Kuo*, No. C07-02377, 2009 WL 839289 (N.D. Cal. Apr. 3, 2008) ................................. 8

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001)......................................................... 8

*Roth v. OfficeMax, Inc.,* 05 C 236, 2006 WL 2661009 (N.D. Ill. September 13, 2006) .............. 35

*SEC v. Platforms Wireless*, 617 F.3d 1072 (9th Cir. 2010) ......................................... 5

*SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008) .......................................................... 4, 9

*Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416 (D. N.H. 1996).................................. 15

*Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd* 563 U.S. ___ (2011) ................................................................................................................ 8, 28, 31

*South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ............................................... 9, 27, 30

*Steckman v. Hart Brewing*, 143 F.3d 1293 (9th Cir. 1998) ................................................ 12

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008) ..................................................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...................................... 5, 8, 27

*Thesling v. Bioenvision, Inc.*, 374 Fed. Appx. 141 (2d Cir. 2010) ........................................ 14

*United States v. O'Hagan*, 521 U.S. 642 (1997) .......................................................... 28

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)............................................ 37

*Young v. Dresibach*, 182 F. Appx. 714 (9th Cir. 2006)................................................... 9

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) .............................. passim

**Other Authorities**

Commission Statement About MD&A of Financial Condition and Results of Operations 67 FR 3746-02, 2002 WL 90781, at *3747 (Jan. 25, 2002) ............................................... 11

Exchange Act Release No. 34-26831, 54 Fed. Reg. 22427, 22430 (May 24, 1989).................... 12

**Rules**

17 C.F.R. § 240.10b-5................................................................................... 9

**Regulations**

17 C.F.R 229.303 ..................................................................................... 11, 13

## I.  PRELIMINARY STATEMENT

Despite having no opportunity to conduct discovery, Plaintiffs have conducted a rigorous informal investigation and the Second Consolidated Amended Complaint ("Complaint") meets all of the requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b). In support of their allegations, Plaintiffs cite no fewer than 17 confidential witnesses – including former employees of the Company and others with knowledge of the allegations set forth in the Complaint; an industry insider, Charlie Demerjian, who reported on NVIDIA chip defects; information from a graphics chip expert, John Rigg; a sworn declaration submitted by a high-level HP employee, Richard Hunt Hodge, in *Nygren v. Hewlett-Packard Co.,* a case involving the defective NVIDIA chips; an internal HP email written May 9, 2007, by Hodge; and news sources addressing NVIDIA's chip problem.

By the start of the Class Period, NVIDIA was aware its core products were causing widespread failures in laptops manufactured by their key OEMs. Even if (as Defendants claim) they had not identified the precise cause of the failure by that time, the fact that those failures were occurring and posed the very real risk of extraordinary liability on NVIDIA'S part (a prospect that became reality) was material and had to be disclosed under Section 10(b), Rule 10b-5, and Item 303 of SEC Regulation S-K ("Item 303") thus rendering statements made materially false and misleading.

In an analogous recent case, *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S __, 2011 WL 977060, at *3 (March 22, 2011), the United States Supreme Court unanimously ruled that a drug company that "failed to disclose reports of a possible link between its leading product, a cold remedy, and loss of smell" in a small number of patients violated Section 10(b) and Rule 10(b)(5). The Court rejected claims by defendant that the incidents need not be disclosed because they were "anecdotal" and not "statistically significant." *Id.* at *8. The Court found that the risk of loss was material and needed to be disclosed even though it could not be quantified and the connection between their product and the alleged injury was not established scientifically. *Id.* at *9. Here, as in *Matrixx*, Defendants failed to disclose they had received reports of problems with

a key product that created a risk of great financial loss or loss of key customers. The failure to disclose rendered the Company's positive statements about its outlook false when made.

With regard to scienter, the *Matrixx* Court found that even in the absence of a motive allegation, the inference that defendants "acted recklessly (or intentionally for that matter) is at least as compelling, if not more compelling, than the inference that it simply thought the reports [of product failure] did not indicate anything meaningful." *Id.* at *14. Similarly here, the inference that Defendants knew that disclosure would affect the market and chose to conceal the problem until after the affected chips were at the end of their useful life is at least as compelling as any competing inference. The *Matrixx* Court rejected an inference that the delay in making disclosure was to allow defendants to further investigate the cause of the problem, an inference similar to that hinted at by NVIDIA. *Id.* at *14 n. 15.

The Complaint alleges a clear account and timeline of Defendants' fraud: HP, a key NVIDIA customer, came to NVIDIA in late 2006 complaining of widespread problems with NVIDIA's chips. ¶35. HP had identified a *physical problem* with NVIDIA's chip – a fracture in the solder bump between the chip's die and substrate – and reported this problem to NVIDIA. ¶36. NVIDIA refused to take responsibility, however, and blamed HP's design configurations and customer use patterns for the problem. ¶37, 39. HP maintained that it was not at fault because it had designed products within NVIDIA's provided specifications and the problem was at the hardware level. ¶40. Nevertheless, faced with pushback from NVIDIA for this multi-million dollar problem, HP was forced to conduct an investigation and identify the source of problem in order to prove that NVIDIA was at fault. ¶40. HP began to research the origin of the cracks and shared the data with NVIDIA along the way. ¶40. By early 2007, Dell, another key NVIDIA customer, also began complaining of problems with NVIDIA chips. ¶45.

By mid-2007, HP identified the thermal profile that caused the weakening of the solder materials and resulted in the fractures, reported the problem to NVIDIA, and received confirmation from the Company that NVIDIA was able to reproduce the problem. ¶42. The identification of the specific thermal profile that triggered the bump crack problem eliminated NVIDIA's ability to shift blame to its OEMs ("Original Equipment Manufacturers") because it

demonstrated that the problem arose during normal conditions, normal use, and under the thermal and product specifications provided *to* OEMs *by* NVIDIA. ¶47. Thus, by mid-2007, *months before the Class Period*, NVIDIA had received corroboration from at least two of its most important customers, each using different notebook configurations, that there were tangible, physical problems in NVIDIA chips, and NVIDIA had been able to reproduce those problems in its own facilities.

Just five days after the beginning of the Class Period, on November 14, 2007, a consumer class action lawsuit was filed against HP relating to problems with NVIDIA's chips. ¶105. Defendants knew and/or deliberately disregarded that HP would seek indemnification from NVIDIA for the damages associated with that suit, but still, they made no disclosure. ¶105.

These allegations are supported in part by three witnesses whom Plaintiffs' counsel and their investigators spoke to separately, and whose independent recollections corroborated each other. CW 1, a former product engineering manager at HP who did the root cause analysis for NVIDIA's defective chipset, ¶3, provided a detailed discussion and timeline of HP's analysis of the problem and NVIDIA's communications and level of cooperation, ¶¶35-42. Demerjian, a reporter with 25 years experience working with computers and who covered NVIDIA's chip defects and spoke to numerous about the chip problems, provided detailed insight on the problem, including information that directly substantiates reports made by other CWs. *See, e.g.,* ¶¶43-44. CW 7 was a Dell employee who communicated directly with NVIDIA regarding the bump chip problem. ¶¶3, 45. Plaintiffs also include allegations from a number of other CWs who reported regarding, *inter alia*, the Company's history of concealing known problems, history of failing to take responsibility, testing procedures or lack thereof, and extensive history of thermal problems, as well as Defendant Huang's direct involvement in and knowledge of the bump crack problem. ¶160.

These allegations are further supported by a public statement from an NVIDIA senior employee, VP of Investor Relations Michael Hara, and the sworn testimony of Hodge, a high-level HP employee who took part in trouble-shooting the NVIDIA chip problem in one of the several manifestations of the bump crack failure. Hara publicly acknowledged that

NVIDIA had been "working on [the bump crack] problem with the customers for well over a year, going all the way back to August of [2007]." ¶153. Hodge's sworn declaration, which Defendants have given great emphasis and credence, *see* MTD at 5-7, 12, acknowledges that, *by* mid-November 2007, HP (which was only one of multiple NVIDIA customers that complained of chip problems) concluded that the bump crack problem was the probable cause of the wireless issues in certain of its notebooks *and* had hypothesized that temperature mini-cycling (i.e., cycling through a range of temperatures that occur during normal use) had caused the issue. Decl. ¶¶50-51.

Nevertheless, NVIDIA failed to take responsibility for the issue, failed to disclose to investors, and continued to claim to HP that the Company was still investigating the issue. ¶86. This delay had an obvious purpose*: NVIDIA waited to reveal the problems until after the affected chips were at the end of their useful life*. As NVIDIA VP Hara acknowledged in September 2008, just two months after the truth was disclosed: "Two of the three parts that are failing the most . . . have been end of lifed . . . [o]ne additional part . . . it's end of lifed here pretty shortly." ¶90. Six different CWs reported that NVIDIA had a history of delaying the disclosure of known problems. ¶¶95-101. NVIDIA's own insurers accused the Company of being aware of the problem at least as far back as August 2007 and refusing to provide information regarding the timing of claims made relating to the chips. ¶¶102-105.

One of the key issues in dispute on this motion turns on timing: When did Defendants have an obligation to make a disclosure regarding the bump crack problem? Defendants had a duty to disclose as soon as they were in possession of material information, 17 C.F.R. § 240.10b-5, i.e., information "that a reasonable investor would consider [] important in deciding whether to buy or sell securities." *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008). Defendants also had a duty to disclose under Item 303, which requires disclosure of facts sufficient to inform investors of a known, but as yet unquantifiable or unrealized *risk* <u>that may never come to fruition</u>. Here, at best, Defendants could argue that they did not know for certain that NVIDIA was at fault for the chip problems. However, it is clear that Defendants did know, throughout the Class Period, that: (1) NVIDIA's largest OEM customers had identified failures with NVIDIA's

chips; (2) NVIDIA's chips were a common denominator among the various configurations of laptops that experienced chip failures; (3) these failures would require chip (and often motherboard) replacement, causing significant costs for their OEM customers; and (4) NVIDIA's OEM customers were claiming that NVIDIA was responsible for the problem. *E.g.*, ¶¶20, 35-37, 45. Thus, NVIDIA had a duty to disclose each of those underlying facts on two separate grounds: 1) those facts were material, and 2) they gave rise to a known uncertainty that the Company faced the risk that it would need to replace an entire generation of NVIDIA chips or lose significant future business.

Faced with Plaintiffs' detailed allegations, Defendants seek to inflate Plaintiffs' pleading burden, claiming that "Plaintiffs must allege facts that establish NVIDIA knew, before July 2008, *that it was at fault* for the bump crack problem and that its exposure for the problem exceeded its normal reserve." MTD at 12. Defendants are wrong. The Complaint need not allege Defendants knew who was at "fault" for the bump crack problem nor that Defendants fully appreciated the extent of the Company's "exposure for the problem." Instead, scienter can be satisfied through allegations that create an inference of deliberate recklessness, or allegations that Defendants acted in conscious disregard of the mere "risk" that their statements could be false. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1094 (9th Cir. 2010). As noted above, Defendants had a duty to disclose any material information, including risks, regardless of fault or their ability to quantify exactly the extent of the problem. The Complaint adequately alleges that Defendants knew or were deliberately reckless in disregarding those risks.

Plaintiffs have alleged a strong case, and Defendants, unable to articulate legal insufficiencies with Plaintiffs' allegations, instead attack the factual credibility of the Complaint's content. Of course, Plaintiffs' well-pleaded allegations – extensively corroborated by an array of well-placed sources, experts, a consultant, admissions of the Company and news reports -- must be accepted as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). For these reasons, discussed in detail below, the motion to dismiss should be denied.

## II.  FACTUAL BACKGROUND

NVIDIA's graphics processing units and media communications processors ("chips") were its main revenue generators prior to and during the Class Period, comprising nearly 80% of the Company's revenues. ¶¶13, 17.[1] NVIDIA sold these chips, which render images and integrate memory, Ethernet communications, and audio, ¶14, to original equipment manufacturers ("OEMs") like Dell and HP for use in their notebook (i.e., laptop) and desktop computers, ¶18.

This lawsuit concerns a problem in certain NVIDIA chips relating to a "weak die/packaging material set," i.e., the "bump crack problem." The bump crack problem originated in part from a materials change made by NVIDIA in fall 2006. In 2006, certain NVIDIA chips experienced cracking from pressure applied during testing (the "pressure testing problem"). ¶25. To solve this problem, NVIDIA hastily transitioned some of the solders used in its chips from one type to another. ¶27. These new solders would resist cracking during testing (avoiding the pressure testing problem), but were more susceptible to fatigue and cracking during use (causing the bump crack problem). ¶¶26-28, 79-83.

Almost immediately after the solder change was made in September 2006, ¶79, NVIDIA's customers began seeing a high rate of failure with NVIDIA's chips and reporting these failures to NVIDIA. ¶¶20. By late 2006 and early 2007, Hewlett-Packard ("HP") had identified the bump crack problem and had begun testing the cause of this problem, highlighting and sharing the data with NVIDIA every step of the way. ¶¶35-37, 43. In early 2007, another NVIDIA customer, Dell, notified NVIDIA that it too experienced problems with NVIDIA chips. ¶45. By mid-2007, HP had identified the root cause, i.e., the exact thermal profile that caused the bump crack problem, and NVIDIA had reproduced the problem using the thermal profile provided by HP. ¶¶41-43.

Despite these material, undisclosed facts which were known to and/or deliberately disregarded by Defendants even *before* the Class Period began on November 8, 2007,

---

[1] Unless otherwise noted, ¶ references are to the Complaint.

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                    6

Defendants made a number of materially false and misleading statements and omissions throughout the Class Period regarding NVIDIA's core business, growth, relationships with its key OEMs, demand for its product, product performance, technical expertise, risks regarding future product defects, and the veracity of their public statements. ¶¶116-141.

On July 2, 2008, Defendants finally disclosed that the Company faced a pervasive, material problem with its key products and primary source of revenue. That day, NVIDIA revealed that it would "take a $150 million to $200 million charge against cost of revenue to cover anticipated customer warranty, repair, return, replacement and other consequential costs and expenses arising from a weak die/packaging material set in certain versions of [its] previous generation MCP and GPU products used in notebook systems." ¶22. Following this disclosure, NVIDIA's stock plummeted by 31% from an intraday high of $18.78 per share on July 2, 2008, to an opening of $12.98 per share on July 3, 2008—an overnight loss of over $3 billion in NVIDIA market capitalization—thereby damaging Plaintiffs and the Class. ¶23.

## III.  PLAINTIFFS ADEQUATELY ALLEGE DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS WITH SCIENTER

### A.  Applicable Standards for Materiality, Falsity, and Scienter

To allege a "material misrepresentation or omission of fact," Plaintiffs need only "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 990-91 (9th Cir. 2009). Falsity is alleged by omission where, as here, Defendants were aware of "undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Connetics Corp. Sec. Litig.*, No. 07-CV-2940, 2008 WL 3842938, at *7 (N.D. Cal. Aug.14, 2008). Misleading statements includes those that are literally true, but "create an impression of a state of affairs which differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

In addition, "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," *Glenbrook Capital Ltd. P'ship v. Kuo*, No. C07-02377, 2009

WL 839289, at *7 (N.D. Cal. Apr. 3, 2008), and the Ninth Circuit has combined the pleading requirements for both elements into a single inquiry, *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).[2] *In re Syncor Intern. Corp Sec. Litig.*, 239 Fed.Appx 318, 322 (9th Cir. 2007) (finding "same basic facts that allege falsity also allege scienter").

Scienter allegations will survive a motion to dismiss if "a reasonable person would deem the inference cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."[3] *Tellabs,* 551 U.S. at 310. The requisite inference "need not be irrefutable . . . or 'even the most plausible of competing inferences.'" *Id.* at 310. Rather, it need only be "at least as compelling" (i.e., in "equipoise") as any opposing inference one could draw from the facts alleged." *Id. See also Matrixx,* 2011 WL 977060, at *2 (same). A plaintiff pleads a strong inference of scienter by alleging "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009), *aff'd* 563 U.S. ___ (2011) (citation omitted); *Zucco,* 552 F.3d at 991.

The Court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 511 U.S. at 310; *see also In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (considering "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."). Even "vague or ambiguous" allegations must be considered, as "the court's job is not to scrutinize each allegation in isolation but to assess all the

---

[2] Indeed Defendants concede that, "[i]n an omissions case like this one, the issues of falsity and scienter are necessarily intertwined." MTD at 27 (citing Order at 9).

[3] Defendants have offered no competing inference; they have merely claimed the Complaint's well-pleaded allegations should not be taken as true. The failure to propose an opposing plausible inference weighs in favor of finding a strong inference of scienter. *See In re Openwave Sys. Sec. Litig.,* 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ("Defendants have not pointed to any 'competing inferences rationally drawn from the fact alleged' that could explain their receipt of options bearing dates other than the ones on which they received them").

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                    8

1  allegations holistically." *Tellabs*, 551 U.S. at 310. *See also South Ferry LP v. Killinger*, 542 F.3d

2  776, 784 (9th Cir. 2008).

## B.  Materiality and Defendants' Duty to Disclose

4  Defendants do not dispute that the bump crack problem existed, that the weak materials

5  set was present in NVIDIA chips throughout the Class Period, or that it existed in products

6  manufactured and sold in material quantities prior to and during the Class Period.[4] Instead,

7  Defendants dispute whether and when they knew and/or deliberately disregarded the existence

8  and/or extent of the bump crack problem (scienter) and at what point they had a duty to disclose

9  the issues relating to the bump crack problem (materiality).

10  Defendants had a duty to disclose as soon as they were in possession of material

11  information, *see Young v. Dresibach*, 182 F. Appx. 714, 718-20 (9th Cir. 2006); 17 C.F.R. §

12  240.10b-5, i.e., information "that a reasonable investor would consider [] important in deciding

13  whether to buy or sell securities." *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) (citing

14  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Because "[q]uestions of materiality . . .

15  involv[e] assessments peculiarly within the province of the trier of fact," *id.* (quoting *Arrington

16  v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981)), an allegation

17  cannot be dismissed as immaterial at the pleading stage unless the misrepresentations or

18  omissions are "so obviously unimportant to a reasonable investor that reasonable minds could

19  not differ on the question of their importance," *see In re DDi Corp. Sec. Litig.*, 2005 WL

20  3090882 (C.D. Cal. 2005) (citations omitted); *see also Fecht v. The Price Co.*, 70 F.3d 1078 (9th

21  Cir. 1995) ("[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so

22  obvious that reasonable minds could not differ are these issues appropriately resolved as a matter

23  of law'").

---

24

25  [4] In addition to Defendants' failure to disclose the bump crack problem itself, Plaintiffs also allege Defendants' statements were materially false and/or misleading because they failed to disclose, *inter alia*, strained relationships with and negative feedback from NVIDIA's OEMs and key customers; exposure to repair, replacement, and warranty costs; risks regarding future market acceptance; flaws in NVIDIA's design and testing procedures; and failures with the Company's internal and disclosure controls. See, *e.g.*, ¶¶ 117-119.

26

27

28

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                                          9

The Supreme Court addressed the issue of materiality very recently in *Matrixx,* 2011 WL 977060. In *Matrixx*, a 10(b) case, the Court rejected the defendant company's argument that the Court should adopt "a bright-line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of such reports to establish a statistically significant risk that the product is in fact causing the events." *Id.* at *8. The Court stated that that the "[a]pplication of *Basic's* "total mix" standard does not mean that pharmaceutical manufacturers must disclose all reports of adverse events. . . . The fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event." *Id.* at *11. Similarly here, NVIDIA did not have to disclose each individual report of a chip failure. The Court continued: "The question remains whether a *reasonable* investor would have viewed the nondisclosed information "'as having *significantly* altered the 'total mix' of information made available.'" *Id.* (quoting *Basic*, 485 U.S. at 232) (emphasis in original).

While "something more" than "the mere existence of reports of adverse events" is needed, "that something more is not limited to statistical significance," *id*. Rather, the "something more" can come from "the source, content, and context of the reports." *Id.* Here, the sources of those reports of adverse events were NVIDIA's key OEMS, Dell and HP – customers with worldwide reputations that were crucial to NVIDIA's ability to sustain its business. The content of those reports included complaints of widespread failures at the hardware level; the fact the failures were occurring during normal use and in various laptop configurations; and the fact that the OEMs were blaming NVIDIA and were gathering evidence and data to bolster their claims against the Company. The context of those reports includes that they came almost immediately after the Company had made a hasty, untested change to the very materials that were now failing, ¶27; that they came from multiple customers. ¶¶34, 45; and that they concerned the Company's core products. ¶17.

Moreover, the Complaint alleges that Defendants failed to disclose other specific information that reasonable investors would consider important to their investment decisions, including, for example, complaints from HP of physical hardware problems in NVIDIA chips

(beginning late 2006); HP placing the blame for a widespread chip problem on NVIDIA (beginning late 2006); HP and Dell reporting substantiating claims of chip problems despite their unique computer configurations and customer use patterns (early 2007); the identification of the thermal profile responsible for causing the chip failure, and the realization that the thermal problem fell within the product specifications that NVIDIA had provided for normal use, thus rendering all of NVIDIA's chips with the affected materials set at risk for failure (mid-2007). Each of these events alone was material and triggered a duty to disclose, but certainly, as these events compounded, Defendants' duty to make a disclosure to investors is even more apparent.

While Plaintiffs have alleged that Defendants knew and/or deliberately disregarded that NVIDIA was *at fault* for the bump crack problem from the first time HP identified the cracks in the solder, Defendants' duty to disclose *does not depend on fault*. The mere *risk* that NVIDIA would lose its key OEMs, or that it *could be* at fault for this widespread problem, was enough to weigh into a reasonable investor's decision to invest, as well as to trigger additional, independent duties to disclose under Item 303.

## C.  Item 303 and Defendants' Duty to Disclose

Item 303 requires that every SEC Form 10-K and 10-Q "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R 229.303. The "[i]nstructions to paragraph 303(a)" explain that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id*.[5]

During the Class Period, Defendants filed 10-Qs on November 21, 2007, and May 22,

---

[5] *See also* 17 C.F.R. 229.303(a) (requiring disclosure of "such other information" as necessary to provide an understanding of corporate conditions); Commission Statement About MD&A of Financial Condition and Results of Operations 67 FR 3746-02, 2002 WL 90781, at *3747 (Jan. 25, 2002) (observing that Item 303(a) "identifies a basic and overriding requirement of MD&A" in requiring the disclosure of "such other information," while noting the importance of providing investors with "an accurate understanding" of a company).

2008, and a 10-K on March 21, 2008. In each of these reports, Defendants were required to comply with the disclosure requirements under Item 303, and thus had a duty to disclose any trends or uncertainties, known to management, that were reasonably likely to materially affect NVIDIA's liquidity, sales, revenues or income.

Item 303 compels the disclosure of the known facts that constitute the trend or uncertainty itself. Investors are thereafter left to make their own evaluations of the risk of the trend or uncertainty. The trend or uncertainty need not ultimately adversely impact a company's operations, nor does the consequence of the trend or uncertainty have to be quantifiable. The SEC has provided explicit guidance on application of Item 303 in a release titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("SEC Release"):

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments: (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

Exchange Act Release No. 34-26831, 54 Fed. Reg. 22427, 22430 (May 24, 1989).[6]

Courts should "adhere to this formula" in assessing whether Item 303 is satisfied. *Steckman v. Hart Brewing*, 143 F.3d 1293, 1297 (9th Cir. 1998). In spite of Item 303, NVIDIA's 10-K and 10-Qs throughout the Class Period failed to disclose management's knowledge, at the time these reports were filed, that at least two of its largest customers were experiencing problems in a large number of their products containing NVIDIA chips or that the customers were blaming NVIDIA for this problem. There is no question that if Defendants were certain that NVIDIA was responsible for the chip failures, it would be a material fact that NVIDIA was

---

[6] The SEC Release provided examples of known trends or uncertainties that would require disclosure, including when a "registrant may know that a material government contract is about to expire. . . . [and] may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed." *Id.* There, the registrant would have a duty to disclose the known uncertainty regarding the renewal of the contract, since the loss of the contract, if it occurred, would have a material impact on the company.

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                    12

1   required to disclose in its public documents. However, under Item 303, *certainty is not the test*

2   *for a duty to disclose*. Rather, the duty to disclose facts sufficient to inform investors of a known,

3   but as yet unquantifiable or unrealized risk that may never come to fruition.

4          Here, at best, Defendants could assert that they did not know for certain that NVIDIA

5   was at fault for the bump crack problem. But the Complaint adequately alleges that Defendants

6   knew during the Class Period that: (1) two of NVIDIA's largest OEM customers (HP and Dell)

7   had identified repeated failures with NVIDIA's chips; (2) NVIDIA's chips were a common

8   denominator among the various configurations of laptops that experienced chip failures; (3) these

9   problems would require chip replacement and were causing significant costs for NVIDIA's

10  OEMs; and (4) NVIDIA's OEMs were claiming that NVIDIA was responsible for the problem.

11  Thus, NVIDIA had a duty to disclose each of those facts, which (singly or together) gave rise to

12  a known uncertainty that the Company may need to replace an entire generation of NVIDIA

13  chips or lose significant future business which would "cause reported financial information

14  [during the Class Period] not to be necessarily indicative of future operating results or of future

15  financial condition" and reasonably be expects to "have a material. . . . unfavorable impact on net

16  sales [ ] revenues [and] income from continuing operations." *See* 17 CFR 229.303

17         The uncertainty to NVIDIA's future operations and its future financial condition resulting

18  solely from the fact that several of the Company's largest customers blamed NVIDIA for the

19  chip problem, as well as the consequent risk that, if the issue was not resolved to the customers'

20  satisfaction, they might give their business to other chip manufacturers, was also known to

21  NVIDIA management and separately triggered a duty to disclose the bump chip problem. Again,

22  NVIDIA's belief or knowledge of its fault was irrelevant to its duty to disclose this information

23  in its Class Period 10K and 10Qs under Item 303. Defendants knew that the problem facing the

24  Company was a "material event[] and uncertaint[y] . . . that would cause [NVIDIA's] reported

25  financial information not to be necessarily indicative of future operating results or of future

26  financial condition."

27         Under the steps outlined in the SEC Release, Defendants first had to determine whether

28  replacing the chips or losing business from NVIDIA's OEM customers was "not reasonably

1    likely to occur." Considering that OEM customers blamed NVIDIA for the chip problems,
2    Defendants could not reasonably "make that determination." Thus, Defendants, working "on the
3    assumption that [the uncertainty] will come to fruition," had to determine whether a "material
4    effect on the registrant's financial condition or results of operations is not reasonably likely to
5    occur" as a result of this reduction in business. Because the sale of chips to NVIDIA's OEM
6    customers was a significant amount of NVIDIA's business, replacing a generation of chips or a
7    major reduction in these sales would, at the least, be reasonably likely to have a material effect
8    on NVIDIA's financial condition and future results of operations. Therefore, under 303
9    Defendants were required during the Class Period to disclose the facts surrounding this problem
10   giving rise to this uncertainty in NVIDIA's SEC filings.

11          Under §10(b) and 10b-5, when "an allegation of fraud is based upon nondisclosure, there
12   can be no fraud absent a duty to speak," *Chiarella v. United States*, 445 U.S. 222, 235 (1980).
13   However, the Supreme Court and the various Circuit Courts of Appeals have made it clear that
14   an incomplete affirmative statement by an issuer is not the only time a duty to disclose
15   information arises. *See, e.g., id* at 230 ("silence in connection with the purchase or sale of
16   securities may operate as a fraud actionable under §10(b) despite the absence of statutory
17   language or legislative history specifically addressing the legality of nondisclosure.").

18          Section 10(b) expressly excludes only security-based swap agreements from the
19   application of rules "imposing or specifying reporting or recordkeeping requirements,
20   procedures, or standards as prophylactic measures against fraud, manipulation, or insider
21   trading." Therefore, other rules falling into this category, including Item 303, give rise to an
22   affirmative duty to disclose in connection with the purchase or sale of any security registered on
23   a national securities exchange. While the Ninth Circuit has not directly addressed the issue,
24   numerous other Circuits have held that there is an affirmative duty to disclose when "a
25   regulation, statute or rule requires disclosure," and violation of that duty can give rise to a claim
26   under Section 10(b) and Rule 10b-5. *See, e.g., Thesling v. Bioenvision, Inc.*, 374 Fed. Appx. 141,
27   143 (2d Cir. 2010) (in a 10b-5 nondisclosure case, a duty to disclose "may arise … expressly
28   pursuant to an independent statute or regulation . . ."); *In re Scholastic Corp. Sec. Litig.*, 252

F.3d 63, 70 (2d Cir. 2001) (holding that a failure to make 303 disclosures was a proper basis for a 10b-5 nondisclosure claim); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 431 (D. N.H. 1996) (holding that Item 303 required disclosure of product defect because it was foreseeable it would have an impact on cost and revenues).[7]

In sum, Defendants were required by Item 303 to disclose in their 10-K and 10-Qs facts concerning a known uncertainty and their repeated failures to do so constitute material omissions actionable under Section 10(b).

### D. Defendants' Attempts To Undermine Plaintiffs' Scienter and Falsity Allegations by Factually Contradicting the Complaint Must Fail

In arguing that they did not need to disclose the bump crack problem or associated risks any earlier than the July 2008 disclosure, Defendants attempt to factually contradict the allegations of the Complaint by going outside of the four corners of the Complaint or by simply taking pot-shots at the well-pleaded allegations. However, the Complaint's allegations, which must be accepted as true and construed in the light most favorable to Plaintiffs, *Daou*, 411 F.3d at 1013; *Jacobson v. Hughes Aircraft Co.*, 105 F.3d 1288, 1296 (9th Cir. 1997), are amply supported by myriad corroborative sources, and adequately allege in great detail.

#### 1. The Hodge Declaration, CW 1, and Mr. Demerjian Strongly Support the Core Allegations of the Complaint

---

[7] The Ninth Circuit has affirmed dismissals of cases asserting §10(b) and Rule 10b-5 claims based on alleged violations of Item 303 duties to disclose, but in each of those cases, the Court of Appeals impliedly acknowledged that a violation of Item 303 would give rise to a duty to disclose sufficient under §10(b) and Rule 10b-5. In those cases, the Ninth Circuit found that the alleged nondisclosures were failures to make financial projections or to quantify the future financial impact of disclosed information, which was outside the scope of Item 303's requirements. *See, e.g., In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (rejecting plaintiff's Rule 10b-5 violation because the disclosures plaintiffs alleged should have been made would constitute forward looking statements and were therefore beyond the scope of Item 303); *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050, 1053 (9th Cir. 1993) ("Plaintiffs also argue that SEC regulations require disclosure of the internal projections. . . . The *Convergent* court rejected a similar argument, observing that . . . forward-looking information need not be disclosed."); *In re Convergent Tech. Sec. Litig*, 948 F.2d 507, 511, 516 (9th Cir. 1991) (defendants did not need to disclose "internal cost projections" because they were "forward-looking" and therefore outside Item 303).

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                                   15

In asserting that NVIDIA employed adequate quality control measures (an argument that, if true, would not save Defendants from their duty to disclose the bump crack problem once it arose), Defendants note that Mr. Hodge testified that "NVIDIA performed 'industry standard' temperature cycling tests and applied extensive 'heat stress tests far above product specification' that 'produced no failures.'" MTD at 12. In truth, Mr. Hodge testified that these tests were performed in late 2006 in connection with the "pressure issue." *See* Decl. ¶36. Moreover, it was through this "quality control protocol," Decl. ¶37, that NVIDIA "altered its material set and manufacturing process to prevent recurrence of the pressure issue" and "transitioned to high-lead solder," Decl. ¶42, the very change that the Complaint alleges triggered the "bump crack problem." ¶¶27-28.

Defendants also claim, MTD at 12, that Mr. Hodge testified that NVIDIA tested the chips through industry standard tests that cycle the chip from -55ºC to +125ºC, and that HP also performed "temperature cycling" testing on laptops pre-sale that 'revealed no problems, including, without limitation, any alleged heat cycling defect." Defendants again omit to state that Mr. Hodge testified regarding these tests in context of the late 2006 "pressure test" problem. Decl. ¶ 40. Indeed, Defendants' motion mentions these "tests of extreme temperature cycles and 'heat stress far above product specification'" in the context of "The 2006 Pressure Issue." MTD at 6. In addition, Defendants ignore the Complaint's allegations that the materials change made in connection with the pressure test issue caused failures during normal use, at normal temperatures, not during extremes or heat stress far above product specification. *E.g.*, ¶39; Hodge Decl. ¶56.

In line with their cherry-picking of dates and distorting facts, Defendants make yet another out of context claim, MTD at 12-13, that "by mid-November [2007][8] . . . HP merely 'hypothesized' about the cause of the bump cracks, did not begin testing until January 2008, and

---

[8] The Hodge declaration, submitted in defense of HP in a consumer class action, is carefully worded to say that the discoveries and hypotheses were made, for example, "by" mid-November, Decl. ¶50 (conveniently, the class action against HP was filed on November 15, 2007) (or, in another instance, "by mid-2008," Decl. ¶56). CW 1 and Demerjian report that the discoveries regarding the bump cracks and thermal profile were actually made much earlier. ¶¶ 37, 43-44.

1   that testing was not complete until March 2008, and that HP did not come to the opinion that

2   NVIDIA's chips were responsible for the problems until 'mid-2008.'" This assertion is false.

3   Mr. Hodge does not claim, anywhere in his declaration, that mid-2008 was the first time

4   that HP had come to the opinion that NVIDIA's chips were responsible for the problems.

5   Defendants' assertion is contradicted by the allegations of the Complaint, by Hodge's own

6   declaration, and by a May 2007 email sent by Hodge which Defendants disingenuously ignore.

7   Not only do CW 1 and Demerjian make clear that HP was blaming NVIDIA for the problem by

8   at least early 2007, ¶¶40, 42-45, Mr. Hodge's declaration states that, "[i]n late October and early

9   November 2007, HP . . . captured and examined several thousand motherboards . . . discovering

10  'opens' between the substrate and die in the same locations found to have L1 solder cracks in

11  previous samples." ¶48. Put simply: in a large scale examination of already-returned, damaged

12  motherboards, HP found cracks in the NVIDIA components on those motherboards, in the same

13  place that HP had *previously* seen cracks in the NVIDIA components. Defendants cannot

14  reasonably aver that the appropriate inference from Mr. Hodge's declaration is that HP was not

15  placing the blame on NVIDIA in the several months after it had developed its hypothesis

16  regarding the bump cracks

17  With regard to the testing, which Defendants claim did not begin until January 2008,

18  Hodge's declaration provides detail on only a single test regarding temperature extremes. Of

19  course, this declaration was filed in defense of HP when that company was facing consumer

20  claims stemming from the same chip problem addressed in this case. Hodge's declaration

21  provides detail regarding an unsuccessful test (in that it did not recreate the bump crack problem)

22  of temperature *extremes* that was conducted starting "In January 2008" and "was concluded in

23  March 2008" Decl. ¶¶53, 55. Hodge's declaration then summarily notes that the exact thermal

24  profile that was the root cause of the bump crack problem was "ultimately" discovered "by mid-

25  2008," without providing any details regarding the *mid-range* temperature testing that actually

26  revealed this root cause. Decl. ¶56.[9] Defendants take advantage of the fact that the declaration is

27

28  [9] Hodge's declaration is quite specific regarding the early 2008 testing: He discusses a January to March 2008 test conducted in China, on 40 units, which involved testing the component at

worded in such a way as to imply that the early-2008 temperature extreme testing correlates with the "root cause" discovery; but that is not the case. As alleged in the Complaint, CW 1 revealed the root cause was discovered much earlier, and this allegation is not contradicted by Mr. Hodge's carefully worded statements regarding the "ultimate" conclusion which was dated, by no coincidence, when NVIDIA began settling claims with its OEMs and made its public disclosure.

Defendants resort to the invention of facts outside of the four corners of the Complaint to undercut the strength of CW 1's allegations, however, CW 1's timeline is clear and the allegations are consistent. While Defendants claim that the Complaint "lacks a clear chronology," MTD at 4, that is simply untrue. The early timeline alleged is as follows:

- July 2006 – the HP products first shipped, Decl. ¶ 24;

- September 2006 – in response to the "pressure crack" issue, NVIDIA transitioned to high-lead solder, Decl. ¶ 42.

- Late 2006 – HP was concerned about the failure rate of NVIDIA's GPUs in HP laptops, began auditing the return authorizations from NVIDIA's records, and engaged NVIDIA to evaluate the problem and conduct a failure analysis, Comp. ¶¶ 36 (citing CW 1);

- January 2007 – HP noticed a systematic problem with NVIDIA chips on HP laptops, Comp. at ¶ 44 (citing Mr. Demerjian);

- First Quarter 2007 – HP began engaging NVIDIA at a heavier level, with NVIDIA coming onsite to HP, beginning testing, and reproducing failures, Comp. ¶¶ 40-41;

- Early 2007 – HP started a "root cause analysis," ¶ 43 (citing Mr. Demerjian);

- Early 2007 – Dell began seeing problems with NVIDIA GPUs and communicated directly with NVIDIA regarding the problem, ¶ 45 (citing CW 7);

- Mid 2007 – HP had reproduced the problem and had NVIDIA perform the thermal profile and reproduce it as well, Comp. ¶ 42 (citing CW 1);

- Summer 2007 – HP employees knew that NVIDIA's GPU problems stemmed from heat cycling, ¶ 43 (citing Mr. Demerjian);

*Mr. Hodge's declaration does not contradict any part of this timeline.* In fact, his declaration makes no discussion of any event during the full year between October 2006 (approximately the

---

temperatures cycling at extremes from 27ºC to 87ºC ¶¶53-55. The root cause of the bump crack problem, however (i.e., the thermal profile that CW 1 says was discovered and confirmed by NVIDIA by mid-2007, ¶¶42,43) was temperature "mini-cycling" when the component idled between roughly 58ºC and 62ºC. The discovery of the root cause (the mini-cycling) was unrelated to, and occurred prior to, the early 2008 temperature extreme test.

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS                                    18

time that CW 1 reports that HP engaged NVIDIA) and September 2007. During this time span, however, as reported in an allegation wholly ignored by Defendants, Mr. Hodge sent a May 9, 2007, email with the subject "Quanta and NVIDIA." In Mr. Hodge's email, he notes that HP is "working an escalation" on the HP laptops, stating in relevant part:

> There are **other issues** on the product that involve NVIDIA and a change of the **solder composition at the famous L1 joint between the die and the substrate**. In this case, NVIDIA damaged some of the ICs during their factory test [the "pressure testing" issue]. **Part of the solution however was to move away from Eutectic solder.** I was aware of this when I put the Ryan paper together. It does not change the results **but it does set up a nasty conversation if you were not prepared . . .**

(Emphasis added).

Hodge's declaration did not address his email or the summer 2007 "escalation," but picks back up, in relevant part, in "October and November 2007" when HP "captured and examined several thousand motherboards returned by customers." Contrary to Defendants' misrepresentation in their motion that "HP *first received*" these motherboards at that time, MTD at 7, these *several thousand* motherboards had *already* been returned prior to October 2007; Mr. Hodge's declaration reveals that they were merely being mass tested at that time. Moreover, his declaration goes on to state that "'opens' between the substrate and die [were discovered] **in the same locations found to have L1 solder cracks in previous samples**" leaving no room for misinterpretation that this was the first time HP had discovered the bump crack problem. Decl. ¶48. It was not. NVIDIA's own VP of Investor Relations admitted to "hearing about [the problem] and working on it for over a year," putting the timeline of discovery *at least* as early as August 2007. ¶¶152-53. The most compelling inference from these allegations is that, after nearly a year of dispute with NVIDIA, and in the face of NVIDIA's refusal to take responsibility for the bump crack problem, HP was forced to gather thousands of returned motherboards to conduct its own root cause testing in order to establish a claim against NVIDIA and recover the millions of dollars in losses that HP incurred as a result of NVIDIA's faulty product.

In the face of these well-pleaded allegations, Defendants would have the Court believe that "hearing about" and "working on" a widespread problem, at the executive level, with multiple OEMs, at least one of which reported specific, physical damage to NVIDIA's hardware,

which could be traced back to a haphazard materials change made immediately prior to the occurrence of the problem, did not trigger a duty to disclose any risk or any problem.

In one of Defendants' more incredible attempts to discredit CW1, they state:

> CW1's claim that HP had known about the heat cycling issue since late 2006 and told NVIDIA at that time is patently unreliable. If true, HP would have had to have fully understood and told NVIDIA about the problem mere months after it started shipping laptops, more than a year before it even obtained and examined returned motherboards, and over 18 months before it even 'hypothesized about the cause or began, let alone completed, testing that confirmed it.

MTD at 14 (citations omitted). This contention is faulty and disingenuous for a number of reasons. The Complaint plainly alleges that HP "understood and told NVIDIA about the problem mere months after it started shipping laptops," MTD at 14; Mr. Hodge's own email makes clear that "[t]he first few months of production have a very high failure rate in the field (about 130k units)"; and CW 1 reported that HP conveyed the problems to NVIDIA from day one, beginning late 2006, ¶37. While Plaintiffs do not contend that HP "fully understood" at that time that it was a heat cycling issue, the Complaint does allege that HP fully understood that it was an issue relating to NVIDIA hardware: CW1 reported that, in late 2006, HP identified a problem with the chips, identified fractures in the solder bumps, and shared the date a with NVIDIA, *e.g.*, ¶¶35-37; Mr. Hodge's email corroborates that, at least as early as May 2007, HP knew that there were additional (i.e., different from the "pressure testing issue"), solder-related issues in NVIDIA's chips, confirming that they were aware of a hardware-level problem ¶¶80-81; and Mr. Demerjian spoke with HP employees who could confirm that the root cause analysis had begun and a thermal cycling issue had been identified by summer 2007, ¶43. And although Defendants try to underscore the length of time that transpired during their purported version of the facts ("more than a year," "over 18 months"), the dates Defendants refer to are derived from Mr. Hodge's declaration, which states that motherboards were examined and the hypothesis regarding temperature cycling was developed by mid-November 2007, ¶¶48, 50, which, at the latest, was *just days into the 8 month Class Period*.

### 2.   Plaintiffs' Technology Consultant, Mr. Rigg, and Industry Insider Mr. Demerjian Corroborate Plaintiffs' Allegations

Defendants criticize Plaintiff's reliance on Mr. Rigg, their technology consultant, and Mr. Demerjian, the industry insider, because they do not have access to the Company or its documents and do not have personal knowledge of the bump crack problem. MTD at 17-19. It is true that at this stage, Plaintiffs, their consultant and their industry insider have not had the benefit of formal discovery from NVIDIA or its OEMs. Nevertheless, the allegations of the Complaint supported by Mr. Rigg provide valuable background and details concerning chip testing and corroborate CW2, who indicated that thermal testing should only take approximately one month. ¶49; *see also* ¶55. Unlike *In re Silicon Storage Tech., Inc., Sec. Litig.*, No. 05-0295, 2007 WL 760535, at *31 (N.D. Cal. Mar. 9, 2007), relied upon by Defendants, where the industry consultant attempted to equate the defendant company's prices with generic industry data of a marketing research firm, Mr. Rigg provides explicit detail related to the problems identified in the Complaint. Mr. Rigg discusses the obviousness of the GPU problem. ¶48. Mr. Rigg identifies soft failures and hard failures, ¶48, and described in layman's terms the process undertaken to verify a GPU failure on a laptop or a motherboard. ¶49. Mr. Rigg provides detailed symptomology of post-manufacture fixes (draining the battery, running loudly, changes to architecture) and costs of repair (replacing a GPU costs more than the cost of the individual GPU). ¶¶57, 58. Mr. Demerjian has 25 years experience reporting on and working with computers and, specifically, he covered NVIDIA's chip defects, and *spoke directly* with numerous insiders. ¶43; *see also* ¶¶43-44, 47, 53, 62-64, 66, 75 (detailing the allegations attributed to Mr. Demerjian). Mr. Rigg's ample relevant experience and background are also provided. ¶2. Such details support falsity and scienter here.

With respect to personal knowledge, "it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense. Rather, the source must be one whose context and access to critical information makes him or her reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008).

### 3. The Existence Of Other Lawsuits Supports Falsity and Scienter

Defendants, again ignoring significant facts and the allegations in the Complaint, argue that lawsuits brought by insurers against NVIDIA offer no support for Plaintiffs' allegations. Defendants misleadingly claim that "the insurers relied on the allegations <u>in this case</u>." MTD at 20 (emphasis in original). Defendants' assertion is simply not true, as their citations to the complaint in *Great Am. Ins. Co. of New York v. NVIDIA Corp.*, 09-133413 (N.D. Cal.) (RJN at 191 ¶8; at 193 ¶17), demonstrate. Both paragraphs Defendants cite from that complaint refer to a lawsuit against HP – *not* a lawsuit against NVIDIA, and certainly not *this* lawsuit against NVIDIA. Further, as the Complaint makes clear, the insurer in *Nat'l Union Fire Ins. Co. of Philadelphia v. NVIDIA Corp.*, 10-1812 (N.D. Cal.), filed an action seeking a declaratory judgment after reviewing "600,000 pages of documents produced to the class action plaintiffs ***in the consumer action related to the defective chips***." SCAC at ¶104 (emphasis added).[10]

Courts have held that the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit" is a factor to consider in the scienter equation.[11] *Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir. 2001); *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir. 1999). In *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005), the Sixth Circuit further considered ancillary lawsuits without fraud allegations and held that, in such cases, the "presence of closely related evidence carries

---

[10] NVIDIA was also informed and aware that HP was the subject of a class action lawsuit, filed November 14, 2007, related to problems with NVIDIA chips and knew that HP would seek indemnification from NVIDIA. ¶105.

[11] As for the August 2010 settlement of the *NVIDIA GPU Litigation*, No. 08-04312 (N.D. Cal.), the settlement involved replacing defective chips, ¶151. Although Defendants tepidly note that there was no admission of wrongdoing, MTD at 20, a significant amount of discovery had already been completed, potentially leading to the settlement. The fact that NVIDIA agreed to rectify the chip problems identified in that lawsuit supports a strong inference that it knew of the bump crack problem and failed to disclose it before the Class Period. Moreover, as Judge Rakoff noted with respect to the common practice of settling with defendants where they neither admit nor deny the allegations against them: "No reasonable observer of these events could doubt that the company has effectively admitted the allegations of the complaint in the way that, for a company, is particularly appropriate: by letting its money do the talking." *S.E.C. v. Vitesse Semiconductor Corp.*, No. 10-9239, 2011 WL 976578, at *5 (S.D.N.Y. Mar. 21, 2011).

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS

some weight." *Id*. Indeed, "[t]he apparent animating idea is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire." *Id*. Thus, although Defendants attempt to discount the significance of the lawsuits, MTD at 20, cited by Plaintiffs (¶¶102-105), these lawsuits are highly indicative of falsity and scienter.

### 4. Mr. Hara's Admissions Support Falsity and Scienter

Defendants contend that Plaintiffs simply rehash the allegations regarding Hara, but they disregard the fact that at the June 24, 2010, motion to dismiss hearing, counsel for the Company admitted and further corroborated that NVIDIA was talking to *at least two of their most important* OEMS about the problems around August 2007. ¶34 (citing Hr'g Tr. at 12:1-5, 7-19). Indeed, the transcript notes:

> **MR. TORPEY:** NO, EVEN LESS THAN THAT. THERE'S NOT A SENTENCE THERE THAT SAYS: "IN AUGUST OF 2007, NVIDIA KNEW THAT THIS WAS ITS PROBLEM," OKAY? **ALL WE'RE SAYING IS WE'RE TALKING TO HP AND DELL, WHICH IS TRUE.**

(Emphasis added).

The fact that NVIDIA was speaking with OEMs in August 2007 goes to the "scope" of the bump chip problem; CW 1 and Mr. Demerjian confirm that NVIDIA was aware of the "nature" of the problem; Plaintiffs' new, detailed allegations regarding the technology and the basic physical properties, ¶¶36, 42-43, address the "cause" of the problem, as does the detail regarding the thermal profile, ¶¶42, 46, and, as discussed in detail above, whether and when the problem would exceed the Company's reserve is not the relevant trigger of Defendants' duty to disclose. Moreover, the Complaint alleges additional detail from Mr. Hara's statements, including the context in which he discussed the nature of the "problem," which was a detailed explanation of the bump crack issue. ¶¶152-153.

### 5. The Articles Challenged By Defendants Support Falsity and Scienter

The Complaint also includes news articles which address the technical details of the problem and corroborate CWs' (e.g., CW 8, ¶64) allegations that transitioning solder bump

materials, as the Company did as early as May 2008, ¶63, would have had to have been in the works months prior. ¶¶67-68. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000) (noting that corporate officials are "responsible for revealing those material facts reasonably available to them.").[12] In addition, the articles provide context and information regarding industry-known principles, which Defendants knew and/or deliberately disregarded, including that high lead bumps were more prone to fatigue and require comprehensive testing before use, especially when combined with eutectic solder, as was the case when NVIDIA made its hasty materials change in fall 2006. ¶¶27-28, 72-74. Defendants wholly misread the purpose of these allegations and argue that "after-the-fact stories do not show that any statement was false when made." MTD at 18.[13]

### 6.   The BIOS Updates And PCNs Support Falsity and Scienter

Defendants claim that Plaintiffs have provided no reason why OEMs would issue "ineffectual software" update to their customers, musing that "OEMs had no incentive to join a scheme to hide chip problems." MTD at 19. The Complaint, however, notes that NVIDIA wrote the BIOS updates, ¶62, they were designed to address thermal issues in an attempt to rectify or delay discovery of the problem, ¶¶59-61, and NVIDIA had an incentive to employ these BIOS

---

[12] Defendants rely on *In re Ligand Pharm., Inc. Sec. Litig.,* No. 04-1620, 2005 WL 2461151, at *10 (S.D. Cal. Sept. 27, 2005), but the hindsight pleading in that case involved defendants there issuing post-class period releases purportedly about the fraud. Here, the articles describe reports about tests conducted on NVIDIA products.

[13] Defendants dramatically distort factual details of the September 2008 TG Daily report. Defendants suggest that "[i]t is not plausible to suggest that if NVIDIA understood the cause of the chip failures in November of 2007, it would be conducting further research in September 2008. MTD at 18.  This is absurd. First, the research was conducted by a scientist at UCLA, and there is no indication that the report was commissioned by NVIDIA, or even by its competitor, AMD/ATI; it simply notes that the timing suggests it is aimed at shedding some light on the NVIDIA problem. ¶ 73. The article also notes only that the report "surfaced late last week," *e.g.*, it was necessarily penned (and the research was conducted) before that time. ¶ 73.  Moreover, the Complaint alleges that NVIDIA refused to take responsibility for the problem, even after HP provided the Company with significant data and information allowing Defendants to recreate the problem. ¶¶41-42. Thus, even if NVIDIA commissioned this report, it is very plausible and consistent with the Complaint's allegations that NVIDIA was simply claiming to conduct research in order to delay taking responsibility for the problem until after it had a new product ready to market. ¶90-91.

updates to delay the manifestation of problem until after the warranty period, ¶62, and until the point when NVIDIA had a replacement product ready to market, ¶89.

In addition, as noted in the Complaint, NVIDIA issued two Product Change Notifications during the Class Period, both of which would have required pre-issuance investigation.[14] First, NVIDIA issued a PCN on May 22, 2008. ¶63. CW8 confirmed that "there's definitely a lead time, at least four to six months" required to engineer a fix and get a product change on production lines. ¶64. Furthermore, Mr. Demerjian indicated that by the time the PCN was issued, NVIDIA had already done the research, development, and thermal testing to approximate field conditions, which "takes months." ¶64. Moreover, Defendants issued another PCN on June 13, 2008, to change the "bump material from high Pb [lead] to Eutectic Solder." ¶¶66-67. Defendants feign ignorance and attempt to throw smokescreens related to this issue. They claim, for instance, not to understand why the "immediate switch" to eutectic solder was ordered and the fact it took months to redesign the chip, MTD at 19; seeking to obfuscate matters rather than accept the obvious – a redesign must occur before a switch can be ordered.[15]

## E.  Huang's Individual Scienter Is Amply Pleaded

Defendant Huang's high-ranking position and deep involvement in the running of NVIDIA, coupled with the paramount importance of the GPU and MCP segments and his

---

[14] Defendants claim that Plaintiffs have not reconciled the need for two PCNs when it involved the same problem. MTD at 19. Perhaps this can be explained by virtue of the name of the PCN, to wit, *Product* Change Notification. Presumably, if NVIDIA wanted one change arising out of the same problem, they might change the nomenclature to *Problem* Change Notification.

[15] Similarly, Defendants query why a change in underfill was necessitated, MTD at 19, but Plaintiffs have alleged that "NVIDIA used an underfill with a low glassification temperature, or low-Tg, meaning it turned soft at low temperatures, and failed to provide sufficient support for the solder bumps." ¶28. The Complaint makes clear that it was a *combination* of factors that contributed to the bump crack problem, (*e.g.*, ¶28, noting that high-lead solder is more malleable, and "[t]hat weakness can be magnified when combined with eutectic solder paste") and thus any component material could be altered to resolve the situation. Defendants also ask why it took months to redesign a eutectic solder bump after the problem was discovered when the Complaint also alleges that NVIDIA ordered an "immediate switch" to the eutectic solder bumps back in fall 2006. MTD at 19. Of course, Plaintiffs allege that it was this "immediate," untested switch that landed NVIDIA in this case to begin with. Plaintiffs certainly understand Defendants' desire to spend the appropriate amount of time, i.e. "months," to redesign the failed chips.

specific directive regarding those products, support a strong inference that Huang knew or was deliberately reckless in not knowing about the bump crack problem and other material omissions that he and the Company had a duty to disclose during the Class Period. *See Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (the individual defendants "were directly responsible for Applied Signal's day-to-day operations, so it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." (internal citations omitted)).

Defendant Huang, NVIDIA's co-founder, has been its President and CEO and a member of its board of directors since the Company's inception and also serves as NVIDIA's chief operating decision maker ("CODM"). ¶12. As CODM, Huang reviews financial information on an operating segment basis for purposes of making operating decisions and assessing financial performance. *Id*. According to the Company's 3Q:08 10-Q, 2008 10-K, and 1Q:09 10-Q, as CODM, Defendant Huang "reviews financial information presented on an operating segment basis for purposes of making operating decisions and assessing financial performance." ¶157. Each of those Class Period SEC filings, which were signed and/or certified by Defendant Huang, stated that "financial information for four operating segments [was reported] to our CODM." *Id.* These four operating segments included the Company's GPU business, MCP business, professional solutions business, or PSB, and consumer products business, or CPB. *Id.* Defendant Huang thus certified that he reviewed the financial information–which includes information regarding sales, income, revenues, inventory, product returns and product warranty liabilities, inventory reserves (the money set aside for inventory that the Company will be unable to sell), and sales allowances (price reductions for problems or deficiencies)—for, *inter alia*, the Company's GPUs and MCPs, which were the Company's core products. *Id.*

Huang also serves as the Company's chief spokesperson, thereby building and maintaining NVIDIA's important customer relations, and has been heavily involved in the production and design of NVIDIA products. *Id.* Without contesting Huang's responsibility for running NVIDIA and his position as CODM, Defendants claim that, because "the complaint is devoid of facts detailing [Huang's] *actual* exposure to the disputed facts, the falsity of the

1    statement must be 'patently obvious' for the Court to infer knowledge." MTD at 29 (citing

2    *Zucco*, 552 F.3d at 1001). This argument falls flat. CW 17 reported that the bump crack problem

3    could have stemmed in part from *Defendant Huang's actual instruction to employees* regarding

4    the bumps. ¶160. According to CW 17, Defendant Huang stated that he did not want an undue

5    number of bumps, and, as a result, NVIDIA employees began "rationalizing" the number of

6    bumps they used, which could lead to signal integrity problems, electro-migration problems, and

7    reliability issues. *Id.* In addition, the Complaint alleges that Defendant Huang has a technical

8    background, including an electrical engineering degree, and could certainly understand and

9    comprehend both the nature and extent of the problem. ¶158.

10       Moreover, under the core operations doctrine, as discussed in greater detail below, the

11   Complaint does not have to allege that Huang had actual exposure to the disputed facts. Rather,

12   Huang's knowledge may be inferred from his position at the Company. *See, e.g., In re*

13   *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1189 (C.D. Cal. 2008) (defendant's

14   position within a company can support a strong inference of scienter when the alleged

15   misrepresentations relate to the company's core operations and may do so standing alone where

16   it is "absurd to suggest" that a defendant did not know). Here, the Complaint is replete with

17   allegations showing Huang was intimately involved in all aspect of NVIDIA's operations since

18   its formation. Hence, it would strain credulity to suggest that Huang was without knowledge of

19   the bump crack problem prior to the beginning of the Class Period. *South Ferry,* 542 F.3d at 786;

20   *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir.

21   2004) ("It is reasonable to infer that the Oracle executives' detail-oriented management style led

22   them to become aware of the allegedly improper revenue recognition. . . ."); *see also Tellabs,*

23   513 F.3d at 709-10.

24       Defendants claim the Complaint does not create a strong inference of scienter because it

25   "offers no reason for Mr. Huang to commit fraud." MTD at 27. The Supreme Court has stated

26   that, "[w]hile it is true that motive can be a relevant consideration, and personal financial gain

27   may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the

28   absence of a motive allegation is not fatal." *Tellabs,* 551 U.S. at 324; *see* also *Siracusano*, 585

F.3d at 1181. Moreover, the Complaint alleges that Defendant Huang profited from stock sales he made while in possession of material, nonpublic information. Although the Court previously held Huang "did not exhibit an intention to maximize profits from an artificially inflated stock price" (Order at 20), Plaintiffs have since expanded upon their allegations to clarify that Defendant Huang *adopted* this plan while in possession of material nonpublic information regarding the chip problem, thereby providing a motive that several courts have found persuasive at the pleading stage, as discussed below. ¶161.

While sales made pursuant to a pre-arranged trading plan can oftentimes reduce the inference of suspiciousness, that is because insider trading involves "trades . . . on the basis of material, nonpublic information," *see, e.g., United States v. O'Hagan*, 521 U.S. 642, (1997), and typically, the 10b5-1 plans are pre-scheduled, *prior to* defendants' alleged fraud or scienter, *see, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994). That is not the case here, where Huang adopted his plan after the chip problem was brought to Defendants' attention. Indeed, "A Rule 10b5-l trading plan may give rise to an inference of scienter because 'a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.'" *Freudenberg v. E*Trade Financial Copr.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (quoting *In re Immucor Inc. Sec. Litig.*, No. 05-CV-2276, 2006 WL 3000133, at *18 n. 8 (N.D. Ga. Oct. 4, 2006)); *See also Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting defendant's attempt to use 10b5-1 plan as a "non-suspicious explanation" because defendant entered into plan during the class period); *In re Biogen Idec, Inc. Sec. Litig.*, No. 05-10400, 2008 WL 4810045, at *14 (D. Mass. Oct. 25, 2008) ("The attempt to use such trading plans as a non-suspicious explanation is undermined . . . when such plans are entered into during the Class Period"). Further, "the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Id.* (quoting *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (citing 17 C.F.R. § 240.10b5-1(c)(1)(i))), and it is thus premature to consider this defense at the motion to dismiss stage.

**F.  Defendants' Scienter is Also Established Under the Core Operations and Collective Scienter Doctrines**

In *Matrixx*, the defendant argued that plaintiffs failed to "allege that [the company] knew of [] statistically significant" evidence regarding the alleged problem, and thus failed to allege scienter. 2011 WL 977060, at *3, 7. According to the defendant company, "the most obvious inference" regarding its scienter was that the reports were not disclosed because the company believed "they were far too few. . . to indicate anything meaningful." *Id.* at *13. The Court disagreed, however, and found the inference that defendant "elected not to disclose the reports of adverse events <u>not because it believed that they were meaningless but because it understood their likely effect on the market</u>" at least, if not more, compelling. *Id.* at *14 (noting that ""[A] reasonable person" would deem the inference that Matrixx acted with deliberate recklessness (or even intent) "at least as compelling as any opposing inference one could draw from the facts alleged.")(citing *Tellabs*, 551 U.S. at 324)).

Similarly here, Defendants cannot make a straight-faced argument that they failed to disclose the complaints from key OEMs regarding problems with their key products, the risks to the Company for liability or strained relationships, or the bump crack problem itself because they thought these issues were "meaningless" or immaterial. The most plausible inference is that Defendants did not disclose the bump crack problem or related issues because they were cognizant of the likely effect on the market.

Indeed, the Complaint alleges at least three bases for a finding that Defendants acted either intentionally or with deliberate recklessness in not timely disclosing the bump crack problem or related risks: (1) the Complaint's specificity,[16] (2) the Core Operations Doctrine, and (3) the Collective Scienter Doctrine.

---

[16] As detailed *supra*, the Complaint alleges with particularly that Defendants knew of or deliberately disregarded, *inter alia*, the bump crack problem and the attendant risks stemming therefrom.

### 1.   The Core Operations Doctrine Supports Scienter

Under the "core operations inference," knowledge of "facts critical to a business's core operations" may be imputed to individual corporate officers (here, Defendant Huang) to support a finding of scienter. *South Ferry*, 542 F.3d at 782; *see also Berson.*, 527 F.3d 982; *McCasland v. FormFactor Inc.*, 2009 U.S. Dist. LEXIS 59996, *17 (N.D. Cal. July 14, 2009). In *South Ferry*, the Ninth Circuit held that core operations allegations can satisfy the PSLRA's scienter requirement in three different ways: (1) "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'"; (2) "such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information"; and (3) "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." 542 F.3d. at 786.

The Complaint satisfies all three tests. NVIDIA's GPUs and MCPs were indisputably its core businesses, growing annually and together comprising nearly 80% of the Company's revenues. ¶17. Defendants concede this point, referring to these segments as their "core" and "central" businesses. ¶116. Indeed, the Seventh Circuit's decision on remand in *Tellabs* found that because the allegations concerned the company's most important products, the court found it "very hard to credit" the assertion "[t]hat no member of [Tellabs'] senior management who was involved in authorizing or making public statements about the demand for the key products knew that they were false" and noted that "no plausible story has yet been told by the defendants that might dispel our incredulity." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (emphasis added).

Not only are the GPU and MCP business segments the Company's most profitable, NVIDIA defines its entire corporate identity in relation to the GPU. For example, NVIDIA's public disclosures frequently and conspicuously tout the Company as "the inventor of the graphic processing chip, or the GPU." ¶¶13, 17. Knowledge about the nature and import of a

company's "core operation" – in this case knowledge about a significant defect with NVIDIA's leading product, the GPU chip – may be imputed to Huang in support of a finding of scienter. *Siracusano*, 585 F.3d at 1182 ("The inference that high-level executives . . . would know the company was being sued in a product liability action is sufficiently strong to survive a motion to dismiss.").[17] *See* also *Makor*, 551 513 F.3d at 708-09.

Defendants further claim that even if Plaintiffs "have pled facts sufficient to show that NVIDIA's GPU and MCP businesses were 'core operations,' the theory does not permit them to bypass their duty to plead particularized facts about the timing of Mr. Huang's knowledge." (MTD at 29 (emphasis omitted)). This claim turns the doctrine on its head.  In reality, the core operations doctrine provides that the "defendants 'must have known' about the falsity of the information they were providing to the public because the falsity of the information was obvious from the operations of the company, the defendants' awareness of the information's falsity can be assumed." *Zucco,* 552 F.3d at 1001.  The doctrine applies here and strongly supports a finding of Defendant Huang's individual scienter where the Company's admittedly core products constituted the problem that was concealed from investors.

## 2.  The Collective Scienter Doctrine Applies Here

The Complaint adequately pleads scienter as to NVIDIA under the Collective Scienter Doctrine. [18] *See Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 744-45 (9th Cir.

---

[17]  *See also No.84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) (finding it "absurd" to contend that outside directors, much less corporate managers, would not discuss and be knowledgeable about highly significant FAA investigations or negotiations); *In re Northwest Biotherapeutics Inc. Sec. Litig.,* 07-1254, 2008 WL 6822401, at *4-5 (W.D. Wash. July 2, 2008) (Because defendants' positions strongly suggest that defendants knew the releases included false or misleading statements, the complaint adequately alleged facts showing those defendants acted with scienter).

[18]  Defendants argument (MTD at 28-29) that because Plaintiffs purportedly failed to plead scienter as to Huang, they failed to plead it as to the Company, completely disregards the very existence of the Collective Scienter Doctrine. In *Glazer*, the Ninth Circuit left the door open to the possibility of applying the doctrine of collective scienter under the appropriate circumstances. As the Ninth Circuit observed in *Glazer*: "The district court in *Apple* appears to have overstated our holding in *Nordstrom*. We had at that time not categorically rejected the concept of 'collective scienter without also implicating the directors and officers. Rather, *Nordstrom* merely held that, on the facts of the case, it is impossible to allege corporate scienter

2008)(citing *Makor*, 513 F.3d at 710 ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.")); *see also Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter with regard to a corporate defendant without doing so with regard to a specific individual defendant."). In upholding the denial of the motion to dismiss in *Matrixx*, a case which involved omissions in corporate statements, the Supreme Court did not even find it necessary to distinguish between the company and its officers. 2011 WL 977060.

Here, the materially false and misleading statements and omissions concern the Company's core product, responsible for 80% of the Company's revenues, and fail to disclose a widespread hardware problem reported by two of the Company's key customers. Certainly, these are the character of important misstatements that can and should trigger the application of the Collective Scienter Doctrine here, even if it were held that the Complaint does not adequately allege scienter as to Defendant Huang.

### G.  Plaintiffs' Well-Placed CWs Support the Allegations of the Complaint

With respect to the 17 CWs, Plaintiffs have alleged facts sufficient to "support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *Oracle Corp.,* 380 F.3d at 1233; *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015-16 (9th Cir. 2005). At this stage, the Court need only determine whether the CWs have been sufficiently described, a matter of form. *Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 263 n.33 (3d Cir. 2009); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (contested allegations "must at least await discovery"). Indeed, "[f]or pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense. Rather, the source must be one whose context and access to critical information makes him or her reasonably reliable, such that his or her conclusions about the

---

without also implicating the directors and officers.'" *Glazer*, 549 F.3d at 744. *See also In re Nvidia Corp., Sec. Litig.*, 2010 WL 4117561, at *10 (N.D. Cal. Oct. 19, 2010).

inner workings of the company are not speculative but reasonably informed." *LDK Solar*, 584 F. Supp. 2d at 1243 (citing cases).

To determine whether a confidential witness is described with "sufficient particularity," courts look to the "level of detail provided by the confidential source[], the corroborative nature of other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 995 (9th Cir. 2009).[19] For each confidential witness, the Complaint sets forth his/her specific job title or description, duration of employment, and basis of knowledge for the information provided. Moreover, the CWs reports are consistent and corroborative of each other and Plaintiffs' other allegations. For instance, CW2 worked as a Senior New Product Introduction Planner at NVIDIA from April 2005 until September 2008. ¶3. CW2 described with sufficient detail the two phases of thermal-related testing, ¶33, and provided detail regarding temperature-related specifications provided with chips, ¶51. Although Defendants seek to malign CW2 as merely holding a "marketing job," MTD at 16, the level of detail that CW2 provides indicates much more about CW2's exposure to matters about the Company and its products.[20] Indeed, CW2 also provided specific details regarding the chip's architecture, which components generate heat, and heat dissipation issues. ¶56.

---

[19] Defendants claim "CW statements should be discounted." MTD at 14 n.10 (relying on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) and *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). But there is no requirement in the Ninth Circuit that confidential witness allegations be "discounted" where sufficient particularity is shown. The Ninth Circuit has specifically not followed cases requiring the discounting of confidential witness statements. *See Zucco,* 552 F.3d at 995 n.2. Indeed, *Higginbotham* itself has been rejected, distinguished, or modified by numerous other courts, including its own Seventh Circuit. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 711-712 (7th Cir. 2008) (giving weight the allegations of the confidential witnesses, who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify.")

[20] Similarly, challenging their titles as not important enough, Defendants seek to malign CW4 and CW6 as merely software engineers, not working with hardware. MTD at 16. CW4, however, developed driver code for graphics chips, ¶3, and so it is reasonable to presume that CW4 would have exposure to and familiarity with hardware issues as related to graphics. CW4 further confirmed that Defendant Huang had direct involvement with the GPU and MCP problems.

Defendants also assert that the CWs, other than CW1, lack personal knowledge of the chip problem. MTD at 14-15. The allegations of the CWs belie these contentions.[21] Moreover, the chips represent the "core" business at NVIDIA. ¶17. In *Berson*, the Ninth Circuit concluded that even lower-level "engineers or technical editors," who were not managers with first-hand knowledge, would be in positions to "know" or "reasonably deduce" that stop work issues had been ordered because of their company-wide effect. 527 F.3d at 985. By comparison, even those CWs here who did not deal specifically with the bump crack problem reported regarding testing failures of the chips (CW3, ¶29) and operating temperature and power product specification changes stemming from the bump crack problem. (CW9, ¶¶69, 77).

In addition, Defendants attempt to exclude certain CWs' allegations on the grounds that they were not employed at NVIDIA during the Class Period. MTD at 15-16. However, the Complaint includes allegations regarding Defendants' scienter and the manifestation of the bump crack problem beginning a year *before* the Class Period began. Indeed, CW17 made it clear that Defendant Huang took an active role in the architecture of the affected chips – at the very least – several months prior to the start of the Class Period.

Other CWs describe the lack of care pervading at NVIDIA during the periods these witnesses had contact with the Company.[22] *See In re Tibco Software, Inc.*, No. 05-2146, 2006

---

¶196. CW6 noted that NVIDIA had a special thermal team, ¶92, and also confirmed that thermal problem resulted from a failure of testing. ¶32.

[21] For instance, CW7 tested prototypes for high-end gaming and office programs, including NVIDIA products. ¶3. Although Defendants suggest that CW7's knowledge relates only to Dell products, MTD at 17, this is wrong. CW7 confirmed that Dell saw problems with NVIDIA GPUs in early 2007. ¶45. CW8 was a computer repair technician (¶¶3, 64) who confirmed that a product change notification (PCN), a significant change to a product, had a "lead time, at least four to six months" to engineer a fix. ¶64. As a computer repair technician, an understanding of PCN timing is simply part of the job. *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) (approving a confidential witness who was a consultant, in part, because his/her "livelihood depends upon his access to reliable, specific industry information"). Defendants challenge CW10 as having no chip design training or experience, MTD at 15-16 n.11, but he discussed first-hand experiences while working at the Company between. ¶93. CW10 indicated that a pattern of failures existed related to thermal problems in the GPU, which CW 10 noted were NVIDIA parts and s/he had them replaced. ¶93; *see also* ¶94.

[22] *E.g.*, CW5 noted that NVIDIA did not provide training. ¶31. CW 11 noted, in part, that NVIDIA operated with a "failure to recognize real problems. They just won't admit it." ¶95.

WL 1469654, at *18 (N.D. Cal. May 25, 2006) (noting that confidential witnesses should "provide information that would suggest that Defendants either knew that the false statements being made were false *when made* or that they were acting in a deliberately reckless manner") (emphasis in original.) These allegations go to an alleged pattern and practice by Defendants of non-accountability. *See* Fed. R. Ev. 406 ("Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.").

Thus, in light of the well-pled allegations concerning the CWs, and contrary to Defendants' assertions, the CWs have been described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *Daou*, 411 F.3d at 1015-16, and his/her statements are sufficiently reliable and probative to support a strong inference of scienter, as well as falsity.

### H.  The Alleged Misstatements and Omissions are Actionable

Defendants devote a great deal of their brief to the red herring argument that that 15 of the 16 materially false and misleading statements are not actionable, claiming they are either: (1) vague and ambiguous; (2) covered by the statutory safe harbor; or (3) historical statements of fact, or (4) nonactionable risk disclosures.[23] *See* MTD at 21-25.

---

CW16 recounted that NVIDIA had a hostile way of dealing with actions against it and had "a lot of fiascos in the past with like the GeForce 2 Ultra, a lot of overheating issues." ¶101. Similarly, CW12, indicated that NVIDIA was notorious for blaming other entities for product related problems, ¶97, a fact echoed by CW13 and CW14. ¶¶98, 99. CW 15 described the philosophy of non-accountability at the Company. ¶100.

[23]  Defendants also contend Defendant Huang's Sarbanes-Oxley ("SOX") certifications are inactionable, however, "[t]hey are statements on which an investor would reasonably rely as reflecting consequential facts about the Company. . . ." *Roth v. OfficeMax, Inc.,* 05 C 236, 2006 WL 2661009, at *4 (N.D. Ill. September 13, 2006). Moreover, the SOX certifications contribute to an inference of scienter. *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir. 2006) (holding that a SOX certification is probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements).

### 1.  Defendants' Statements Do Not Constitute Inactionable Puffery and Are Not Subject To the Safe Harbor

The Ninth Circuit has noted that even optimism, puffery, or forward looking statements become actionable "when '(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 973 (N.D. Cal. 2009) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996)); *see also City of Monroe Employees Retirement System* 399 F.3d at 674 (even "'opinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable.'" (quoting *Longman v. Food Lion, Inc*, 197 F.3d 675, 683 (4th Cir. 1999) (emphasis omitted))); *see also In re Oracle Corp. Sec. Litig.*, 627, F.3d 876, 388 (9th Cir. 2010) (regarding forward-looking statements).

For example, Defendants characterize allegations regarding their alleged misstatements concerning "enabling our customers to achieve superior performance," ¶121, "expertise" and "skilled team," ¶¶127, and "key design wins with leading OEMs" as puffery. However, there was no reasonable basis for these statements. Indeed, the Complaint alleges that Defendants possessed information undermining the statements' accuracy (the Company's core businesses were suffering and the Company could not enable its customers to achieve superior performance because its products were failing; failures in manufacturing and testing had led to product defects; lead OEMs were blaming NVIDIA for wide-spread product failures).

They also criticize allegations regarding Defendants' purported "expectation" that "positive feedback" would continue to drive their growth, and that "close relationships with OEMs" "[would] allow us to better anticipate and address customer needs. . . " as forward-looking. MTD at 22. However, Defendants failed to disclose that they were receiving *negative* feedback or that the Company's relationships with OEMs were severely strained. Thus, not only are the present-tense portions of these representations materially misleading, Defendants also lacked a good faith basis to make these representations regarding the Company's future.

Furthermore, the contested statements amount to more than the typical "forward-looking statements, or [] generalized statements of optimism that are not capable of objective

verification." *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997). Indeed, "'a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery.'"[24] *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) (quoting *Scritchfield v. Paolo*, 274 F.Supp.2d 163, 175-76 (D.R.I. 2003)). Even "indefinite and unverifiable," "conclusory terms" like "high value" and "fair" "in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991)).[25]  In *Matrixx*, the Supreme Court found misleading statements such as that "Zicam was 'poised for growth,'" they company had "very strong momentum," and revenues will "be up in excess of 50%." 2011 WL 977060, at *5. To be sure, very general statements, i.e., that a product is the "best," have been upheld as actionable. *See, e.g. In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997) (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable). Moreover, "'[d]efendants' statements emphasizing superior quality [are] material [where] 'a reasonable jury could conclude that [the company] publicly released optimistic statements . . . **when it knew [its product] could not be built reliably.**'" *Monroe Employees*, 399 F.3d at 673 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 502 (9th Cir. 1992) (emphasis added).

---

[24] Defendants label their statement that "Fiscal 2008 was another outstanding and record year for us" as puffery, MTD at 21, but ignore the following sentence in which Defendants represent that "Strong demand for GPUs in all market segments drove our growth," ¶118. Defendants failed to disclose that this growth was achieved through the sales of defective products; demand was thus declining and growth was unsustainable. Similarly, they label as puffery their statement that "we will accelerate the adoption of 3D graphics," MTD at 21, while omitting the prior sentence that states "Our strategy is to achieve market segment leadership in these platforms by providing award-winning performance. . . .," ¶¶120. As alleged in the Complaint, the "performance" of NVIDIA's products was dismal.

[25] Defendants label as puffery their statements that "We intend to . . . maintain a leading share of the market in areas in which we do have the lead. . . .," MTD at 21 (citing ¶125) and "we believe this [billion dollar quarter] is just the beginning….Our core businesses are continuing to grow . . .," *id.* (citing ¶116). These representations regarding "leading market share" and "core business [] continuing to grow" were reasonably understood to rest on a factual basis.

## 2.  Defendants' Historical Statements Are Materially Misleading

Defendants argue that accurate statements of past growth are inactionable, claiming that they merely report historical results and "NVIDIA was not obliged to say more." MTD at 24. However, when Defendants touted "strong demand for GPUs" and segment growth and made claims regarding "our best first quarter ever" as a result of GPU shipments and "expect[ations that] this positive feedback loop [would] continue to drive our growth," they had a duty to disclose information that was related and material to those representations, including that the same customers that had spurred demand and growth were now making claims for repairs and replacement and were providing negative feedback to the Company, in order to ensure the statements made were not misleading. They did not. *See In re RasterOps Corp. Sec. Litig*, No. 92-20349, 1993 WL 476661, at *11 (N.D. Cal. 1993) (refusing to dismiss historical statements that were coupled with bold projections about future success; "[N]o meaningful purpose can be served by surgically removing the historical statements from the actionable statements and leaving the alleged misstatements to be considered in complete isolation."). Moreover, as discussed in detail above, Item 303 requires the disclosure of "material events and uncertainties. . . that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. 229.303.

While *In re Convergent Tech. Sec. Litig*, 948 F.2d 507, 513 (9th Cir. 1991), and *In re Caere Corp. Sec Litig.*, 837 F.Supp. 1054, 1058 (N.D. Cal. 1993), cited by Defendants, MTD at 24, rejected claims that historical reports of past growth implied future growth, those courts did not hold that defendants were excused from disclosing contemporaneous, material facts, as required by Rule 10b-5. Plaintiffs do not merely allege that Defendants' past results are actionable because they make "implications" regarding future growth, as in *Convergent* and *Caere*; here, the past results failed to disclose that the Company's growth and demand had been achieved by selling a faulty product or that growth could not be sustainable. The court in *Convergent*, by contrast, determined based on analyst reports and articles that "[t]here can be no doubt that the market was [already] aware the company's demand would not increase at the same rate as it had in the past." *Id.* at 513. Contrary to the case in *Convergent*, where the "market <u>understood</u> that [the company] could not maintain [its] growth," 948 F.2d at 513 (emphasis

added), here, Defendants <u>concealed</u> from investors that they were receiving complaints regarding the bump crack problem.

### 3.   NVIDIA's Risk Disclosures Are Actionable

Defendants claim that risk disclosures are inactionable, citing to *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal 2007). MTD at 24-25. In *LeapFrog*, however, "plaintiffs' allegations [did] not show that the risk factor disclosures . . . [were] affirmative[ly] false or misleading statements when made." *Id.* at 1049. Defendants here, by contrast, issued materially incomplete and misleading risk disclosures.

In the Company's March 21, 2008, Form 10-K, for example, Defendants acknowledged the *possibility* of product defects, but failed to disclose that that the Company was *currently facing* widespread reports of defects from its key customers. Specifically, NVIDIA stated that:

> ***We could suffer a loss of market share if our products contain significant defects. . . .*** **In the past,** we have discovered defects and incompatibilities with customers' hardware in some of our products. Similar issues in the future may result in delays or loss of revenue to correct any defects or incompatibilities . . . . ***If*** these defects or flaws exist and are not detected prior to volume production and distribution, we may be required to reimburse customers for costs to repair or replace the affected products in the field.

¶134 (emphasis added). This risk factor regarding what the Company "could" face "if" products contain defects was insufficient to inform investors of problems that *already* and *currently* existed. Indeed, "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981); *See also Apple Computer* 886 F.2d 1109, 1115 (9th Cir 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay."); *Belodoff v. Netlist*, No. SACV 07-00677, 2009 WL 1293690, at *11 (C.D. Cal. April 17, 2009) ("Thus, if [the company] already knew that its customers were significantly reducing their orders at the time of the IPO and had been for some time, Defendants representation of such an event as a contingency in the risk disclosure statement would be deceitful.").

In *Matrixx*, the Supreme Court rejected boilerplate disclosures warning of the potentially materially adverse effect that could result from product liability claims, because "[the company] did not disclose, however, that two plaintiffs had already sued Matrixx for allegedly causing them to lose their sense of smell." 2011 WL 977060, at *5. In this case, by the time Defendants' incomplete "risk" disclosures were made, more than NVIDIA's customers had complained about chip failures, ¶117, a physical defect in the hardware had been identified, ¶110, the cause of that failure had been reproduced, ¶42, and Defendants knew and/or deliberately disregarded that that they would have to replace customers' chips, ¶139. Accordingly, Defendants' risk disclosures are actionable.

### 4. The May 22, 2008, Disclosure Was Materially False and Misleading

Defendants argue that the May 22, 2008, Form 10-Q is inactionable because it was not materially false or misleading. The Form 10-Q stated, in part, that "During the first quarter fiscal year 2009, one of our customers asserted claims for incremental repair and replacement costs related to an alleged die/packaging material set defect in one of our notebook MCP products...." ¶132. However, the Complaint alleges that the Form 10-Q was incomplete, omitted material information, and obscured the truth regarding the widespread chip problem by instead discussing an isolated event regarding "one" customer and "MCP products" only. ¶¶132-133. For example, the Complaint alleges (and Defendants have admitted on the record) that *multiple* OEMs had approached the Company regarding chip problems, ¶¶132-133; by the date of the filing of the 10-Q, the Company had already issued product change notifications for redesigned GPUs (not just MCPs), ¶63; contrary to the May 22, 2008, statement, Defendants *already* knew the "nature and cause of the allege defect and the merits of the customer's claim" as well as "to what extent the alleged defect might occur with other of [NVIDIA's] products," *e.g.* ¶¶132-133.

## IV.  THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

To allege loss causation, Plaintiffs need only allege a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs need only offer "sufficient detail to give defendants ample **notice** of [their] loss

causation theory." *Berson*, 527 F.3d at 982 (noting that the Supreme Court's *Dura* decision assumed that Rule 8 applied) (emphasis added). "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (indicating that loss causation is a matter of proof for trial). The Ninth Circuit has stated that "the Second Circuit has held that loss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.' (Citations omitted.) We agree." *Id.* at 1057.

The Complaint meets the requirements for pleading loss causation by alleging that the price of NVIDIA's stock was inflated during the Class Period because NVIDIA failed to disclose customer report of defects in the Company's chips; that NVIDIA's key OEMs were holding NVIDIA accountable for these problems; the risks associated with the chip defects and potential for liability; or the chip defect itself. Plaintiffs further allege that, when the previously undisclosed information about the defects was revealed to the public on July 2, 2008, in a press release and SEC filing that specifically addressed the chip problem, "NVIDIA's stock plummeted" and investors were harmed as a result. ¶115.

Defendants argue Plaintiffs cannot plead loss causation because "NVIDIA's July 2, 2008 press release disclosed <u>both</u> the chip problem <u>and</u> that the Company's second quarter results would be lower than originally projected." MTD at 31 (underlining in original). This argument is flawed for several reasons.

First, the argument is based on a misapprehension of the law. In *Gilead*, the Ninth Circuit held that **"[t]he misrepresentation need not be the sole reason for the decline in value of the securities."** 536 F.3d at 1055-56 (citing *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) (emphasis added); *see also The Anschutz Corp. v. Merrill Lynch and Co., Inc.*, No. C 09-03780 SI, 2011 U.S. Dist. LEXIS 31691, at *38 (N.D. Ca. March 27, 2011) (**"Moreover, even if the collapse in the global credit crisis caused some part of TAC's losses, in the Ninth Circuit, a plaintiff is not required to show that defendant's conduct 'was the sole reason for the investment's decline in value' in order to show loss causation."**) (quoting *In re Daou Sys.*, 411 F.3d at 1025) (emphasis added); *In re Cell Therapeutics, Inc.*

*Class Action Litig.*, No. 2:10-cv-00414-MJP, 2011 U.S. Dist. LEXIS 11157, at \*16-17 (W.D. Wash. Feb. 4, 2011) (same); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1226 (N.D. Cal. 2009) (same).[26],[27]

Second, the argument disregards the overwhelming focus of the Company's *two* disclosures on July 2, 2008: NVIDIA's July 2, 2008, 8-K, which **addressed the chip issue exclusively** and informed investors that "[t]here can be no assurance that we will not find defects in other MCP or GPU products," as well as the July 2, 2008, press release which disclosed NVIDIA's poor results but devoted **the majority of the disclosure** to the impact of the problems with NVIDIA's chips. RNJ Ex.8.

Third, Defendants' argument ignores that the disclosure that the "second quarter results would be lower than originally projected," MTD at 31 (citing RJN at 178), ties directly into the undisclosed chip problems. The *sole* statement on July 2, 2008, regarding revenues reads:

Second quarter revenue and gross margin are expected to be lower than guidance

---

[26] The cases Defendants cite do not hold otherwise. In *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1045 (N.D. Cal. 2009), the court noted unremarkably that there are three elements to pleading loss causation under a fraud on the market theory. Plaintiffs have alleged each of these elements. ¶¶110-115. In *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008), the Ninth Circuit upheld the district court's determination that plaintiffs had failed to plead loss causation. In that case, however, the Ninth Circuit found plaintiffs had not "allege[d] facts to suggest that on August 2 the market became aware that Corinthian was manipulating student records company-wide, other than an undocumented assertion that Corinthian's August 2 stock drop was, by necessity, a result of this market 'realization.'" *Id.* at 1064. Here, Plaintiffs explicitly allege the false statements made by NVIDIA during the Class Period, the drop in NVIDIA's stock price when the revelation of NVIDIA's chip problems was made on July 2, 2008, and the causal link between the two. ¶¶22-23, 59, 89.

[27] If accepted, Defendants' argument would enable defendants to escape liability for securities fraud by coupling any corrective disclosures with unrelated statements revealing bad news. *See, e.g., In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 544 (N.D. Ill. 2007):

A company that has, for example, booked revenue from non-existent contracts could simply issue some damaging announcement that appears on its face unrelated to any fraudulent scheme, *e.g.*, a significant earnings warning citing order weakness, wait for its share price to plummet, and then disclose the wrongdoing once the damage has been done. The plaintiff would be unable to tie its loss, i.e., the share price decline, to the fraud, rather than to the apparently unrelated announcement.

Opp. to MTD Second Amended Comp.; No. 08-cv-4260 RS

42

provided during its first quarter financial conference call held May 8, 2008. Total revenue is now estimated to be from $875 million to $950 million. The estimated decrease in revenue and gross margin is due to several reasons: **end-market weakness around the world, the delayed ramp of a next generation MCP, and price adjustments of our GPU products to respond to competitive products.**

(emphasis added). The "delayed ramp of a next generation MCP" and "price adjustments of our GPU products" are clearly related to the Company's problematic chips, need to issue product changes and remodel new generation chips, and damaged customer relationships.[28]

In addition, Defendants point to the Court's prior order in arguing that "the 'far more plausible reason for the resulting drop in [NVIDIA's] stock price' was that 'the company failed to hit prior earnings estimates.'" MTD at 31 (citing Order at 21). As a preliminary matter, the "plausibility" of Plaintiffs' loss causation allegations are not to be weighed against any competing inferences (as is the case with scienter), but must simply *be* plausible and put Defendants on "notice" of their loss causation "theory." *E.g.*, *Maxim*, 639 F. Supp. 2d at 1045; *see also In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1049-50 (Holding in a 10(b) case, where defendants argued that the alleged stock drops were caused by other factors, that: "While it may be true that other factors contributed to the decline in the price of [the company's] stock, Plaintiffs' allegations give Defendants fair notice of the grounds upon which their § 10(b) claim rests. Accordingly, the Court denies Defendants' motion to dismiss on the ground that Plaintiffs have inadequately pleaded loss causation."). Moreover, the Complaint clarifies and expands upon the theory of loss causation; demonstrates a causal link between the undisclosed chip problems and the loss; and includes allegations that have evolved away from accounting-based violations alleged in the previous complaint and are re-focused on the misstatements regarding the chip problems themselves – the core subject of the July 2, 2008, disclosures.

---

[28] While Defendants also made the generic statement, as companies often do, blaming the economy in general and stating that there was "end-market weakness around the world," that does not detract from the market's understanding that NVIDIA had faced and would continue to face widespread, ongoing chip problems. Moreover, the JP Morgan analyst report filed on July 3, 2008, called out Defendants for this representation regarding the economy, stating, in part: "We believe the unit miss is largely NVDA-specific…. [O]ur checks indicate component demand from other chip companies . . . is stable."

In addition, Defendants attempt to distort the contents of a JP Morgan analyst report, claiming that "the report does not attribute its downgrade of NVIDIA stock or the price decline to the chip-related accounting charge." MTD at 31. To the contrary, the very headline of the report is "Stepping Aside Until Execution Improves" and the first sentences of the report read: "Last night after the close, Nvidia announced it would take a $150.0-$200.0 million charge for flaws in shipped products and significantly lowered its F2Q09 guidance (July quarter.). **Due to the overwhelming evidence of broken execution** we are downgrading NVDA stock from Overweight to Neutral."[29]

Finally, Defendants argue that NVIDIA's May 22, 2008, and post-Class Period statements establish an absence of loss causation. This argument fails. Plaintiffs allege the May 22, 2008, statement, rather than being corrective, was itself materially false and misleading. ¶¶138-39. It is therefore not surprising that the stock price did not move following the May 22, 2008, statement, but later plummeted when Defendants disclosed the true scope of the problem.

Similarly, Plaintiffs do not allege that NVIDIA's post-Class Period statements constituted additional corrective disclosures. *See, e.g.* headings ¶¶142-156 ("Ongoing Impact of the Fraud" and "Confirmation of the Problem"). Defendants cite no authority that would require Plaintiffs to speculate about the market's reactions outside the class period. Indeed, requiring such allegations would be inconsistent with the law in this circuit. *C.f. Metzler*, 540 F.3d at 1065 n.9 (rejecting defendant's argument that loss causation could not be established as a matter of law because the complaint "describe[d] post-Class Period events that indicate that the purported fraud continued

---

[29] Defendants also point to the analyst report's discussion of a "product yield problem," a "chipset delay," and the launch of a product with a "disappointingly large die size" as reasons for JP Morgan's downgrade. MTD at 31. However, neither the "product yield problem" nor the new product were the subject of the July 2, 2008, disclosure. Indeed, the analyst report acknowledges that the "product yield problem" is a separate issue that occurred in prior quarters. Thus, the market already knew of and understood these issues, and, while they may be cause for the post-Class Period analyst downgrade, they could not be the cause of the sudden stock drop that followed the July 2, 2008, disclosures. In addition, as discussed above, the "chipset delay" which *was* briefly addressed in the July 2, 2008, disclosure, ties directly into Plaintiffs' allegations regarding the manufacturing defects associated with NVIDIA's chipsets and the product changes necessary to market a defect-free product.

beyond the Class Period" because the statements did "not aver that [defendant] continued to conceal its alleged unlawful enrollment practices after the close of the Class Period").

## V. THE COMPLAINT ADEQUATELY PLEADS §20(a) LIABILITY

The Complaint adequately alleges both a primary violation of §10(b) and Rule 10b-5 and that Huang controlled the primary violator, NVIDIA. *In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *58-59 (N.D. Cal. Apr. 2, 2002) ("the fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage"). Plaintiffs allege that Huang held a very active executive position in the Company. *See, e.g.*, ¶¶158-160. Thus, because Plaintiffs have alleged that Defendant Huang "exercised actual power or control over the primary violator," NVIDIA, they have adequately alleged a *prima facie* case under §20(a) of the Exchange Act. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Dated: April 15, 2011

_____/s/ Kim E. Miller_____
Kim E. Miller (178380)
Melissa Ryan Clark (*Pro Hac Vice*)
Bruce Dona
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: 212-696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: melissa.clark@ksfcounsel.com

Lewis S. Kahn (*Pro Hac Vice*)
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

Barry A. Weprin (*Pro Hac Vice*)
Leigh Smith (*Pro Hac Vice*)
Jean Lee (*Pro Hac Vice*)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: bweprin@milberg.com

Email: lsmith@milberg.com
Email: jlee@milberg.com

Michiyo Michelle Furukawa (234121)
**MILBERG LLP**
One California Plaza
300 South Grand Ave., Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: mfurukawa@milberg.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

Jonathan K. Levine (220289)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: jkl@girardgibbs.com

*Liaison Counsel for Lead Plaintiffs and the Class*

David A.P. Brower (*pro hac vice*)
**BROWER PIVEN**
 A Professional Corporation
488 Madison Avenue
New York, NY 10022
Telephone: (212) 501-9000 9000
Facsimile: (212) 501-0300

*Additional Counsel for Lead Plaintiff Roberto Cohen*

Albert J. Kroll
**KROLL HEINEMAN, LLC**
Metro Corporate Campus
99 Wood Avenue South, Suite 307
Iselin, NJ 08830

*Additional Counsel for Lead Plaintiffs the Funds*

**CERTIFICATE OF SERVICE**

I hereby certify that this Opposition to Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 15, 2011.


_____/s/ Kim E. Miller_____
Kim E. Miller